**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CAMDEN COUNTY COUNCIL ON ECONOMIC OPPORTUNITY, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| UNITED STATES DEPARTMENT OF HEALTH & HUMAN SERVICES, | ) ) ) |
| and | ) ) |
| MICHAEL LEVITT, Secretary, United States Department of Health & Human Services, | ) ) ) ) |
| Defendants. | ) ) ) |

Civil Action No.: 07-1835 (RCL)

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants, the United States Department of Health and Human Services ("HHS") and

Michael Levitt, through counsel, hereby move the Court for an order, pursuant to Federal Rule of

Civil Procedure 56, granting defendants summary judgment on the grounds that no genuine issue

of material fact exists and defendants are entitled to judgment as a matter of law.  In support of

this motion, defendants respectfully submit the attached statement of material facts as to which

there is no genuine dispute, a memorandum of points and authorities with exhibits, and a

proposed order.[1]

---

[1] Defendant has previously lodged the administrative record in this case.  Pursuant to this Court's Local Civil Rule 7(n), the parties will file an appendix containing the exhibits cited to the Court within ten days "following the final memorandum on the subject motion."  LCvR 7(n)(2).

Respectfully submitted,


  /s/ Jeffrey A. Taylor
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


  /s/ Rudolph Contreras
RUDOLPH CONTRERAS, D.C. BAR #  434122
Assistant United States Attorney


  /s/ Michelle N. Johnson
MICHELLE N. JOHNSON, D.C. BAR # 491910
Assistant United States Attorney
United States Attorney's Office
Civil Division
555 4th Street, N.W. – Room E4212
Washington, D.C. 20530
(202) 514-7139

COUNSEL FOR DEFENDANTS



Of Counsel:

Joyce E. McCourt
Assistant Regional Counsel
Office of the General Counsel
United States Department of Health
and Human Services

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| **CAMDEN COUNTY COUNCIL**<br>**ON ECONOMIC OPPORTUNITY,** | ) <br> ) <br> ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **UNITED STATES DEPARTMENT OF**<br>**HEALTH & HUMAN SERVICES,** | ) <br> ) |
| | ) |
| **and** | ) |
| | ) |
| **MICHAEL LEVITT, Secretary, United States**<br>**Department of Health & Human Services,** | ) <br> ) |
| | ) |
| | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

**Civil Action No.: 07-1835 (RCL)**

_____

## <u>DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF</u> <u>THEIR MOTION FOR SUMMARY JUDGMENT</u>

Defendants, the United States Department of Health and Human Services ("HHS") and

Michael Levitt, submit this memorandum of law in support of their motion for summary

judgment. The undisputed facts in this matter establish that the defendants' decision to terminate

funding for the plaintiff's, Camden County Council on Economic Opportunity ("CCC"), Head

Start grant was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with law. Accordingly, defendants are entitled to judgment as a matter of law.

## <u>FACTUAL BACKGROUND</u>

The Head Start and Early Head Start program, 42 U.S.C. §§ 9831-9852 (the "Head Start

Act" or "the Act"), is a federally funded program designed to deliver "comprehensive health,

educational, nutritional, social, and other services to economically disadvantaged children and their families." 42 U.S.C. § 9831(a).   HHS is statutorily charged with implementation of the Head Start Act.  HHS provides financial assistance or annual grants to designated local agencies "for the planning, conduct, administration, and evaluation of a Head Start program focused primarily upon children of low-income families who have not reached the age of compulsory school attendance." 42 U.S.C. § 9833.  Within HHS, the Administration for Children and Families ("ACF") has been delegated oversight authority for the Head Start/Early Head Start Program.  45 C.F.R. § 1304.60(b).

CCC is non-profit corporation established under the laws of the State of New Jersey, and had been a Head Start grantee for the greater Camden, New Jersey area.  Amended Complaint ("Compl.") ¶ 2.  This case concerns CCC's failure to provide services to the community in accordance with the Head Start standards, which resulted in the termination of funding of CCC's Head Start program.

## I.    Review of Head Start Programs.

To ensure that eligible children and their families receive high quality services responsive to their needs, Head Start grantees must comply with the Head Start Program Performance Standards, which are codified at 45 C.F.R. § 1304.  These performance standards encompass the entire range of Head Start services and constitute the minimum requirements that a Head Start grantee must meet in three specific areas: Early Childhood Development and Health Services; Family and Community Development; and Program Design and Management.  45 C.F.R. Part 1304.  The Secretary of HHS, through ACF, is required to conduct a periodic review of each Head Start grantee at least once every three years.  42 U.S.C. § 9863a(c)(1)(A).

If as a result of review the Secretary finds a grantee to have a deficiency,[1] the grantee may be required to correct the deficiency immediately, or within ninety days, or pursuant to a Quality Improvement Plan ("QIP"). 42 U.S.C. § 9836a(d)(1)(B)(ii). Termination of funding is warranted if a grantee fails to "timely correct one or more deficiencies as defined in 45 C.F.R. Part 1304[.]" 45 C.F.R. § 1303.14(b)(4).

## II. Review of CCC's Head Start Program Reveals that CCC was a Grantee with Deficiencies.[2]

ACF conducted an on-site monitoring review of CCC's Head Start program from September 11, 2005 to September 16, 2005 using the Program Review Instrument for Systems Monitoring ("PRISM "). Id. ¶ 9; A.R. at 226.[3] In a letter dated January 27, 2006, ACF notified CCC that it was a grantee with deficiencies as defined under 45 C.F.R. 1304.3(a)(6)(i)(A) and 45 C.F.R. 1304.3(a)(6)(i)(C). A.R. at 226. Specifically, CCC was found to have failed to substantially perform the requirements related to Childhood Development and Health Services and Program Design and Management. Id. The January 27, 2006 letter explicitly informed CCC that if its "program continue[d] to have uncorrected deficiencies beyond the timeframes suggested for correction . . . pursuant to Sec. 641A(d)(1)(C) of the Head Start Act, 42 U.S.C.

---

[1]A deficiency is defined as including "[a]n area or areas of performance in which [a] . . . Head Start grantee agency is not in compliance with State or Federal requirements, including but not limited to, the Head Start Act or one or more of the regulations under parts 1301, 1304, 1305, 1306, or 1308 . . . which involves . . . [a] failure to perform substantially the requirements related to Early Childhood Development and Health Services, Family and Community Partnerships, or Program Design and Management." 45 C.F.R. § 1304.3(a)(6)(C).

[2]CCC was determined to have twelve deficiencies. A.R. at 192. Only those that were subsequently addressed by CCC's appeal are discussed fully herein.

[3]References to "A.R." are to the administrative record that has been filed in this case. Page numbers refer to the stamped numbers appearing at the bottom right of the documents.

9836a(d)(1)(C) . . . ." proceedings would be initiated to terminate CCC's Head Start grant.  A.R. at 231.

      **A.**    **CCC's Deficiencies in the Area of Childhood Development and Health Services.**

         **1.**    **Violation for Which CCC was Afforded 30 days to Correct.**

CCC failed to comply with 45 C.F.R. § 1304.53, entitled "Facilities, materials and equipment."  45 C.F.R. § 1304.53(a)(10) required CCC to "conduct a safety inspection, at least annually, to ensure that each facility's space, light, ventilation, heat, and other physical arrangements are consistent with the health, safety, and developmental needs of children." (Emphasis added).  At a minimum, agencies are required to ensure that "[i]ndoor and outdoor premises are cleaned daily and kept free of undesirable and hazardous materials and conditions." 45 C.F.R. § 1304.53(a)(10)(viii).

ACF determined that CCC failed to comply with 45 C.F.R. § 1304.53(a)(10)(viii) because "[t]wo (2) sites visited had outdoor areas that were not secured or cleaned to prevent the children from being injured."  A.R. at 236.  At one of the two sites, the Charleston site, the "playground area had vines protruding onto the play area, where the children received their daily physical development.  These vines had pokeberries growing on them.  If a child were to digest these pokeberries, this could cause a risk to the child's health."  Id.  In addition, the Charleston site playground's "wooden play structure had splinters, rusty nails, and leaves inside the structure."  Id.

At the second identified site, the Haynes site, ACF found that the "front area was cluttered with trash and leaves."  Id.  Furthermore, "there was no indication of daily cleaning to

4

this site." Id.  CCC was given 30 days to remedy the deficiencies related to 45 C.F.R. §

1304.53(a)(10)(viii).  A.R. at 227.

> ### 2.    Violations for Which CCC Was Afforded 90 days to Correct.

_____Also in the area of Child Health and Developmental Services, ACF determined that

CCC was not in compliance with 45 C.F.R. § 1304.20(a)(1) "Determining child health status"

that requires a grantee to

> [i]n collaboration with the parents and as quickly as possible, but
> no later than 90 calendar days . . . from the child's entry into the
> program . . . (ii) Obtain from a health care professional a determination
> as to whether the child is up-to-date on a schedule of age appropriate
> preventative and primary health care which includes medical, dental
> and mental health. . . . (A) For children who are not up-to-date on an
> age-appropriate schedule of well child care, grantee and delegate agencies
> must assist parents in making the necessary arrangements to bring the child
> up-to-date[.]

A.R. at 233; 45 C.F.R. § 1304.20(a)(1).  ACF determined that CCC failed to "ensure that all

children were up-to-date on their medical and dental care within the 90 day requirements."  A.R.

at 233.  Notably, ACF's review "of 56 returning children's files . . ." revealed these files lacked

the following information: "five (5) did not contain signed medical exams; seven (7) did not

contain dental screenings; and eight (8) had no lead screenings."  Id.  CCC was afforded 90 days

to correct deficiencies related to 45 C.F.R. §1304.20(a)(1)(ii)(A).  A.R. at 43.

Furthermore, ACF determined that CCC failed to comply with 45 C.F.R. § 1304.20(b),

entitled "Screening for developmental, sensory, and behavioral concerns," which requires CCC

"[i]n collaboration with each child's parent, and within 45 days of the child's entry into the

program . . . [to] perform or obtain linguistically and age appropriate screening procedures to

identify concerns regarding a child's developmental, sensory (visual and auditory), behavioral,

motor, language, social, cognitive, perceptual, and emotional skills." A.R. at 233; 45 C.F.R. §

1304.20(b)(1). CCC failed to comply with 45 C.F.R. § 1304.20(b)(1) because it "did not ensure

that all children enrolled in the program were up-to-date on a schedule of age appropriate

preventive and primary health care." A.R. at 233. Specifically, "[a] review of 56 returned

children's files did not contain the following screenings: seven (7) files had no vision screenings;

eleven (11) had no hearing screenings; and 22 did not contain any developmental screenings."

A.R. at 233. "[A]n interview with the Health Manager . . . confirmed that these screenings were

missing from the files and could not be located by the program." Id. CCC was afforded 90 days

to comply with the requirements of 45 C.F.R. § 1304.20(b)(1). A.R. at 228.

_____ **B.      CCC's Deficiencies in the Area of Program Design and Management.**

ACF found that CCC failed to comply with 45 C.F.R. § 1304.51, entitled

"Management Systems and Procedures." A.R. at 246. Specifically, 45 C.F.R. § 1304.51(g),

"Record-keeping systems" required that CCC "establish and maintain efficient and effective

record-keeping systems to provide accurate and timely information regarding children, families,

and staff and must ensure appropriate confidentiality of this information." ACF found that CCC

had failed to comply with 45 C.F.R. § 1304.51(g) because it "did not establish and maintain

efficient and effective record-keeping systems to provide accurate and timely information

regarding children, families and staff. The record-keeping systems reviewed and found to be

non-compliant included those for human resources, family partnerships, supervision and

management, enrollment, and disabilities services." A.R. at 246. Specifically, ACF's review of

CCC's files reviewed that "[f]ifteen (15) of (17) files did not contain the required Criminal

History and 17 of 17 files did not contain required Child Abuse Clearances. Eleven (11) of 17

6

files did not contain results of TB screenings.  Ten (10) of 17 files did not contain the record of

initial medical exam.  Two (2) of 17 files did not contain references.  Eight (8) of 17 files did not

contain the 2004 employee job performance evaluations.  Five (5) of 7 files had no records of

training for year 2004."  A.R. at 246.

CCC's files included additional deficiencies.  Notably, fifty-six (56) of fifty-six children

files "had one or more required data entries missing."  A.R. at 246.  "Examples of missing

documentation included: missing enrollment dates in 56 children's files; 33 files had no nutrition

assessment; seven (7) files were missing signed medical exams; seven (7) had no vision

screenings; eleven (11) contained no hearing screenings."  Id. at 246-47.  Furthermore, the files

were missing Individual Education Plans (IEPs), contained no documentation of progress, no

signatures on IEPs, and no documentation of parent involvement in the referral process in files of

children with disabilities.  A.R. at 246-47.  CCC was afforded a 90-day time frame in which to

attain compliance with 45 C.F.R. § 1304.51(g).  A.R. at 228.

A certified mail receipt shows that CCC received the January 27, 2006 deficiency

notice, receipt of which starts the time running on the 30 and 90-day correction periods, on

February 13, 2006.  A.R. at 101.

### III.    Follow-Up Reviews Reveal that CCC Remained a Grantee with Deficiencies.

A follow-up review report was mailed to plaintiff on April 9, 2007.  A.R. at 191.  The

review reported that from March 20, 2006 to March 23, 2006 and May 15, 2006 to May 19, 2006

ACF conducted on-site monitoring follow-up reviews of CCC's Head Start program "to

determine whether the previously identified area(s) of noncompliance and/or area(s) of

deficiency had been corrected."  A.R. at 100, 191.

A.    **The March 2006 Follow-Up Review.**

The March 2006 follow-up review specifically focused on the deficiencies that required correction within 30 days, while the May 2006 follow-up review focused on the remaining deficiencies.  A.R. at 187.

The March 20, 2006 follow-up review found that CCC continued to be in non-compliance with 45 C.F.R. § 1304.53(a)(10)(viii).  A.R. at 201.  CCC failed to "ensure that the outdoor premises of a site were cleaned daily and kept free of undesirable and hazardous materials and conditions."  A.R. at 187.  Specifically, CCC did not properly "maintain the outdoor premises at the Lois I Center."  A.R. at 201.  On-site review on March 22, 2006 "revealed leaves and trash inside the playground fence and alongside the walkway used by the children to access the playground."  Id.  An on-site review of the Lois I Center further revealed that there were two grills in the playground area, one with an attached gas tank, "metal poles used for erecting a tent, drink cans, beer caps, a tank with a wooden beam attached, and a tree from next door that had fallen on the fence."  A.R. at 201-202.  Furthermore, along the fence at the end of the walkway was "a pile of old wood planks with rusty nails sticking out of it[,]" and children had to "walk past this pile of wood in order to access the playground."  A.R. at 202.

The review team re-visited the Lois I Center on March 23, 2006, and found that some improvements had been made.  A.R. at 202.  "However, the following clean-up still needed to be made: fill holes where tent poles had been extracted from the ground, removal of cement pieces in upper left hand corner of the playground, removal of tree branch leaning on fence in lower left corner, and removal of other debris which included trash and leaves on the playground and the walkway used to access the playground."  Id.  The follow-up reveal revealed that the

concerns regarding the Charleston Center and the Hayes Center had been resolved.  A.R. at 202.[4]

**B.    The May 2006 Follow-Up Review.**

The May follow-up review began on Monday, May 15, 2006, which was the 91st

day after CCC's receipt of the follow-up report.  A.R. at 100.  This review revealed that CCC

remained a grantee with deficiencies.

First, ACF determined that CCC failed to correct its deficiency related to 45 C.F.R. §

1304.20(a)(1)(ii)(A).  Specifically by May 14, 2006, CCC had still failed to "ensure that all

children were up-to-date on their medical and dental care within the 90-day requirement."  A.R.

at 187, 195.  ACF's "review of fifty-one (51) files revealed that although all fifty-one(51)

contained a signed medical exam, there was still required information missing: seven (7) had no

lead screening [14%] and two (2) did not contain a dental screening [4%].  This lack of

information was verified by a review of the grantee's health tracking records."  A.R. at 195.

The May 14, 2006 follow-up review also revealed that CCC had failed to remedy

the deficiency concerning 45 C.F.R. § 1304.20(b)(1).  A.R. at 187, 196.  Specifically, CCC had

failed to "[i]n collaboration with each child's parent, and within 45 calendar days of the child's

entry into the program, . . . ensure that all children enrolled in the program were screened for

developmental, sensory, and behavioral concerns."  A.R. at 196.  Notably, ACF's "review of

fifty-one (51) children's files showed missing screenings: twelve (12) had no vision screening

---

[4] ACF identified several new areas of deficiencies under 45 C.F.R. §1304.3(a)(6)(iii) Other Violation.  A.R. at 219.  CCC was required to "develop a Quality Improvement Plan (QIP) to correct the newly identified deficiencies . . . and submit this QIP to the Regional Office."  A.R. at 223.  ACF reviewed these areas of noncompliance in the May review and determined that CCC had failed to correct six of them.  A.R. at 191.  ACF required CCC to submit a QIP within 30 days as to these newly identified deficiencies, detailing CCC's six-month plan for corrective action.  Id.

[24%]; ten (10) had no hearing screening [20%]; and three (3) had no developmental screening [6%]. A review of the grantee's health tracking records also showed these screenings to be missing." A.R. at 196.

The May 14, 2006 follow-up review revealed that CCC had also failed to remedy the deficiencies related to 45 C.F.R. § 1304.51(g). A.R. at 198. CCC had "not fully established and maintained efficient and effective record-keeping systems to provide accurate and timely information regarding children, families, and staff." A.R. at 188, 198. "A review of 16 personnel files revealed that 10 of 16 files did not contain the required Policy Council approval; 11 of 16 files did not contain the fingerprint/background check; 12 of 16 files did not contain CPR/First Aid Training Certificates; 6 of the 16 files did not contain either a job description or one relevant to the present job." A.R. at 198. Further, review of "51 children's files found that 12 files did not have vision screenings, 10 files did not have hearing screenings, two files did not have dental examinations, seven files had no lead screenings, seven files did not have nutritional assessments, and thee files did not have child developmental screenings." A.R. at 198.

IV.    **ACF Decides to Terminate CCC's Head Start Grant Funding.**

In a letter dated April 9, 2007, CCC was notified of the decision to terminate its Head Start federal financial assistance pursuant to 42 U.S.C. § 9836a(d)(1)(C) and 45 C.F.R. § 1303.14(b)(4). A.R. at 186. The basis for terminating CCC's funding was its failure "to timely correct the findings determined to constitute deficiencies from the PRISM Monitoring Review conducted in September 2005." Id. CCC was informed that "[b]ased on the totality of information obtained by ACF through program review and follow-up visits, information provided by Camden County, and the authority of 42 U.S.C. § 9836a(d)(1)(C), 45 C.F.R. §§

10

74.61, and 1303.14(b)(4), ACF . . . has concluded that termination of Federal financial assistance is presently warranted." A.R. at 188.

In accordance with 45 C.F.R. § 1303.14(f)(1) CCC was notified that if it timely appealed the termination decision, funding would "continue until an adverse decision [was] rendered or until expiration of the current budget period." A.R. at 186. If no decision had been rendered by the end of this period, "ACF [would] award a grant to Camden County until a decision is made . . . ." Id.

## V.    The Departmental Appeals Board Affirms ACF's Termination of CCC's Head Start Grant Funding.

On May 11, 2007, CCC filed its notice of Appeal and Motion to dismiss with the Departmental Appeals Board ("DAB" or "the Board"). A.R. at 45. In response to CCC's appeal, ACF requested that the Board enter summary judgment in ACF's favor on the ground that CCC had failed to present reliable or sufficient evidence that there was any material issue of fact with respect to ACF's deficiency findings. A.R. at 1.

In a decision dated September 25, 2007, the Board denied CCC's motion to dismiss and granted ACF's motion for the entry of summary judgment, affirming ACF's decision to terminate funds for CCC's Head Start grant. A.R. at 1.

### A.    The Board's Rejection of CCC's Arguments in Support of Dismissal.

CCC presented three arguments to the Board in support of its position that ACF's decision to terminate funding for CCC's Head Start grant should be reversed. A.R. at 6.

CCC first argued that the May review was procedurally infirm because it did not occur within the required 90-days. A.R. at 6. CCC contended that it received the January 27,

2006 notice on February 14 and that the May review took place during the week of May 14, 2006, only 89 days after the notice of initial determination.  Id.  In rejecting CCC's argument, the DAB concluded that CCC failed to submit any evidence to refute ACF's submission of a U.S. Postal certified mail receipt addressed to CCC with a signature indicating receipt by CCC on February 13.  Id.  In addition, the Board credited ACF's assertion that although the members of the review team met on Sunday May 14, the team did not arrive at CCC's premises to begin the review until Monday, May 15.  Id. at 6-7.  For these reasons, the Board concluded that the May review did not begin until the expiration of the 90-day corrective action period.  Id. at 7.

CCC next argued that ACF did not have authority to require CCC to correct deficiencies within 90 days of a receipt of a notice of deficiencies absent a QIP.  Id.  The Board noted that the Head Start Act gives the Secretary authority, which he has delegated to ACF, to require a grantee to correct deficiencies immediately, within 90 days, or pursuant to a QIP.  Id.  CCC argued that ACF has restricted its own authority under the Act by promulgating 45 C.F.R. § 1304.60(b), which provides that if the responsible HHS official determines that a grantee has one or more deficiencies "he or she will notify the grantee promptly, in writing, of the finding . . . and inform the grantee that it must correct the deficiency either immediately or pursuant to a Quality Improvement Plan."  45 C.F.R. § 1304.60(b); A.R. at 8.

In rejecting this argument, the Board found that when ACF published section 1304.60 in 1996, "it described the notice to be given to grantees in accordance with the time frames for corrective action then described by 42 U.S.C. § 9836a(d)(1)(B).  There was no indication that the regulation was intended to limit the options made available by the statute."  A.R. at 8.  The Board concluded that when Congress amended section 9836(d)(1)(B) in October 1998, months after

12

section 1304.60(b)'s effective date of January 1, 1998, and provided for correction in 90 days in addition to the options of requiring correction immediately or pursuant to a QIP, Congress intended the October 1998 amendment "to supplement the enforcement options described in 45 C.F.R. § 1304.60(b)." Id. The Board also rejected that CCC's argument that ACF's reliance on 42 U.S.C. § 9836a(d)(1)(B)(ii) without amending 45 C.F.R. § 1304.60(b) through notice and comment rulemaking violates section 553 of the Administrative Procedure Act ("APA"). A.R. at 9. The Board found that here, where Congress, which is not subject to the APA, had expanded ACF's authority to require grantees to correct deficiencies, ACF may act pursuant to this statutory grant of authority without violating section 553 of the APA. Id. at 10. The Board further rejected CCC's argument that ACF was in violation of section 552(a)(1) of the APA because its "'policy statements and guidance' contained in the 2005 PRISM review instrument 'reveal no intention to implement the 'ninety-day authority' . . . and make 'no reference of any ninety day correction period[.]'" A.R. at 11. The Board found that ACF did not violate section 552(a)(1) of the APA because CCC had constructive notice from the statute that ACF had authority to require correction within 90 days and, in this case, also received actual and timely notice by the January 26, 2006 notice that ACF would utilize its statutory authority to require CCC to correct deficiencies within 90 days without a QIP. A.R. at 12. The Board concluded that even if notice had not been furnished timely, CCC had not shown that it believed ACF could not lawfully require CCC to correct the alleged deficiencies within 90 days without a QIP. Id. Rather, "[b]y remaining silent, participating in the resulting follow-up review, and only now complaining that the process was invalid, CCC [was] seeking two chances for correction when the statute and regulations provide for only one." Id.

Finally, as its last argument, CCC challenged the validity of the January notice on the ground that section 9836a(d)(1)(B)(ii) authorizes ACF to require a grantee to correct deficiencies within 90 days "if the Secretary finds, in the discretion of the Secretary, that such a 90-day period is reasonable, in light of the nature and magnitude of the deficiency[,]" and ACF admittedly made no such determination.  Id.   In rejecting this argument, the Board found there was nothing in the record to support a finding that ACF had admittedly not made a determination as to the reasonableness of the 90-day correction period.  A.R. at 13. The Board also rejected CCC's argument that ACF was required, as part of its prima facie case for termination, to prove or explain its basis for requiring a grantee to correct under one or another of the three time frames made available by section 9836a(d)(1).  A.R. at 13-14.  The Board found that, based on ACF's reference in the January notice to the relevant statutory provision and to the review findings, that there was a presumption "that ACF did make a finding that the 90-day period was reasonable in light of the nature and magnitude of the deficiencies found."  A.R. at 14.

Next the Board rejected CCC's argument that ACF could not rely upon conditions at the Lois I center as the basis for termination of funding because CCC was not provided with sufficient notice that ACF would consider conditions at other playgrounds.  A.R. at 15.  The Board found that the cited regulation clearly sets forth the expectation that **all** outdoor premises will be cleaned daily and free of undesirable and hazardous materials.  Id. at 15-16.  The Board also found that the conditions found to be deficient at the Lois I center (such as trash and unsafe objects) were the same or similar in both reviews, despite the fact that they were found at different locations, and thus "CCC had notice of the type of conditions that the surveyors regarded as violating the performance standard."  Id. at 16.  The Board found there was evidence

14

in the record supporting a finding that CCC understood that it had to ensure all of its premises were safely maintained since CCC Board materials revealed that actions had been taken to not only correct the Hayes and Charleston locations but also to train CCC's staff on safety issues and institution of a newly modified system for reporting repairs.  Id.  Furthermore, the Board concluded that CCC could not show that its belief that it did not have to correct conditions at the Lois I center was reasonable.  Id.  The Board noted that because Head Start reviews "necessarily involve[ ] inspection of a portion, or a sample, of a grantee's program[,] [p]roblems that are identified in that sample are assumed to be representative of problems that may exist elsewhere in the program and that must be addressed in order to fully correct the deficiency citation."  Id. The Board went on to note that the review process "is not intended to be an opportunity to play cat and mouse with ACF by correcting one premise while allowing other premises to be or become noncompliant or by correcting one set of hazards while allowing similar hazards to exist."  Id. (citation omitted).

     **B.**     **The Board's Grant of ACF's Motion for Summary Judgment.**

In granting ACF's motion for summary judgment, the Board concluded that "CCC . . . failed to raise a dispute of material fact as to whether it has fully corrected the deficiencies cited under 45 C.F.R. §§ 1304.20(a)(1)(ii)(A), 1304.20(b)(1), and 1304.51(g)."  Id. at 18.

As it pertains to 45 C.F.R. § 1304.20(a)(1)(ii)(A) (lead screening and dental determinations), the Board found that CCC failed to create a material issue of fact as to whether it failed to "perform these tasks for some of the children addressed in the May review by the time of the review[,]" despite the fact that these children had been enrolled in the program for 90 days or more. Id. at 21-22.  Specifically concerning lead screening, the Board rejected CCC's

15

argument that documentation of a "current lead screening and blood test" for each child was not actually required.  Id. at 22.  The Board also found that CCC did not dispute the fact that a number of children's files were missing the required documentation and rejected CCC's implicit argument that because there were a relatively small number of children whose files were missing, termination of funding was not warranted.  Id. at 25.  Notably, a review of one child's file revealed that the Child Health Assessment, although dated five months after the corrective action period, indicated that a lead test was still pending at that time.  Id. at 27.  Nor was there any documentation that CCC was taking steps to assist parents to obtain the required test.  Id. Concerning dental records, the Board found that CCC failed to create a material disputed issue of fact concerning two files that were missing dental screenings.  Id. at 29.  In sum, the Board concluded, regarding section 1304.20(a)(1)(ii)(A), that "as to six of the seven children cited for lead determinations and the two children cited for dental determinations, the evidence on which CCC relies does not show a material dispute of fact about ACF's basis for finding that CCC failed to obtain the required determinations of whether these children were up-to-date or, if a child was determined not to be up-to-date, assisted the parents in making the necessary arrangements to bring the child up-to-date."  Id. at 30.

Regarding CCC's violation of 45 C.F.R. § 1304.20(b)(1), which required that vision, hearing, and developmental screenings be conducted within 45 days of a child's entry into CCC's program, the Board found that CCC provided no evidence regarding four children and thus there was no material fact raised "as to those four files and that screenings for these children are not adequately documented."  Id. at 32.  Based on a review of the files cited by CCC, the Board found that "as to nine of the 12 children cited as lacking vision screening . . . and eight of

16

the ten children cited for lacking hearing screening . . . the evidence on which CCC relies does not show a material dispute of fact about ACF's basis for finding that CCC failed to 'perform or obtain . . . screening procedures to identify concerns regarding a child's sensory (visual and auditory) . . . skills' prior to the end of the correction action period." Id. at 35.  The Board did find that there was a material dispute of fact regarding ACF's conclusion that CCC failed to perform or obtain developmental screenings for two children.  Id. at 36.

As it regards 45 C.F.R. § 1304.51(g), which required CCC to "establish and maintain efficient and effective record-keeping systems to provide accurate and timely information regarding children, families, and staff and . . . ensure appropriate confidentiality of this information[,]" the Board found that CCC's failure to maintain accurate records related to lead and dental determinations, as well as vision, hearing and developmental screenings, and nutritional assessments, established that "CCC did not have effective record keeping systems with accurate and timely information as required by section 1304.51(g)." Id. at 38.  Concerning nutritional assessments, the Board, viewing the evidence in a light most favorable to CCC, found a material dispute of fact about ACF's basis for concluding that the records of nutritional assessment did not comply with section 1304.51(g) as it pertained to two children's files.  Id. at 39.

However, the Board found that there was no "material dispute of fact about ACF's basis for finding that CCC's records of nutritional assessments did not comply with section 1304.51(g) as to the three of the seven children's records cited . . . ." Id. at 40.  Regarding the required background checks that were to be maintained, there was no record of checks for three of the cited employees prior to the expiration of the corrective action period.  Id. at 42.  The

17

Board found that "such checks are plainly vital to assuring the safety and security of children. These failures of documentation are in themselves sufficient to show that CCC did not have a record keeping system effective to ensure accurate and timely records were maintained for its staff." Id.

In sum, the Board found that CCC failed to show that it was in compliance with section 1304.51(g) based "on the lack of records related to lead screening determinations, dental determinations, hearing screenings, vision screenings, nutritional assessments, and criminal and child abuse background checks. Nothing that CCC argued or proffered provided any basis to undercut this finding." Id. at 43. For all of these reasons, the Board granted ACF's motion for summary judgment and affirmed "ACF's decision to terminate funds for CCC's Head Start grant[.]" Id. at 44.

## APPLICABLE LEGAL STANDARDS

_____In this case, the Court's inquiry must be guided by the standards applicable to summary judgment as well as those pertinent to review of administrative decisions pursuant to the Administrative Procedure Act ("APA").

## I.    SUMMARY JUDGMENT

Summary judgment pursuant to Fed. R. Civ. P. 56(c) is appropriate when the record shows that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). In determining whether a genuine issue of material fact exists, the trier of fact must view all the facts, and the reasonable inferences to be drawn from them, in a

18

light most favorable to the non-moving party.  Anderson, 477 U.S. at 255.  If the evidence

favoring the non-moving party is "merely colorable, or is not significantly probative, summary

judgment may be granted."  Id. at 249-50.  In order to withstand summary judgment, the non-

moving party is not at liberty to rest upon mere allegations or denials but must come forth with

evidence establishing a material issue of fact for trial.  Id. at 248.  The mere existence of some

factual dispute is insufficient to withstand summary judgment; there must be a genuine issue of

material fact.  Id. at 247-48.  If the submitted evidence is of such a character that it would not

permit a reasonable fact-finder to find in favor of the non-moving party, summary judgment is

appropriate.  Id. at 251.

## II.    REVIEW UNDER THE ADMINISTRATIVE PROCEDURE ACT ("APA")

Under the APA, 5 U.S.C. § 706(2)(A), the standard of review for resolving a challenge to

final agency action is that agency action should be set aside if it is found to be "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. §

706(2)(A); see also American Public Comm. Council v. FCC, 215 F.3d 51, 55 (D.C. Cir. 2000).

The scope of the Court's review "under the 'arbitrary and capricious' standard is narrow" and

lower courts may not "substitute [their] judgment for that of an agency."  Motor Vehicle

Manufacturers Ass'n v. State Farm Mutual Ins. Co., 463 U.S. 29, 43 (1983).  While the Court

must engage in a "thorough, probing, in-depth review" in determining "whether the decision was

based on consideration of the relevant factors and whether there has been a clear error of

judgment[,]" agency action enjoys a "presumption of regularity" and the district court's review of

an agency decision is highly deferential.  Citizens to Preserve Overton Park v. Volpe, 401 U.S.

402, 415, 416 (1971).

19

CCC bears the burden of establishing that DAB's decision was arbitrary and capricious. Id. at 415. Plaintiff cannot meet that burden in this instance, particularly because a single uncorrected deficiency is sufficient to warrant termination of its federal Head Start funding. See 45 C.F.R. § 1303.14(b)(4) (authorizing termination of funding for failure to correct "one or more deficiencies."). In this case, termination of funding was premised on CCC's failure to correct not one, but four, deficiencies. The Court should therefore affirm the DAB's grant of summary judgment to ACF.

## ARGUMENT

The undisputed evidence in this case amply support's ACF's decision to terminate CCC's Head Start grant, a decision affirmed by the DAB.

**I.  DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT BECAUSE DAB'S DECISION AFFIRMING THE TERMINATION OF FUNDING FOR CCC'S HEAD START GRANT WAS REASONABLE AND BASED ON THE PROPER STATUTORY CONSIDERATIONS.**

In this case, the DAB found that ACF's decision to terminate CCC's Head Start grant funding was supported by unrebutted evidence. Any one of the reasons identified by the Board supports the Court's affirmance of the Board's conclusion. See 45 C.F.R. § 1303.14(b)(4) (authorizing termination of funding for failure to correct "one or more deficiencies."). Therefore, summary judgment is warranted in defendants' favor.

**A.  The Evidence Supports the Board's Finding that CCC Remained Deficient by Failing to Comply with 45 C.F.R. § 1304.20(a)(1)(ii)(A).**

45 C.F.R. section 1304.20(a)(1)(ii)(A) required CCC to:

> [i]n collaboration with the parents and as quickly as possible, but no later than 90 calendar days . . . from the child's entry into the program . . . (ii) Obtain from a health care professional a determination as to whether

20

> the child is up-to-date on a schedule of age appropriate preventive and
> primary health care which includes medical, dental and mental health. . . .
> (A) For children who are not up-to-date on an age-appropriate schedule of
> well child care, grantee and delegate agencies must assist parents in making
> the necessary arrangements to bring the child up-to-date.

The Board found that CCC failed to create a material issue of fact as to whether it failed
to "perform these tasks for some of the children addressed in the May review by the time of the
review[,]" despite the fact that these children had been enrolled in the program for 90 days or
more. A.R. at 21-22. Notably, the Board found that CCC did not dispute the fact that a number
of children's files were missing the required documentation. Id. at 25. Review of one child's file
in particular revealed that the Child Health Assessment, although dated five months after the
corrective action period, indicated that a lead test was still pending at that time. Id. at 27. Nor
was there any indication that CCC was taking active steps to assist the parents to obtain the
required test for the child. Id. There were also missing dental screening records for two children.
Id. CCC cannot refute these determinations. For this reason, the Board correctly found that CCC
had failed to correct the identified deficiencies pertaining to 45 C.F.R. § 1304.20(a)(1)(ii)(A) and
affirmed ACF's decision to terminate CCC's Head Start funding. See Philadelphia Housing
Auth. v. Leavitt, No. Civ. A. 05-2390, 2006 WL 299039, at *2 (E.D. Pa. Oct. 17, 2006) (granting
summary judgment in favor of and upholding DAB's decision affirming ACF's termination of
Head Start funding where there was not any material dispute that the plaintiff failed to meet the
Head Start enrollment requirements).

**B.    The Evidence Supports the Board's Finding that CCC Remained Deficient
        by Failing to Comply with 45 C.F.R. § 1304.20(b)(1).**

The Board also found that ACF's decision to terminate CCC's Head Start funding was

supported by the fact that CCC could not show it was in compliance with 45 C.F.R. section

1304.20(b)(1). Pursuant to that section, CCC, in collaboration with each child's parent had the

obligation to:

> within 45 days of the child's entry into the program . . . perform or
> obtain linguistically and age appropriate screening procedures to identify
> concerns regarding a child's developmental, sensory (visual and auditory),
> behavioral, motor, language, social, cognitive, perceptual, and emotional
> skills.

45 C.F.R. § 1304.20(b)(1).

The Board concluded that ACF's finding that CCC was deficient in its compliance with

45 C.F.R. § 1304.20(b)(1) was justified because CCC failed to rebut the fact that the files of four

children did not contain adequate documentation regarding the requisite screenings. A.R. at 32.

The Board further found that as to nine of the 12 children there had not been any vision screening

and that eight of the ten children lacked hearing screenings. Id. at 35. CCC had also failed to

obtain developmental screenings for two children. Id. at 36. These findings by the Board went

undisputed by CCC. These findings therefore amply support the Board's conclusion that CCC

remained a grantee with deficiencies, which justified ACF's termination of CCC's Head Start

funding. See Philadelphia Housing Auth., 2006 WL 299039, at *2 ((granting summary judgment

in favor of and upholding DAB's decision affirming ACF's termination of Head Start funding

where there was not any material dispute that the plaintiff failed to meet the Head Start

enrollment requirements).

### C. The Evidence Supports the Board's Finding that CCC Remained Deficient by Failing to Comply with 45 C.F.R. § 51(g).

45 C.F.R. section 51(g) required CCC to "establish and maintain efficient and effective

record-keeping systems to provide accurate and timely information regarding children, families, and staff . . . ." The Board found that CCC failed to comply with this requirement because of the "lack of records related to lead screening determinations, dental determinations, hearing screenings, vision screenings, nutritional assessments, and criminal and child abuse background checks." A.R. at 43. Notably, the Board found that CCC failed to show that it had records pertaining to background check records for three employees prior to the end of the corrective action period. Id. at 42. The Board noted that "such checks are plainly vital to assuring the safety and security of children. These failures of documentation are in themselves sufficient to show that CCC did not have a record keeping system effective to ensure accurate and timely records were maintained for its staff."

CCC cannot refute ACF's, or the Board's conclusions. Rather, its failure to maintain proper records pertaining to lead and dental determinations, hearing and vision screenings, nutritional assessments, and criminal and child abuse background checks showed it was not in compliance with the Head Start requirements. Therefore, the decision to terminate its Head Start finding was not arbitrary or capricious. See Philadelphia Housing Auth., 2006 WL 299039, at (granting summary judgment in favor of and upholding DAB's decision affirming ACF's termination of Head Start funding where there was not any material dispute that the plaintiff failed to meet the Head Start enrollment requirements).

**D.     CCC Continued to Be Deficient Concerning 45 C.F.R. § 1304.53(a)(10)(viii).**

It is well-established that under the Head Start Act, ACF must only show there was a similarity between an initial determination of deficiency and a final determination in order to support a termination action. 42 U.S.C. § 9836a(d)(1)(A). In its appeal and motion to dismiss,

23

CCC argued that ACF could not use the alleged violation at the Lois I site as the basis for the finding of a deficiency because ACF's initial determination focused solely on the Charleston and Hayes sites.  A.R. at 50.

CCC's argument should be rejected.  CCC's failure to maintain the outdoor conditions at its sites is evidenced not only by the specifically cited Charleston and Haynes sites in the 2005 review, but by the March 2006 review that identified the same underlying problem of site management at the Lois I site.  CCC was put on notice in September 2005 that at least two of its sites outdoor area were not secured or cleaned to prevent children from being injured.  A.R. at 236.  Yet, on March 22, 2006, this condition remained unchanged as it concerns a separate site, the Lois I site.  Specifically, the follow-up review revealed that CCC failed to maintain the Lois I site properly, and there was trash, leaves, two grills – including one with an attached gas tank – metal poles, cans and more that continued to endanger the health of children.  A.R. at 201-02.   A revisit made to the Lois I Center on March 23, 2006 noted that while some improvements were being made, there remained trash and leaves still to be removed.  Id. at 202.

There is no merit to CCC's contention that it did not have notice that it was required to comply with 45 C.F.R. § 1304.53(a)(10)(viii) concerning each of its facilities, not just those visited on a given day by the ACF reviewers.  Pursuant to 45 C.F.R. section 1304.53(a)(10), CCC was required to "conduct a safety inspection, at least annually, to ensure that each facility's space, light, ventilation, heat and other physical arrangements are consistent with the health, safety, and developmental needs of children."  (Emphasis added).  Specifically, section 1304.53(a)(10)(viii) required that, at a minimum, CCC ensure that "[i]ndoor and outdoor premises are cleaned daily and kept free of undesirable and hazardous materials and conditions."

24

In light of its clear duties under these regulatory provisions, the Board correctly rejected CCC's argument that the Lois I Center could not be used as the basis for a finding of deficiency.  See, e.g., Beverly Health & Rehab. Services, Inc. v. Thompson, 223 F. Supp. 2d 73, 111 (D.D.C. 2002).

Beverly Health & Rehab. Services presents a situation somewhat analogous to the present one.  In that case, the Court rejected the plaintiff's argument that it did not have notice that termination of its Medicaid and Medicare funding could be based on "non-immediate jeopardy" findings.  223 F. Supp. 2d at 113.  Based on a survey of the plaintiff nursing home's facility, sixteen deficiencies were identified, four of which that were classified at the "immediate jeopardy" level, with the remaining deficiencies "found to 'pose the potential for more than minimal harm to residents.'"  Id. at 109.  A decision was thereafter made to terminate the nursing home's participation in the Medicaid and Medicare programs.  On appeal, the ALJ and DAB found that the agency's evidence did not support the finding of immediate jeopardy; nonetheless, the termination was upheld on the basis of the other identified deficiencies.  Id. at 110.  In rejecting the plaintiff's argument that it had "been denied adequate notice that they would be subject to termination based on the non-immediate jeopardy findings . . . ." the Court noted that the agency had provided sufficient notice that the termination would be based "on the actual deficiency findings – the combination of both immediate jeopardy findings and non-immediate jeopardy findings."  Id. at 113.  Furthermore, the Court observed that plaintiffs had notice that failure to comply with the pertinent provisions of the Social Security Act and the requirements for long term care facilities could result in the termination of their ability to participate in the programs.  Id.  "Thus, any argument that plaintiffs did not get fair notice of the deficiencies–

including the non-immediate jeopardy findings-lacks merit."  Id.

Similar to the situation in Beverly Health & Rehab. Services, the record in this case

supports DAB's conclusion that CCC had notice that deficiencies at the Lois I site could result in

termination of its funding.  First, CCC clearly had notice as to the type of conditions that the

reviewers deemed to be in violation of the performance standards.  Specifically, the Charleston

site had wooden play structures with splinters, rusty nails and leaves and the Haynes site's front

area was "cluttered with trash and leaves[,]" and there was no indication that it was cleaned daily.

A.R. at 236.  Therefore, it should have come as no surprise that the Lois I center, with a wooden

pile with rusty nails sticking out of it and requiring the removal of other debris, which included

trash and leaves on the playground and the walkway used to access the playground, would be in

violation of section 1304.53 as well.  Furthermore, like the plaintiff in Beverly Health & Rehab.

Services, CCC was on notice of the requirements under the Head Start Act and its duty to comply

with those requirements.  The January 27, 2006 letter clearly informed CCC that it had

deficiencies in two areas – Childhood Development and Health Services and Program Design

Management – and that if CCC's "program continues to have uncorrected deficiencies beyond

the timeframes stated for correction, as stated above, pursuant to Sec. 641A(d)(1)(C) of the Head

Start Act, 42 U.S.C. 9836A(d)(1)(C), we will initiate proceedings to terminate your Head Start

grant."  A.R. at 231.  As the Board noted,

> A Head Start review necessarily involves inspection of a portion, or
> a sample, of a grantee's program.  Problems that are identified in that
> sample are assumed to be representative of problems that may exist
> elsewhere in the program and that must be addressed in order to fully
> correct the deficiency citation.  The Head Start review, notice, and
> correction process is designed to give grantees an opportunity to correct
> deficiencies and noncompliances.  The process is not intended to be an

opportunity to play cat and mouse with ACF by correcting one premise
while allowing other premises to be or become noncompliant or by
correcting one set of hazards while allowing similar hazards to exist.

A.R. at 16. For these reasons, the Court should conclude that the decision to terminate CCC's

funding based, in part, on the conditions at the Lois I Center was not in violation of the APA.[5/]

## II.   NONE Of CCC'S ALLEGATIONS WARRANT THE DENIAL OF ACF'S MOTION FOR SUMMARY JUDGMENT.[6/]

Before the Board,[7/] CCC presented three arguments regarding why its motion for

---

[5/]Furthermore, because the decision to terminate CCC's funding could be based on any one deficiency pursuant to 45 C.F.R. § 1303.14(b)(4), even if the Court were to find that CCC was not provided with sufficient notice regarding the Lois I Center, there is ample basis to affirm the termination decision in this case. See, e.g., Beverly Health & Rehab. Services, Inc., 223 F. Supp. 2d at 111(affirming DAB decision to terminate nursing home facility where the applicable provisions provided for such termination and it was "not within [the] Court's province to substitute its judgment for the agency's decision that termination was appropriate given the scope and severity of the deficiencies.").

[6/]Defendants address those arguments that CCC made before the Board and are set forth in the amended complaint without intending to waive, and expressly preserving their rights to address any arguments later asserted by CCC in its pleadings or that are not otherwise herein addressed.

[7/]In its amended complaint, CCC appears to raise a new argument that was never passed on by the DAB. For the first time, in its amended complaint, CCC contends that the decision to terminate its Head Start funding "violates the requirements of 45 C.F.R. §§ 74.90 and 1303.14(a) because it was made without any finding or determination that the problems that remained could not 'be resolved through further exchange of information and views' and also was made without the concurrence of the ACF Commissioner." Compl.¶ 27. This attempt by CCC to raise new arguments must fail as it is well-settled that a party's failure to raise an argument before the administrative agency in the first instance will preclude the district court's consideration of that challenge. See United States v. L.A. Tucker Truck Lines, Inc., 344 U.S. 33, 37 (1952) ("orderly procedure and good administration require that objections to the proceedings of an administrative agency be made while it has opportunity for correction in order to raise issues reviewable by the courts."); Salt Lake Comm. Action Program v. Shalala, 11 F.3d 1084, 1087 (D.C. Cir. 1993) ("We start from the well-settled premise that objections to agency proceedings must be presented to the agency 'in order to raise issues reviewable by the courts.'") (citations omitted); see also Delta Foundation, Inc. v. United States, 303 F.3d 551, 562 (5th Cir. 2002) ("[W]e hold that there is a sufficiently adversarial nature to HHS proceedings so as to impose an exhaustion

dismissal should be granted.  Of the arguments meriting further discussion,[8/] none warrant denial

of defendants' motion for summary judgment.

**A.**    **ACF Was Authorized to Require CCC to Correct the Identified Deficiencies Without a QIP.**

Before the Board CCC argued that the Head Start Performance Standards at 45 C.F.R.

part 1304, subpart E, required that, "upon identification of a deficiency in a Head Start grantee's

operations, the 'responsible HHS official' will notify the grantee in writing of the deficiency, and

'inform the grantee that it must correct the deficiency either immediately or pursuant to a Quality

Improvement Plan.'" A.R. at 53 (quoting 45 C.F.R. § 1304.60(b)).  According to CCC, ACF was

without authority to require correction of a deficiency within 90 days absent a QIP.  A.R. at 53.

Rather, ACF's only option, according to CCC, was to require "immediate correction of a health

and safety/fund integrity deficiency, or to direct correction of any other deficiency according to

the terms and conditions of a QIP." Id.  Despite the existence of 42 U.S.C. § 9836a(d)(1)(B), the

statutory provision that explicitly affords HHS the right to require a grantee to correct

deficiencies within 90 days without the issuance of a QIP, CCC believes that ACF has restricted

its own authority under the Act by promulgating 45 C.F.R. § 1304.60(b).  According to CCC, 45

C.F.R. § 1304.60(b) is a "self-imposed constraint on ACF's discretionary authority under 42

---

requirement to those proceedings.  A claimant must therefore exhaust all issues in a request for
review by DAB in order to preserve judicial review of those issues.") (citing Salt Lake Comm.,
11 F.3d at 1088); Washington Ass'n for Television & Children v. F.C.C., 712 F.2d 677, 680
(D.C. Cir. 1983) ("As a general rule, claims not presented to the agency may not be made for the
first time to a reviewing court.") (citing L.A. Tucker Truck Lines, Inc., 344 U.S. at 37).

[8/]Defendant has addressed CCC's argument that it lacked notice regarding the Lois I
center's conditions supra at 23-27.

U.S.C. § 9836a(d)(1)(B)(ii)." A.R. at 53.

The infirmity of CCC's argument is belied by the clear statutory language of 42 U.S.C. § 9836a(d)(1)(B). That provision provides that, with regard to each identified deficiency, the grantee may be required to (1) correct the deficiency immediately if the deficiency is found to pose a threat to integrity of federal funds; (2) correct the deficiency within 90 days if this period is determined to be reasonable in light of the nature and magnitude of the deficiency; **or** (3) develop a QIP. 42 U.S.C. § 9836a(d)(1)(B).

45 C.F.R. § 1304.60(b) provides for only a QIP when "immediate correction" is not required. There is no validity to CCC's argument that the imposition of a 90-day correction period, without a QIP, is procedurally infirm. Reference to the two applicable provisions – 42 U.S.C. 9836a(d)(1)(B) and 45 C.F.R. § 1304.60(f) – reveal that the regulation was promulgated on November 5, 1996, amended on January 15, 1998, and the entire Section 1304 carries an effective date of January 1, 1998. 45 C.F.R. § 1304.2. Thereafter, the Head Start Act provision 42 U.S.C. § 9836a(d)(1)(B) was amended on October 27, 1998, adding the 90-day correction option. As a result, 45 C.F.R. § 1304.60(b) of the regulation was implicitly superceded by the statutory provision. See, e.g., Goodyear Atomic Corp. v. Miller, 486 U.S. 174, 184-85 (1988) ("We generally presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts."); see also United States v. Larionoff, 431 U.S. 864, 873 (1977) ("For regulations, in order to be valid must be consistent with the statute under which they are promulgated."). Cf. Lincoln Sav. & Loan Ass'n v. Federal Home Loan Bank Bd., 856 F.2d 1558, 1561 (D.C. Cir. 1988) ("So long as an agency has statutory authority to issue regulations, those regulations will preempt inconsistent state statutes . . . ."). In this case, ACF exercised its

29

authority under the relevant statutory provision, 42 U.S.C. § 9836(a)(d)(1)(B), to impose a 90-day correction period, and its action was not arbitrary, capricious, an abuse of discretion, or otherwise contrary to law.  Cf. Independent Banker's Ass'n v. Farm Credit Admin., 164 F.3d 661, 669 (D.C. Cir. 1999) (holding that, "given the absence of any restrictive language within the statute . . . ."the agency's interpretation that removed a prior requirement was a reasonable interpretation of the statute); Mineral Policy Ctr. v. Norton, 292 F. Supp. 2d 30, 37 (D.D.C. 2003) ("However, if a regulation unreasonably interprets a statute or is inconsistent with the statute under which it is promulgated, the regulation may not be sustained.").  Simply stated, there is nothing to support CCC's belief that ACF was constrained by regulations that were more restrictive than, and pre-dated, the amended Head Start Act.[9/]

**B.      DAB Properly Concluded that ACF Determined That the 90-Day Period Was Reasonable.**

CCC also argued before the Board that there was no explicit finding by ACF that the 90-day period afforded to CCC to correct its deficiencies was reasonable.  This finding was required, according to CCC, by 42 U.S.C. § 9836a(d)(1)(b)(ii).  This provision authorizes the Secretary to

---

[9/]CCC's argument that ACF could not rely upon 42 U.S.C. § 9836a(d)(1)(B)(ii) without first amending 45 C.F.R. § 1304.60(b) through notice and comment and that doing so violates section 553 of the APA, is without merit.  Section 553 provides the procedures for notice and comment rulemaking that must be adhered to when an agency issues a legislative rule.  5 U.S.C. § 553(b).  Assuming section 553's applicability, CCC relied upon National Family Planning & Reproductive Health Ass'n v. Sullivan, 979 F.2d 227, 234 (D.C. Cir. 1992) in support of its argument.  However, as the DAB noted, National is inapposite here because in National the agency reversed its prior interpretation of a legislative regulation.  979 F.2d at 234.  Here, the ACF did not reverse its interpretation of its regulation but exercised its authority under the broader authority provided by the statute.  A.R. at 10.  Furthermore, DAB did not necessarily accept CCC's assumption that 45 C.F.R. § 1304.60(b) is a legislative rule, since it merely repeats the terms of the Head Start statute that was in existence when the section was promulgated.  Id. at 10 & n.8.

require a grantee to correct a deficiency within 90 days "if the Secretary finds, in the discretion of the Secretary, that such a 90-day period is reasonable, in light of the nature and magnitude of the deficiency[.]"  In rejecting CCC's argument, the DAB found that there was no requirement that ACF, in establishing a prima facie case of termination, "prove or even explain its basis for requiring a grantee to correct under one or another of the three time frames prescribed by section 9836a(d)(1)."  A.R. at 13-14.  However, the Board went on to conclude that because "ACF's January notice referred to the relevant statutory provision and to the review findings. . ." there was sufficient basis for the Board to conclude that "ACF did make a finding that the 90-day period was reasonable in light of the nature and magnitude of the deficiencies found."  Id. at 14.

Here, there is nothing in the Act that requires the Secretary to provide an explanation of his imposition of a 90-day correction period.  Rather, 42 U.S.C. § 9836a(d)(1)(b)(ii) provides that the Secretary may impose this 90-day period if, in his "discretion" he finds the period "reasonable, in light of the nature and magnitude of the deficiency[.]"[10/]  While there was no requirement that the Secretary explain why the 90-day period was being imposed, the notice to plaintiff clearly indicated why certain deficiencies would be subject to the 30-day correction period and indicated that the remaining deficiencies would be subject to the 90-day correction period.  Thus, DAB's presumption that the agency did make a finding that the period was reasonable in light of the nature and magnitude of the deficiencies found is supported by the

_____

[10/]Whether plaintiff's challenge to this provision of the Act is in fact reviewable under the APA is questionable given the broad standards set forth in the provision.  See, e.g., Community Action v. Bowen, 866 F.2d 347, 353 (10th Cir. 1989) (holding that court lacked subject matter jurisdiction to consider whether agency's decision to terminate a grant or impose a lesser sanction because the "applicable statutes and regulations are so broadly drawn that the court has no standard against which to measure HHS' exercise of discretion.").

record in this case and plaintiff cannot show any violation of the APA.  See, e.g., Shays v. Federal Election Comm'n, 424 F. Supp. 2d 100, 109 (D.D.C. 2006) ("In applying the 'arbitrary and capricious' standard, a court 'may not supply a reasoned basis for the agency's action that the agency itself has not given,' . . . but a court should 'uphold a decision of less than ideal clarity if the agency's path may be reasonably discerned.'") (citations omitted).

## CONCLUSION

For the reasons set forth above, defendants respectfully request that the Court enter summary judgment in defendants' favor and dismiss this action with prejudice.

Respectfully submitted,

  /s/ Jeffrey A. Taylor
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

  /s/ Rudolph Contreras
RUDOLPH CONTRERAS, D.C. BAR #  434122
Assistant United States Attorney

  /s/ Michelle N. Johnson
MICHELLE N. JOHNSON, D.C. BAR # 491910
Assistant United States Attorney
United States Attorney's Office
Civil Division
555 4th Street, N.W. – Room E4212
Washington, D.C. 20530
(202) 514-7139

COUNSEL FOR DEFENDANTS

Of Counsel:

Joyce E. McCourt
Assistant Regional Counsel
Office of the General Counsel
United States Department of Health
and Human Services

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CAMDEN COUNTY COUNCIL ON ECONOMIC OPPORTUNITY,    ) ) ) | |
| Plaintiff,    ) | Civil Action No.: 07-1835 (RCL) |
| ) v.    ) ) | |
| UNITED STATES DEPARTMENT OF HEALTH & HUMAN SERVICES,    ) ) ) | |
| and    ) ) | |
| MICHAEL LEVITT, Secretary, United States Department of Health & Human Services,    ) ) ) ) ) | |
| Defendants.    ) ) ) | |

**DEFENDANTS' STATEMENT OF MATERIAL FACTS**
**AS TO WHICH THERE IS NO GENUINE ISSUE**

Pursuant to LCvR 56.1 and 7(h), Defendants, the United States Department of Health and

Human Services ("HHS") and Michael Levitt, in his official capacity as Secretary of HHS,

respectfully submit their statement of material facts as to which there is no genuine issue in

support of his Motion for Summary Judgment.

**I.    The Federal Head Start and Early Head Start Program**

1.    The Head Start and Early Head Start program, 42 U.S.C. §§ 9831-9852 (the

"Head Start Act"), is a federally funded program designed to deliver "comprehensive health,

educational, nutritional, social, and other services to economically disadvantaged children and

their families."  42 U.S.C. § 9831(a).

2       HHS is statutorily charged with implementation of the Head Start Act.  Within

HHS, the Administration for Children and Families ("ACF") has been delegated oversight

authority for the Head Start/Early Head Start Program.  45 C.F.R. § 1304.60(b).

3.       To ensure that eligible children and their families receive high quality services

responsive to their needs, Head Start grantees must comply with the Head Start Program

Performance Standards, which are codified at 45 C.F.R. § 1304.

4.       These performance standards encompass the entire range of Head Start services

and constitute the minimum requirements that a Head Start grantee must meet in three specific

areas: Early Childhood Development and Health Services; Family and Community Development;

and Program Design and Management.  45 C.F.R. Part 1304.

5.       The Secretary of HHS, through ACF, is required to conduct a periodic review of

each Head Start grantee at least once every three years.  42 U.S.C. § 9863a(c)(1)(A).

6.       If as a result of review the Secretary finds a grantee to have a deficiency,[1] he

requires the grantee to correct the deficiency immediately, or within ninety days, or pursuant to a

Quality Improvement Plan ("QIP").  42 U.S.C. § 9836A(d)(1)(B)(ii).

7.       45 C.F.R. § 1303.14(b)(4) provides for the termination of funding if a grantee

"has failed to timely correct one or more deficiencies as defined in 45 C.F.R. Part 1304."

---

[1]A deficiency is defined as including "[a]n area or areas of performance in which [a] . . . Head Start grantee agency is not in compliance with State or Federal requirements, including but not limited to, the Head Start Act or one or more of the regulations under parts 1301, 1304, 1305, 1306, or 1308 . . . which involves . . . [a] failure to perform substantially the requirements related to Early Childhood Development and Health Services, Family and Community Partnerships, or Program Design and Management[.]"  45 C.F.R. § 1304.3(a)(6).

2

## II.    ACF's Review of CCC's Head Start Program

8.      The Camden County Council on Economic Opportunity ("CCC") is non-profit corporation established under the laws of the State of New Jersey, and had been a Head Start grantee for the greater Camden, New Jersey area.  Amended Complaint ("Compl.") ¶ 2.

9.      ACF conducted an on-site monitoring review of CCC's Head Start program from September 11, 2005 to September 16, 2005 using the Program Review Instrument for Systems Monitoring ("PRISM ").  Id. ¶ 9; A.R. at 226.[2]

10.      In a letter dated January 27, 2006, ACF notified CCC that it was a grantee with deficiencies as defined under 45 C.F.R. 1304.3(a)(6)(i)(A) and 45 C.F.R. 1304.3(a)(6)(i)(C). A.R. at 226.[3]  Specifically, CCC was found to have failed to perform substantially the requirements related to Childhood Development and Health Services and Program Design and Management.  Id.

11.      In the area of Child Health and Developmental Services, ACF determined that CCC was not in compliance with 45 C.F.R. § 1304.20(a)(1) "Determining child health status" that requires a grantee "[i]n collaboration with the parents and as quickly as possible, but no later than 90 calendar days . . . from the child's entry into the program . . . (ii) Obtain from a health care professional a determination as to whether the child is up-to-date on a schedule of age appropriate preventative and primary health care which includes medical, dental and mental health. . . . (A) For children who are not up-to-date on an age-appropriate schedule of well child

---

[2]References to "A.R." are to the administrative record that has been filed in this case. Page numbers refer to the stamped numbers appearing at the bottom right of the documents.

[3]CCC was determined to have twelve deficiencies.  A.R. at 192.  Only those that were not subsequently corrected are addressed herein.

care, grantee and delegate agencies must assist parents in making the necessary arrangements to bring the child up-to-date[.]" A.R. at 233; 45 C.F.R. § 1304.20(a)(1).

12.    ACF determined that CCC failed to "ensure that all children were up-to-date on their medical and dental care within the 90 day requirements." A.R. at 233.

13.    Specifically, "[a] review of 56 returning children's files lacked the following information: five (5) did not contain signed medical exams; seven (7) did not contain dental screenings; and eight (8) had no lead screenings." Id.

14.    CCC was afforded 90 days to correct deficiencies related to 45 C.F.R. § 1304.20(a)(1)(ii)(A). A.R. at 43.

15.    Also in the area of Child Health and Development Issues, ACF determined that ACF failed to comply with 45 C.F.R. § 1304.20(b), entitled "Screening for developmental, sensory, and behavioral concerns," which requires CCC "[i]n collaboration with each child's parent, and within 45 days of the child's entry into the program . . . [to] perform or obtain linguistically and age appropriate screening procedures to identify concerns regarding a child's developmental, sensory (visual and auditory), behavioral, motor, language, social, cognitive, perceptual, and emotional skills." A.R. at 233; 45 C.F.R. § 1304.20(b)(1).

16.    ACF determined that CCC failed to comply with 45 C.F.R. § 1304.20(b)(1) because CCC "did not ensure that all children enrolled in the program were up-to-date on a schedule of age appropriate preventive and primary health care." A.R. at 233.

17.    Specifically, "[a] review of 56 returned children's files did not contain the following screenings: seven (7) files had no vision screenings; eleven (11) had no hearing screenings; and 22 did not contain any developmental screenings." Id.

4

18.    Furthermore, "an interview with the Health Manager . . . confirmed that these screenings were missing from the files and could not be located by the program."  Id.

19.    CCC was afforded 90 days to comply with the requirements of 45 C.F.R. § 1304.20(b)(1).  A.R. at 228.

20.    ACF found that CCC failed to comply with 45 C.F.R. § 1304.51, entitled "Management Systems and Procedures."  A.R. at 246.

21.    Specifically, 45 C.F.R. § 1304.51(g), "Record-keeping systems" required that CCC "establish and maintain efficient and effective record-keeping systems to provide accurate and timely information regarding children, families, and staff and must ensure appropriate confidentiality of this information."

22.    ACF found that CCC had failed to comply with 45 C.F.R. § 1304.51(g) because it "did not establish and maintain efficient and effective record-keeping systems to provide accurate and timely information regarding children, families and staff.  The record-keeping systems reviewed and found to be non-compliant included those for human resources, family partnerships, supervision and management, enrollment, and disabilities services."  A.R. at 246.

23.    Specifically, a review of CCC's files reviewed that "[f]ifteen (15) of (17) files did not contain the required Criminal History and 17 of 17 files did not contain required Child Abuse Clearances.  Eleven (11) of 17 files did not contain results of TB screenings.  Ten (10) of 17 files did not contain the record of initial medical exam.  Two (2) of 17 files did not contain references.  Eight (8) of 17 files did not contain the 2004 employee job performance evaluations.  Five (5) of 7 files had no records of training for year 2004."  Id.

24.    Among others, additional deficiencies with CCC's files included the fact that

fifty-six (56) of fifty-six children files "had one or more required data entries missing." A.R. at 246.

25.    Examples of missing documentation included: missing enrollment dates in 56 children's files; 33 files had no nutrition assessment; seven (7) files were missing signed medical exams; seven (7) had no vision screenings; eleven (11) contained no hearing screenings." Id. at 246-47.

26.    Furthermore, the files were missing Individual Education Plans (IEPs), contained no documentation of progress, no signatures on IEPs, and no documentation of parent involvement in the referral process in files of children with disabilities. A.R. at 246-47.

27.    CCC was afforded a 90-day time frame in which to attain compliance with 45 C.F.R. § 1304.51(g). A.R. at 228.

28.    CCC was found to also have failed to comply with 45 C.F.R. § 1304.53, entitled "Facilities, materials and equipment."

29.    Specifically, 45 C.F.R. § 1304.53(a)(10) required CCC to "conduct a safety inspection, at least annually, to ensure that each facility's space, light, ventilation, heat, and other physical arrangements are consistent with the health, safety, and developmental needs of children."

30.    At a minimum, agencies are required to ensure that "[i]ndoor and outdoor premises are cleaned daily and kept free of undesirable and hazardous materials and conditions." 45 C.F.R. § 1304.53(a)(10)(viii).

31.    ACF determined that CCC failed to comply with 45 C.F.R. § 1304.53(a)(10)(viii) because "[t]wo (2) sites visited had outdoor areas that were not secured or cleaned to prevent the

children from being injured." A.R. at 236.

32.    Specifically, "[t]he Charleston site playground area had vines protruding onto the play area, where the children received their daily physical development. These vines had pokeberries growing on them. If a child were to digest these pokeberries, this could cause a risk to the child's health." Id.

33.    In addition, the Charleston site playground's "wooden play structure had splinters, rusty nails, and leaves inside the structure." Id.

34.    As it concerned the Haynes site, ACF found that the "front area was cluttered with trash and leaves." Id. Furthermore, "there was no indication of daily cleaning to this site." Id.

35.    CCC was given 30 days to remedy the deficiencies related to 45 C.F.R. § 1304.53(a)(10)(viii). A.R. at 227.

36.    The January 27, 2006 letter explicitly informed CCC that if its "program continue[d] to have uncorrected deficiencies beyond the timeframes suggested for correction . . . pursuant to Sec. 641A(d)(1)(C) of the Head Start Act, 42 U.S.C. 9836A(d)(1)(C) . . . ." proceedings would be initiated to terminate CCC's Head Start grant. A.R. at 231.

37.    A certified mail receipt shows that CCC received the January 27, 2006 deficiency notice, receipt of which starts the time running on the 30 and 90-day correction periods, on February 13, 2006. A.R. at 101.

**III.    ACF's Follow-Up Review**

38.    A follow-up review report was mailed to plaintiff on April 9, 2007. A.R. at 191.

39.    The review reported that from March 20, 2006 to March 23, 2006 and May 15, 2006 to May 19, 2006 ACF conducted on-site monitoring follow-up reviews of CCC's Head

Start program "to determine whether the previously identified area(s) of noncompliance and/or area(s) of deficiency had been corrected." A.R. at 100, 191.

40. The March 2006 follow-up review specifically focused on the deficiencies that required correction within 30 days, while the May 2006 follow-up review focused on the remaining deficiencies. A.R. at 187.

41. The March 20, 2006 follow-up review found that CCC continued to be in non-compliance with 45 C.F.R. § 1304.53(a)(10)(viii). A.R. at 201.

42. CCC failed to "ensure that the outdoor premises of a site were cleaned daily and kept free of undesirable and hazardous materials and conditions." A.R. at 187. Specifically, CCC did not properly "maintain the outdoor premises at the Lois I Center." A.R. at 201.

43. On-site review on March 22, 2006 "revealed leaves and trash inside the playground fence and alongside the walkway used by the children to access the playground." Id.

44. Review at the Lois I Center further revealed that there were two grills in the playground area, one with an attached gas tank, "metal poles used for erecting a tent, drink cans, beer caps, a tank with a wooden beam attached, and a tree from next door that had fallen on the fence." A.R. at 201-202.

45. Furthermore, along the fence at the end of the walkway was "a pile of old wood planks with rusty nails sticking out of it[,]" and children had to "walk past this pile of wood in order to access the playground." A.R. at 202.

46. The review team re-visited the Lois I Center on March 23, 2006, and found that some improvements had been made. A.R. at 202. "However, the following clean-up still needed to be made: fill holes where tent poles had been extracted from the ground, removal of cement

pieces in upper left hand corner of the playground, removal of tree branch leaning on fence in lower left corner, and removal of other debris which included trash and leaves on the playground and the walkway used to access the playground." Id.

47.     The follow-up review revealed that the concerns regarding the Charleston Center and the Haynes Center had been resolved.  A.R. at 202.

48.     ACF identified several new areas of deficiencies under 45 C.F.R. § 1304.3(a)(6)(iii) Other Violation.  A.R. at 219.

49.     CCC was required to "develop a Quality Improvement Plan (QIP) to correct the newly identified deficiencies . . . and submit this QIP to the Regional Office."  A.R. at 191, 223.

50.     The May follow-up review began on Monday, May 15, 2006, which was the 91st day after receipt of the follow-up report.  A.R. at 100.

51.     ACF determined that CCC failed to correct its deficiency related to 45 C.F.R. § 1304.20(a)(1)(ii)(A).  Specifically by May 14, 2006, CCC had still failed to "ensure that all children were up-to-date on their medical and dental care within the 90-day requirement."  A.R. at 187, 195.

52.     Specifically, "[a] review of fifty-one (51) files revealed that although all fifty-one (51) contained a signed medical exam, there was still required information missing: seven (7) had no lead screening [14%] and two (2) did not contain a dental screening [4%].  This lack of information was verified by a review of the grantee's health tracking records."  A.R. at 195.

53.     The May 14, 2006 follow-up review also revealed that CCC had failed to remedy the deficiency concerning 45 C.F.R. § 1304.20(b)(1).  A.R. at 187, 196.

54.     Specifically, CCC had failed to "[i]n collaboration with each child's parent, and

within 45 calendar days of the child's entry into the program, . . . ensure that all children enrolled in the program were screened for developmental, sensory, and behavioral concerns." A.R. at 196.

55.    Notably, "[a] review of fifty-one (51) children's files showed missing screenings: twelve (12) had no vision screening [24%]; ten (10) had no hearing screening [20%]; and three (3) had no developmental screening [6%]. A review of the grantee's health tracking records also showed these screenings to be missing." A.R. at 196.

56.    The May 14, 2006 follow-up review revealed that CCC had also failed to remedy the deficiencies related to 45 C.F.R. § 1304.51(g). A.R. at 198.

57.    Specifically, CCC had "not fully established and maintained efficient and effective record-keeping systems to provide accurate and timely information regarding children, families, and staff." A.R. at 188, 198.

58.    "A review of 16 personnel files revealed that 10 of 16 files did not contain the required Policy Council approval; 11 of 16 files did not contain the fingerprint/background check; 12 of 16 files did not contain CPR/First Aid Training Certificates; 6 of the 16 files did not contain either a job description or one relevant to the present job." A.R. at 198.

59.    Review of "51 children's files found that 12 files did not have vision screenings, 10 files did not have hearing screenings, two files did not have dental examinations, seven files had no lead screenings, seven files did not have nutritional assessments, and three files did not have child developmental screenings." A.R. at 198.

IV.    **The Decision to Terminate CCC's Head Start Program Grant**

60.    In a letter dated April 9, 2007, CCC was notified of the decision to terminate its

10

Head Start federal financial assistance pursuant to 42 U.S.C. § 9836a(d)(1)(C) and 45 C.F.R. § 1303.14(b)(4).  A.R. at 186.

61.     The basis for terminating CCC's funding was its failure "to timely correct the findings determined to constitute deficiencies from the PRISM Monitoring Review conducted in September 2005."  Id.

62.     "Based on the totality of information obtained by ACF through program review and follow-up visits, information provided by Camden County, and the authority of 42 U.S.C. § 9836a(d)(1)(C), 45 C.F.R. §§ 74.61, and 1303.14(b)(4), ACF  . . . concluded that termination of Federal financial assistance is presently warranted."  A.R. at 188.

63.     In accordance with 45 C.F.R. § 1303.14(f)(1) CCC was notified that if it timely appealed the termination decision, funding would "continue until an adverse decision [was] rendered or until expiration of the current budget period."  A.R. at 186.  If no decision had been rendered by the end of this period, "ACF [would] award a grant to Camden County until a decision is made . . . ."  Id.

## V.     The Board Affirms ACF's Decision to Terminate CCC's Head Start Funding

64.     On May 11, 2007, CCC filed its notice of Appeal and Motion to dismiss with the Departmental Appeals Board ("DAB" or "the Board").  A.R. at 45.

65.     On July 9, 2007, after receiving discovery that it had sought, CCC filed a revised written appeal and request for hearing.  A.R. at 5.  ACF filed a response to CCC's revised appeal and a brief in support of summary judgment on August 3, 2007.  Id.

66.     In a decision dated September 25, 2007, the Board denied CCC's motion to dismiss and granted ACF's motion for the entry of summary judgment, affirming ACF's decision

to terminate funds for CCC's Head Start grant.  A.R. at 1.

67.    CCC presented three arguments to the Board in support of its position that ACF's decision to terminate CCC's Head Start grant should be reversed.  A.R. at 6.

68.    CCC first argued that the May review was procedurally infirm because it did not occur within the required 90-days.  A.R. at 6.

69.    CCC contended that it received the January 27, 2006 notice on February 14 and that the May review took place during the week of May 14, 2006, only 89 days after the notice of initial determination.  Id.

70.    In rejecting CCC's argument, the DAB concluded that CCC failed to submit any evidence to refute ACF's submission of a U.S. Postal certified mail receipt addressed to CCC with a signature indicating receipt on February 13, which showed that CCC had in fact received the notice on February 13.  Id.

71.    In addition, the Board credited ACF's assertion that although the members of the review team met on Sunday May 14, the team did not arrive at CCC's premises to begin the review until Monday, May 15.  Id. at 6-7.

72.    For these reasons, the Board concluded that the May review did not begin until the expiration of the 90-day corrective action period.  Id. at 7.

73.    CCC next argued that ACF did not have authority to require CCC to correct deficiencies within 90 days of a receipt of a notice of deficiencies absent a QIP.  Id.

74.    The Board noted that the Head Start Act gives the Secretary authority, which he has delegated to ACF, to require a grantee to correct deficiencies immediately, within 90 days, or pursuant to a QIP.  Id.

75.     CCC argued that ACF has restricted its own authority under the Act by promulgating 45 C.F.R. § 1304.60(b), which provides that if the responsible HHS official determines that a grantee has one or more deficiencies "he or she will notify the grantee promptly, in writing, of the finding . . . and inform the grantee that it must correct the deficiency either immediately or pursuant to a Quality Improvement Plan." 45 C.F.R. § 1304.60(b); A.R. at 8.

76.     In rejecting this argument, the Board found that when ACF published section 1304.60 in 1996, "it described the notice to be given to grantees in accordance with the time frames for corrective action then described by 42 U.S.C. § 9836a(d)(1)(B). There was no indication that the regulation was intended to limit the options made available by the statute." A.R. at 8.

77.     The Board concluded that when Congress amended section 9836(d)(1)(B) in October 1998, months after section 1304.60(b)'s effective date of January 1, 1998, and provided for correction in 90 days in addition to the options of requiring correction immediately or pursuant to a QIP, Congress intended the October 1998 amendment "to supplement the enforcement options described in 45 C.F.R. § 1304.60(b)." Id.

78.     The Board also rejected that CCC's argument that ACF's reliance on 42 U.S.C. § 9836a(d)(1)(B)(ii) without amending 45 C.F.R. § 1304.60(b) through notice and comment rulemaking violates section 553 of the Administrative Procedures Act ("APA"). A.R. at 9.

79.     The Board found that here, where Congress, which is not subject to the APA, had expanded ACF's authority to require grantees to correct deficiencies, ACF may act pursuant to this statutory grant of authority without violating section 553 of the APA. Id. at 10.

13

80.     The Board further rejected CCC's argument that ACF was in violation of section 552(a)(1) of the APA because its "'policy statements and guidance' contained in the 2005 PRISM review instrument 'reveal no intention to implement the 'ninety-day authority' . . . and make 'no reference of any ninety day correction period[.]'" A.R. at 11.

81.     The Board found that ACF did not violate section 552(a)(1) of the APA because CCC had constructive notice from the statute that ACF had authority to require correction within 90 days and, in this case, also received actual and timely notice by the January 26, 2006 notice that ACF would utilize its statutory authority to require CCC to correct deficiencies within 90 days without a QIP.  A.R. at 12.

82.     The Board concluded that even if notice had not been furnished timely, CCC had not shown that it believed ACF could not lawfully require CCC to correct the alleged deficiencies within 90 days without a QIP.  Id.

83.     Rather, "[b]y remaining silent, participating in the resulting follow-up review, and only now complaining that the process was invalid, CCC [was] seeking two chances for correction when the statute and regulations provide for only one."  Id.

84.     Finally, as its last argument, CCC challenged the validity of the January notice on the ground that section 9836a(d)(1)(B)(ii) authorizes ACF to require a grantee to correct deficiencies within 90 days "if the Secretary finds, in the discretion of the Secretary, that such a 90-day period is reasonable, in light of the nature and magnitude of the deficiency[,]" and ACF admittedly made no such determination.  Id.

85.     In rejecting this argument, the Board found there was nothing in the record to support a finding that ACF had admittedly not made a determination as to the reasonableness of

14

the 90-day correction period.  A.R. at 13.

86.    The Board also rejected CCC's argument that ACF was required, as part of its prima facie case for termination, to prove or explain its basis for requiring a grantee to correct under one or another of the three time frames prescribed by section 9836a(d)(1).  A.R. at 13-14.

87.    The Board found that, based on ACF's reference in the January notice to the relevant statutory provision and to the review findings, that there was a presumption "that ACF did make a finding that the 90-day period was reasonable in light of the nature and magnitude of the deficiencies found."  A.R. at 14.

88.    The Board rejected CCC's argument that ACF could not rely upon conditions at the Lois I center as the basis for termination of funding because CCC was not provided with sufficient notice that ACF would consider conditions at other playgrounds.  A.R. at 15.  The Board found that the cited regulation clearly sets forth the expectation that all outdoor premises will be cleaned daily and free of undesirable and hazardous materials.  Id. at 15-16.

89.    The Board also found that the conditions found to be deficient at the Lois I center (such as trash and unsafe objects) were the same or similar in both reviews, despite the fact that they were found at different locations, and thus "CCC had notice of the type of conditions that the surveyors regarded as violating the performance standard."  Id. at 16.

90.    The Board found there was evidence in the record supporting a finding that CCC understood that it had to ensure all of its premises were safely maintained since CCC Board materials revealed that actions had been taken to not only correct the Hayes and Charleston locations but also to train CCC's staff on safety issues and a newly modified system for reporting repairs.  Id.

91.     Furthermore, the Board concluded that CCC could not show that its belief that it did not have to correct conditions at the Lois I center was reasonable.  Id.  The Board reasoned that because Head Start reviews "necessarily involve[ ] inspection of a portion, or a sample, of a grantee's program[,] [p]roblems that are identified in that sample are assumed to be representative of problems that may exist elsewhere in the program and that must be addressed in order to fully correct the deficiency citation."  Id.

92.     The Board went on to note that the review process "is not intended to be an opportunity to play cat and mouse with ACF by correcting one premise while allowing other premises to be or become noncompliant or by correcting one set of hazards while allowing similar hazards to exist."  Id. (citation omitted).

93.     In granting ACF's motion for summary judgment, the Board concluded that "CCC . . . failed to raise a dispute of material fact as to whether it has fully corrected the deficiencies cited under 45 C.F.R. §§ 1304.20(a)(1)(ii)(A), 1304.20(b)(1), and 1304.51(g)."  Id. at 18.

94.     As it pertains to 45 C.F.R. § 1304.20(a)(1)(ii)(A) (lead screening and dental determinations), the Board found that CCC failed to create a material issue of fact as to whether it failed to "perform these tasks for some of the children addressed in the May review by the time of the review[,]" despite the fact that these children had been enrolled in the program for 90 days or more. Id. at 21-22.

95.     Specifically concerning lead screening, the Board rejected CCC's argument that documentation of a "current lead screening and blood test" for each child was not actually required.  Id. at 22.

96.     The Board also found that CCC did not dispute the fact that a number of

16

children's files were missing the required documentation and rejected CCC's implicit argument

that there were a relatively small number of children whose files were missing, which did not

support termination of funding.  Id. at 25.

97.    Notably, a review of one child's file revealed that the Child Health Assessment,

although dated five months after the corrective action period, indicated that a lead test was still

pending at that time.  Id. at 27.  Nor was there any documentation that CCC was taking steps to

assist parents to obtain the required test.  Id.

98.    Concerning dental records, the Board found that CCC failed to create a material

disputed issue of fact concerning two files that were missing dental screenings.  Id. at 29.

99.    The Board concluded, regarding section 1304.20(a)(1)(ii)(A), that "as to six of the

seven children cited for lead determinations and the two children cited for dental determinations,

the evidence on which CCC relies does not show a material dispute of fact about ACF's basis for

finding that CCC failed to obtain the required determinations of whether these children were up-

to-date or, if a child was determined not to be up-to-date, assisted the parents in making the

necessary arrangements to bring the child up-to-date."  Id. at 30.

100.    Regarding CCC's violation of 45 C.F.R. § 1304.20(b)(1), which requires that

vision, hearing, and developmental screenings be conducted within 45 days of a child's entry into

CCC's program, the Board found that CCC provided no evidence regarding four children and

thus there was no material fact raised "as to those four files and that screenings for these children

are not adequately documented."  Id. at 32.

101.    Based on a review of the files cited by CCC, the Board found that "as to nine

of the 12 children cited as lacking vision screening . . . and eight of the ten children cited for

lacking hearing screening . . . the evidence on which CCC relies does not show a material dispute

of fact about ACF's basis for finding that CCC failed to 'perform or obtain . . . screening

procedures to identify concerns regarding a child's sensory (visual and auditory) . . . skills' prior

to the end of the correction action period." Id. at 35.

102.    The Board did find that there was a material dispute of fact regarding ACF's

conclusion that CCC failed to perform or obtain developmental screenings for two children. Id.

at 36.

103.    Concerning 45 C.F.R. § 1304.51(g), which requires CCC to "establish and

maintain efficient and effective record-keeping systems to provide accurate and timely

information regarding children, families, and staff and . . . ensure appropriate confidentiality of

this information[,]" the Board found that CCC's failure to maintain accurate records related to

lead and dental determinations, as well as vision, hearing and developmental screenings, and

nutritional assessments, established that "CCC did not have effective record keeping systems

with accurate and timely information as required by section 1304.51(g)." Id. at 38.

104.    Concerning nutritional assessments, the Board, viewing the evidence in a light

most favorable to CCC, found a material dispute of fact about ACF's basis for concluding that

the records of nutritional assessment did not comply with section 1304.51(g) as it pertained to

two children's files. Id. at 39.

105.    However, the Board found that there was no "material dispute of fact about ACF's

basis for finding that CCC's records of nutritional assessments did not comply with section

1304.51(g) as to the three of the seven children's records cited . . . ." Id. at 40.

106.    Regarding the required background checks that were to be maintained in

employees' personnel files, the Board found that CCC failed to show that it had records of such checks for three of the cited employees prior to the expiration of the corrective action period. Id. at 42.

107.    The Board found that "such checks are plainly vital to assuring the safety and security of children. These failures of documentation are in themselves sufficient to show that CCC did not have a record keeping system effective to ensure accurate and timely records were maintained for its staff." Id.

108.    In sum, the Board found that CCC failed to show that it was in compliance with section 1304.51(g) based "on the lack of records related to lead screening determinations, dental determinations, hearing screenings, vision screenings, nutritional assessments, and criminal and child abuse background checks. Nothing that CCC argued or proffered provided any basis to undercut this finding." Id. at 43.

109.    For all of these reasons, the Board granted ACF's motion for summary judgment and affirmed "ACF's decision to terminate funds for CCC's Head Start grant[.]" Id. at 44.

Respectfully submitted,

  /s/ Jeffrey A. Taylor
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

  /s/ Rudolph Contreras
RUDOLPH CONTRERAS, D.C. BAR #  434122
Assistant United States Attorney

  /s/ Michelle N. Johnson
MICHELLE N. JOHNSON, D.C. BAR # 491910
Assistant United States Attorney

19

United States Attorney's Office
Civil Division
555 4th Street, N.W. – Room E4212
Washington, D.C. 20530
(202) 514-7139

COUNSEL FOR DEFENDANTS


Of Counsel:

Joyce E. McCourt
Assistant Regional Counsel
Office of the General Counsel
United States Department of Health
and Human Services

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CAMDEN COUNTY COUNCIL ON ECONOMIC OPPORTUNITY,** ) | |
| ) | |
| **Plaintiff,** ) | **Civil Action No.: 07-1835 (RCL)** |
| ) | |
| **v.** ) | |
| ) | |
| **UNITED STATES DEPARTMENT OF HEALTH & HUMAN SERVICES,** ) | |
| ) | |
| **and** ) | |
| ) | |
| **MICHAEL LEVITT, Secretary, United States Department of Health & Human Services,** ) | |
| ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

**[PROPOSED] ORDER**

This matter having come before the Court on the Defendants' Motion for Summary

Judgment, Plaintiff's Opposition to the motion, if any, and Defendants' reply, if any, it is hereby

**ORDERED** that Defendants' Motion for Summary Judgment is hereby **GRANTED**.

And it is further

**ORDERED** that judgment is entered in favor of the Defendants.

**SO ORDERED** on this _____ day of _____, 2008.

_____
ROYCE C. LAMBERTH
UNITED STATES DISTRICT JUDGE