**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| CAMDEN COUNTY COUNCIL | ) | |
|   ON ECONOMIC OPPORTUNITY, | ) | |
| 538 Broadway | ) | |
| Camden, NJ 08103 | ) | |
| | ) | |
|       Plaintiff, | ) | |
| | ) | |
|     v. | ) | Civil Action No.: 1:07-cv-01835-RCL |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
|   HEALTH AND HUMAN SERVICES, | ) | |
| 200 Independence Avenue, S.W. | ) | |
| Washington, D.C. 20201, | ) | |
| | ) | |
|     and | ) | |
| | ) | |
| MICHAEL LEAVITT, Secretary, | ) | |
|   U.S. Department of Health and | ) | |
|   Human Services, | ) | |
| 200 Independence Avenue, S.W. | ) | |
| Washington, D.C. 20201, | ) | |
| | ) | |
|      Defendants. | ) | |

_____)

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56, plaintiff Camden County Council on Economic

Opportunity ("CCC") respectfully moves that the Court enter summary judgment in its favor in

the above-captioned matter, and that it vacate Defendants' decision to terminate CCC's financial

assistance under the Head Start Act (42 U.S.C. §§ 9831-9852).  Summary judgment is

appropriate for the reasons set forth in the accompanying memorandum of points and authorities.

Respectfully submitted,


/s/ Robert A. Graham
Robert A. Graham (D.C. Bar No. 450345)
FELDESMAN TUCKER LEIFER FIDELL LLP
2001 L Street, N.W., Second Floor
Washington, D.C. 20036
(202) 466-8960 (telephone)
(202) 293-8103 (facsimile)
rgraham@ftlf.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                          )
CAMDEN COUNTY COUNCIL                 )
   ON ECONOMIC OPPORTUNITY,           )
538 Broadway                                        )
Camden, NJ 08103                                 )
                                                          )
                    Plaintiff,                          )
                                                          )
          v.                                               )          Civil Action No.: 1:07-cv-01835-RCL
                                                          )
UNITED STATES DEPARTMENT OF       )
   HEALTH AND HUMAN SERVICES,      )
200 Independence Avenue, S.W.             )
Washington, D.C. 20201,                        )
                                                          )
          and                                            )
                                                          )
MICHAEL LEAVITT, Secretary,             )
   U.S. Department of Health and           )
   Human Services,                               )
200 Independence Avenue, S.W.             )
Washington, D.C. 20201,                        )
                                                          )
                    Defendants.                      )
_____)

### PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT

Plaintiff Camden County Council on Economic Opportunity ("CCC") respectfully submits this memorandum in opposition to Defendants' ("ACF's") motion for summary judgment and in support of its cross-motion for summary judgment filed contemporaneously herewith.

As described in greater detail below, ACF's decision to terminate CCC's federal financial assistance under the Head Start Act (42 U.S.C. §§ 9831-9852) was arbitrary, capricious, and/or contrary to law, and CCC is therefore entitled to judgment as a matter of law.  The record plainly

reveals that ACF failed to follow the mandates of the Head Start Act and the procedures set forth in agency regulations and guidance in terminating CCC's Head Start grant. The Departmental Appeals Board's decision upholding ACF's determination is likewise erroneous in assuming facts not in evidence in an effort to cure the defects in the agency action. Accordingly, the Court should reverse the judgment in CCC's administrative appeal and direct Defendants to reinstate CCC's Head Start grant.

## STATEMENT OF FACTS

This case arises out of a review of CCC's Head Start program by the Administration for Children and Families ("ACF") within the United States Department of Health and Human Services ("HHS"), and the resultant decision by ACF to terminate CCC's Head Start grant.

The Head Start Act authorizes federal funding of "health, educational, nutritional, social, and other services" to low-income children and families to promote school readiness. 42 U.S.C. § 9831. Funded activities are to be carried out by eligible "local public or private nonprofit or for-profit agenc[ies]" designated by the Secretary of HHS. 42 U.S.C. § 9836(a).

CCC is one such entity. Since 1968, CCC has been the Head Start grantee for the greater Camden, New Jersey area. As of 2007, CCC's Head Start programs served some 1,300 children through twenty-two facilities.

From September 11, 2005 through September 16, 2005, CCC was the subject of a triennial program review by ACF as required under 42 U.S.C. § 9836A(c). The purpose of that review was (1) to determine whether CCC was in compliance with the mandates of the Head Start Act, implementing regulations, and the terms and conditions of CCC's Head Start grant agreement with ACF, and (2) to afford CCC an opportunity to correct those aspects of its operations found to be deficient or out of compliance.

ACF issued a letter to CCC dated January 27, 2006 (the "Initial Determination") describing the results of its review and stating, among other things, that ACF had identified twelve deficiencies in CCC's Head Start program. *See* AR 00226-00257. ACF further instructed CCC to correct three of these deficiencies immediately (*i.e.*, within thirty days), and to correct the remainder within ninety days. AR 00227-29. ACF cited 42 U.S.C. §§ 9836A(d)(1)(B)(i) and (ii) as authority for the thirty- and ninety-day corrective action periods. AR 00228-29.

Of the twelve deficiencies listed in the Initial Determination, four are relevant for the purposes of this litigation. They are as follows:

1.  **Prevention and Early Intervention – Facilities, Materials and Equipment (45 C.F.R. § 1304.53(a)(10)(viii))** – ACF alleged that CCC failed to comply with the regulatory requirement that it ensure that "[i]ndoor and outdoor premises are cleaned daily and kept free of undesirable and hazardous materials and conditions" based on the review team's observation of (1) vines bearing "pokeberries" and a wooden play structure with "splinters, nusty nails, and leaves inside the structure" on the playground at one site (Charleston), and (2) trash and leaves cluttering the front area at another (Hayes). *See* AR 00236. ACF directed CCC to correct these conditions within thirty days. AR 00227.

2.  **Prevention and Early Intervention – Child Health and Developmental Services (45 C.F.R. § 1304.20(a)(1)(ii)(A))** – ACF further found that CCC had not met its obligation to "ensure that all children were up-to-date on their medical and dental care" within ninety days of a child's entry into CCC's Head Start program. ACF specifically stated that of the fifty-six returning children's files reviewed, "five (5) did not contain signed medical exams; seven (7) did not contain dental screenings; and eight (8) had no lead screenings." *See* AR 00233. ACF imposed a ninety-day correction period for this alleged deficiency. AR 00228.

3.  **Prevention and Early Intervention – Child Health and Developmental Services (45 C.F.R. § 1304.20(b)(1))** – ACF also asserted that CCC was deficient for its failure to "ensure that all children enrolled in the [Head Start] program were up-to-date on a schedule of age appropriate preventive and primary health care" within forty-five days of a child's entry into the program. *See* AR 00233. In support of this conclusion, ACF indicated that of the fifty-six returning children's files reviewed, "seven (7) files had no vision screenings; eleven (11) had no hearing screenings; and 22 did not contain any child developmental screenings." *Id.* ACF again required correction of this alleged deficiency within ninety days. AR 00228.

4.  **Record-keeping and Reporting – Management Systems and Procedures (45 C.F.R. § 1304.51(g))** – Finally, ACF cited CCC for a deficiency in its systems of record-keeping

"regarding children, families and staff." *See* AR 00246. ACF stated that its review of seventeen employee files revealed fifteen that did not contain criminal history checks, seventeen with no child abuse clearances, eleven missing tuberculosis screenings, ten without a record of an initial medical examination, two containing no references, eight with no performance evaluation for 2004, and five missing records of training in 2004. *Id.* The review team further found "that in excess of 30% of files [maintained by the Health Manager] contained inaccuracies when compared to hard copy files." *Id.* ACF alleged that files for various children and families lacked health and nutrition information, evidence of progress tracking, documentation of parent participation/involvement, and/or adequate documentation of eligibility and enrollment. AR 00246-47. ACF directed CCC to correct this alleged deficiency within ninety days. AR 00228.

ACF then conducted two on-site follow-up reviews of CCC. The first took place during the week of March 20, 2006, some thirty-four days after notice of the Initial Determination. The March follow-up review focused on corrections required in thirty days. Id. The second follow-up review took place during the week of May 14, 2006. The May follow-up review focused on the deficiencies that were to be corrected within ninety days. *See* AR 00268-310.

Nearly one year later, on April 10, 2007, CCC received a letter from ACF dated April 9, 2007 notifying CCC of the termination of its Head Start grant number 02CH0799. AR 00186-90, 00311. ACF specifically cited three uncorrected deficiencies in the area of Prevention and Early Intervention (deficiencies 1. through 3. discussed above) and one uncorrected deficiency in the area of Record-keeping and Reporting (deficiency 4. discussed above). 00186-90.

According to ACF, CCC had not corrected the deficiency under 45 C.F.R. § 1304(a)(1)(ii)(A) identified in the Initial Determination within the ninety-day corrective action period based on the follow-up review team's conclusion that of the fifty-one children's files examined, "seven (7) had no lead screening [14%] and two (2) did not contain a dental screening [4%]." *See* AR 00195.

The May 2006 review team further found that CCC remained deficient under 45 C.F.R. § 1304(b)(1) because those same fifty-one files "showed missing screenings: twelve (12) had no

vision screening [24%]; ten (10) had no hearing screening [20%]; and three (3) had no developmental screening [6%]." AR 00195-96.

As to the deficiency under 45 C.F.R. § 1304.53(a)(10)(viii) alleged in the Initial Determination, ACF contended that CCC was still deficient based on the March follow-up review team's observations at the "Lois I Center" – a site not mentioned in the initial deficiency finding – where there were "leaves and trash inside the playground fence and alongside the walkway used by the children to access the playground," as well as "two grills (one with an attached gas tank), metal poles used for erecting a tent, drink cans, beer caps, a tank with a wooden beam attached, and a tree from next door that had fallen on the fence" in the playground area. AR 00201-02. The review team also observed "a pile of old wood planks with rusty nails sticking out of it" near the fence at the end of the walkway to the playground. AR 00202. Although the review team acknowledged that CCC staff addressed a number of these conditions immediately after being notified of them, the review team's report stated that:

> the following clean-up still needed to be made: fill holes where tent poles had been extracted from the ground, removal of cement pieces in upper left hand corner of the playground, removal of tree branch leaning on fence in lower left corner, and removal of other debris which included trash and leaves in the playground and the walkway used to access the playground.

AR 00202.

Finally, ACF asserted that CCC's record-keeping practices continued to be deficient under 45 C.F.R. § 1304.51(g) as of the time of the follow-up review. ACF specifically alleged that of the sixteen personnel files examined in the May 2006 site visit, ten did not contain evidence of hiring approval by the CCC Policy Council, eleven lacked a "fingerprint/background check," twelve were missing "CPR/First Aid Training Certificates," and six had no job description. AR 00198. Likewise, of the fifty-one children's files reviewed, the follow-up

review team "found that 12 files did not have vision screenings, 10 files did not have hearing screenings, two files did not have dental examinations, seven files had no lead screenings, seven files did not have nutritional assessments, and three files did not have child developmental screenings." *Id.*

After CCC's filing of its initial submission in this appeal and in response to CCC's request for supporting documentation for the findings in the follow-up review team's report, ACF provided, among other things, the review team's notes regarding the fifty-one children's files. *See* AR 00710-12. The notes listed the seven children's files (two by first initial and last name, one by first and last initial only, and four by full name) that showed no evidence of lead screenings, the two (both by full name) without dental screenings, the twelve (three by first initial and last name, one by first and last initial only, and eight by full name) lacking vision screenings, the ten (three by first initial and last name and seven by full name) containing no hearing screening, the three (one by first and last initial only and two by full name) showing no developmental screening, and the seven (three by first initial and last name and four by full name) that had no nutritional assessments. AR 00710-11.[1]

CCC timely filed an appeal from the Final Determination with the HHS Departmental Appeals Board ("DAB") as permitted under 42 U.S.C. § 9841 and in accordance with the procedures set forth at 45 C.F.R. §§ 1303.14 and 1304.60. As part of that appeal, CCC raised numerous legal and factual arguments disputing the legal and factual underpinnings of ACF's termination of its Head Start grant. CCC argued, among other things, that (1) ACF's finding of a

---

[1] ACF's document production also contained the follow-up review team's "PRISM Question #7 Human Resources" checklist showing the names of the sixteen CCC staff members whose files were reviewed, as well as what appears to be a designation of the documentation present and/or absent from each file. *See* AR 00937-40. The last page of this checklist indicates the review team's count of the number of files missing information by category. AR 00940.

continuing deficiency under 45 C.F.R. § 1304.53(a)(10)(viii) based on the conditions at the Lois I site was erroneous because ACF failed to notify CCC of any need to address those conditions, (2) ACF did not have the authority under its own regulations unilaterally to impose a ninety day corrective action period, and (3) even assuming that ACF was empowered to require CCC to correct the alleged deficiencies within ninety days, it failed to exercise that power in a manner consistent with the Head Start Act.

ACF moved for summary disposition of CCC's appeal.  In doing so, ACF contended that, despite the fact that its initial finding of a deficiency under 45 C.F.R. § 1304.53(a)(10)(viii) made no reference to the Lois I site, CCC was necessarily on notice of the need to ensure that "[i]ndoor and outdoor premises are cleaned daily and kept free of undesirable and hazardous materials and conditions" at all of its facilities, including Lois I.  ACF further asserted that the 1996 amendments to the Head Start Act authorized the agency to instruct a "grantee with deficiencies" to take corrective action within ninety days, and that Head Start regulations providing only for corrective action according to a negotiated "quality improvement plan" or, in extraordinary circumstances, "immediately" were effectively superseded by this legislative enactment.

On September 25, 2007 the DAB issued a decision granting ACF's motion for summary disposition and thereby upheld the termination CCC's Head Start grant.  The DAB ruled that 42 U.S.C. § 9836a(d)(1)(B)(ii) – *i.e.*, the 1996 amendment to the Head Start Act referenced above – authorized ACF unilaterally to impose a ninety day corrective action period.  AR 00009. According to the DAB, this portion of the statute is self-implementing, and ACF's failure to incorporate the "ninety day authority" into either Head Start regulations or ACF policy guidance is therefore of no moment *Id.*  As to CCC's contention that ACF had not made a finding "that . .

. a 90-day period is reasonable, in light of the nature and magnitude of the deficiency" as required to avail itself of the provisions of 42 U.S.C. § 9836a(d)(1)(B)(ii), the DAB simply "presume[d] that ACF did make a finding that the 90-day period was reasonable in light of the nature and magnitude of the deficiencies found." The DAB further postulated "that ACF could have articulated the reasons for that finding had CCC questioned it at the time" of its Initial Determination. AR 00014. Finally, the DAB held that ACF's finding in its Initial Determination that CCC was deficient under 45 C.F.R. § 1304.53(a)(10)(viii) provided sufficient notice to CCC of the need to correct any similarly deficient conditions at the Lois I facility. AR 00014-17.

### STANDARD OF REVIEW

Summary judgment is proper if the undisputed material facts in the record, viewed in the light most favorable to the non-moving party, reveal that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Agency action reviewable under the Administrative Procedure Act is susceptible to reversal and/or vacatur if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5 U.S.C. § 706(2)(A). It is a well-established principle of administrative law that an agency action is arbitrary and capricious if the agency has "entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Assn. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983); *see also U.S. Telecom Association v. FCC*, 227 F. 3d 450, 461 (D.C. Cir. 2000) ("Fundamental principles of administrative law require that agency action be based on a consideration of the relevant factors." (internal quotations and citation omitted)). It is also well-established that "an Agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs.*, 463 U.S. at 50.

## ARGUMENT

Summary judgment in favor of CCC is proper in this circumstance for at least two reasons. First, as to the deficiencies alleged under 45 C.F.R. § 1304.20(a)(1)(ii)(A), 45 C.F.R. § 1304.20(b)(1), and 45 C.F.R. § 1304.51(g), ACF lacked the authority under its own regulations unilaterally to require correction of those deficiencies within ninety days and, in any event, failed to follow the statutorily required procedures in imposing such a ninety-day correction period. Second, as to the deficiency alleged under 45 C.F.R. § 1304.53(a)(10)(viii), ACF failed to provide sufficient notice to CCC of any need to address the conditions underlying that deficiency determination.

ACF is not entitled to summary judgment as there are genuine disputes over the factual predicates for ACF's motion.

I.    *ACF Did Not have the Authority to Impose a 90-Day Corrective Action Period in the First Instance.*

Anticipating CCC's arguments concerning the legal infirmities in the process that led to the termination of CCC's Head Start grant, ACF contends, in part, that the 1998 amendments to the Head Start Act permit it to direct a Head Start agency "to correct [a] deficiency not later than 90 days after the identification of the deficiency if the Secretary finds, in the discretion of the Secretary, that such a 90-day period is reasonable, in light of the nature and magnitude of the deficiency." 42 U.S.C. § 9836a(d)(1)(B)(ii). ACF further asserts that it may take advantage of this authority despite the fact that Head Start implementing regulations provide only for correction of deficiencies "either immediately" where necessary to protect participant/staff health and safety or to safeguard the integrity of federal funds, " or pursuant to a Quality Improvement Plan." 45 C.F.R. § 1304.60(b). ACF bases its position on the notion that the 1998 statutory amendments supersede and/or implicitly repeal the limitations in 45 C.F.R. § 1304.60 because

9

(1) the relevant changes to the Head Start Act post-date ACF's promulgation of 45 C.F.R. §

1304.60, and (2) 45 C.F.R. § 1304.60 is in conflict with the amended 42 U.S.C. §

9836a(d)(1)(B)(ii).

ACF's arguments on this score are unavailing. Head Start regulations do not currently

allow ACF to impose the ninety-day correction period to which it refers. The Head Start

Performance Standards at 45 C.F.R. part 1304, subpart E, govern and define the contours of

ACF's implementation and enforcement authority. Those regulations provide that upon

identification of a deficiency in a Head Start grantee's operations, the "responsible HHS official"

will notify the grantee in writing of the deficiency, and "inform the grantee that it must correct

the deficiency *either immediately or pursuant to a Quality Improvement Plan*." 45 C.F.R. §

1304.60(b) (emphasis added).

At no point in the Head Start implementation and enforcement regulations is there any

mention of any power on the part of ACF to require correction of a deficiency within ninety days

and without a QIP. Rather, 45 C.F.R. § 1304.60(c) is framed in mandatory "either/or" terms –

*i.e.*, the sole options that ACF has under its own regulations are to direct immediate correction of

a health and safety/funds integrity deficiency, or to direct correction of any other deficiency

according to the terms and conditions of a QIP.

In this regard, 45 C.F.R. § 1304.60(b) serves as a self-imposed constraint on ACF's

discretionary authority under 42 U.S.C. § 9836a(d)(1)(B)(ii). Where, as here, an agency enjoys

some measure – even a substantial measure – of discretion under a statute, it is well-settled that

an agency regulation may limit the exercise of that discretion. *Vitarelli v. Seaton*, 359 U.S. 535,

539 (1959); *see also Padula v. Webster*, 822 F.2d 97, 100 (D.C. Cir. 1987) ("[A]n agency, even

one that enjoys broad discretion, must adhere to voluntarily adopted, binding policies that limit

its discretion.").  Indeed, for an agency simply to disregard its own duly-promulgated and valid regulations would not only amount to arbitrary and capricious action in violation of the Administrative Procedure Act ("APA"), but would also violate the fundamental due process principle that the government will follow the law.  *See Daniels v. Williams*, 474 U.S. 327, 330-332 (1986); *see also National Family Planning and Reproductive Health Ass'n v. Sullivan*, 979 F.2d 227, 234 (D.C. Cir. 1992) (agency is bound to follow its own duly-adopted regulations, even where they operate to inconvenience the government).

That the amended 42 U.S.C. § 9836a(d)(1)(B)(ii) was enacted after ACF's adoption of 45 C.F.R. § 1304.60(b) does nothing to overcome the principles cited above.  ACF posits that because the "ninety-day authority" conferred by § 108 of the Coats Human Services Amendments of 1998, Pub. L. No. 105-285, 112 Stat. 2716 (1998), was in addition to that enjoyed by ACF under its regulations, and because Congress is, as a matter of statutory construction, presumed to be familiar with the state of the law when it takes a particular legislative action, Congress necessarily intended that the revised 42 U.S.C. § 9836a(d)(1)(B) would supplant or supersede the provisions of 45 C.F.R. § 1304.60(b).  ACF Br. at 29-30.

ACF's authority under the 1998 version of 42 U.S.C. § 9836a(d)(1)(B)(ii) does not, however, conflict with the requirements of 45 C.F.R. § 1304.60(b), and ACF therefore cannot reasonably contend that the former works to repeal the latter.  This is particularly the case given that this authority is a discretionary one (as opposed to a mandatory one).  That is, were 42 U.S.C. § 9836a(d)(1)(B)(ii) to provide that ACF *must* require correction within ninety days, it would be manifestly inconsistent with 45 C.F.R. § 1304.60(b), and ACF would have a far more tenable argument for repeal by implication.  However, because the "ninety day authority" is permissive (to the extent that it allows the Secretary to opt for the quality improvement plan

process), ACF regulations surrendering that authority may properly remain in effect as a self-imposed constraint on its discretion.

ACF's reasoning further ignores the fact that more than nine years have passed since the Congress added the "ninety-day authority" to the Head Start Act, yet ACF has taken no steps to inform regulated entities of any intention to avail itself of that authority, much less to amend its regulations to incorporate that power. To the contrary, ACF has consistently stated in its public guidance that it views its authority as confined to the terms of its existing regulations. ACF now seeks to reverse that position vis-à-vis CCC. The 2005 PRISM Guide makes no reference to any ninety-day correction period.[2] It instead shows ACF's continued reliance on 45 C.F.R. § 1304.60(b) as requiring "the responsible HHS official [to] inform the grantee that it must correct [a] deficiency either immediately or pursuant to a Quality Improvement Plan." AR 01593; *see also* AR 01598 (deficiencies "must be corrected, either immediately or pursuant to a Quality Improvement Plan"). ACF cannot now disavow this position for its advantage or convenience. *See National Family Planning and Reproductive Health Ass'n*, 979 F.2d at 234.

If ACF wishes to abandon the structure currently set forth in 45 C.F.R. § 1304.60 in favor of a ninety-day correction scheme, it can only do so through a notice and comment rulemaking proceeding under 5 U.S.C. § 553. The portion of the Head Start Act governing "Quality Standards; Monitoring of Head Start Agencies and Programs" makes clear that in establishing quality standards and enforcement rules for Head Start programs, HHS shall do so by regulation. 42 U.S.C. § 9836A(a)(1). Accordingly, any changes to 45 C.F.R. part 1304 (the Head Start Performance Standards) may be effected only by way of a duly-promulgated regulation.

---

[2] This is the PRISM guide followed by ACF during the initial review of CCC as that review took place in the 2005 Federal fiscal year. *See* AR 01542-01860.

This view of the statute is consistent with the approach that ACF took in issuing the current Head Start enforcement regulations. ACF indicated in its April 22, 1996 omnibus "Notice of Proposed Rulemaking" that one of its chief purposes in initiating that rulemaking was to "implement[] the [1994] amendments in section [641A(d)]" of the Head Start Act – *i.e.*, the portion of the Act at issue here, 42 U.S.C. § 9836a(d). *See* U.S. Dep't of Health and Human Servs., "45 C.F.R. Parts 1301, 1303, et al. – Head Start Program; Proposed Rule," 61 Fed. Reg. 17,754, 17,758 (Apr. 22, 1996). ACF thus clearly understood not only that it could not simply rely on the text of the Head Start Act itself in implementing the enforcement provisions of the Act, but also that it must proceed by way of notice and comment rulemaking in crafting and adopting such implementing rules.

In brief, much as in *Vitarelli v. Seaton*, ACF cannot avoid the effect of its regulations even where it could have, but did not, amend those regulations. *Vitarelli*, 359 U.S. at 540 ("[T]he Secretary here . . . was bound by the regulations which he himself had promulgated for dealing with such cases . . . ."). So long as ACF leaves 45 C.F.R. § 1304.60(b) in its current form, it remains operative in its current form and has the force of law. *United States v. Nixon*, 418 U.S. 683, 695 (1974).

II.     *ACF Failed to Consider Relevant Factors and Acted Contrary to Law.*

Even assuming that ACF does, in fact, have the authority unilaterally to direct corrections within ninety days, it failed to satisfy even the minimal precondition imposed by statute for the exercise of that authority. Although 42 U.S.C. § 9836a(d)(1)(B)(ii) might afford ACF the option of imposing a ninety-day correction period, that option is available only if ACF makes a

determination that this timeframe is reasonable "in light of the nature and magnitude of the deficiency." By ACF's own admission, it has made no such determination.[3]

"When a statute requires agencies to 'consider' particular factors, it imposes upon agencies duties that are 'essentially procedural' . . . . [T]he only role for a court is to insure that the agency has considered the [factor]." *Getty v. Federal Sav. and Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986). It is insufficient for an agency merely to state it considered a given factor in reaching a decision. *Id.* Rather, a court must make a "searching and careful" inquiry to determine whether it was considered. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416.

As such, it was ACF's obligation as a matter of law to present sufficient reasons for its actions and decisions to allow a reviewing tribunal to pass on the propriety of those actions and decisions. *Armstrong v. Executive Office of the President*, 810 F.Supp. 335, 339 (D.D.C. 1993). A failure to do so will warrant a remand to the agency for greater explanation. *Id.* This is so notwithstanding ACF's contention that its "ninety-day authority" is discretionary, since even the statutory provision on which ACF relies sets as a precondition to the exercise of that authority a finding by the Secretary that a ninety day correction period "is reasonable, in light of the nature and magnitude of the deficiency . . . ." 42 U.S.C. § 9836A(d)(1)(B)(ii). In the absence of any justification for such a finding, a reviewing tribunal will not have a full and fair opportunity to

---

[3] CCC requested, as part of its administrative appeal, any ACF documents that would show that ACF had determined that ninety days was reasonable to allow CCC to correct the deficiencies "in light of the nature and magnitude of the deficiency." ACF responded by stating that, "[a]side from the statute itself, and the regulations, and material on the ACF website . . . we have only used opinions of the courts and the DAB." *See* AR 00942.

determine whether the finding is arbitrary, capricious, and/or an abuse of discretion, and remand

to the agency for further explanation will be appropriate.[4]

The Departmental Appeals Board compounded this error first by effectively reading the

"reasonableness determination" requirement out of the statute, and then by assuming facts not in

evidence to find that ACF had satisfied that requirement.  The DAB determined that the ACF's

admission that it had made no particularized analysis to support the imposition of a ninety-day

correction period failed to "establish that ACF did not make an appropriate determination before

selecting the 90-day period."  AR 00012.  The DAB further stated that, notwithstanding the clear

language of 42 U.S.C. § 9836A(d)(1)(B)(ii), "CCC has cited no basis (nor do we see any) for

concluding that ACF is required, as part of its prima facie case for termination, to prove or even

explain its basis for requiring a grantee to correct under one or another of the three time frames

prescribed by section 9836a(d)(1)."  AR 00012.  In an effort completely to dispose of CCC's

argument on this score, the DAB then found that "since ACF's January notice referred to the

relevant statutory provision and to the review findings, *we presume* that ACF did make a finding

that the 90-day period was reasonable in light of the nature and magnitude of the deficiencies

---

[4] This is no mere formal objection on CCC's part as there is substantial doubt as to whether ACF could plausibly have decided that a ninety-day correction period was "reasonable" given what the Initial Determination demanded of CCC.  As set forth in the January 27, 2006 deficiency notice, CCC was required to correct three deficiencies within thirty days of receipt of that notice, nine deficiencies within ninety days, and fully thirty-six matters of non-compliance within ninety days of such receipt.  *See* AR 00227-228.  Moreover, the issues that ACF identified for CCC to address covered the full spectrum of CCC's Head Start operations, from governance policies, to fiscal administration, to human resources, to facilities management, to virtually every other aspect of the Head Start program.  The sheer number of corrections that CCC was to make within the ninety days allowed by ACF calls into question any determination that such a period is "reasonable," even if ACF enjoys a great deal of discretion in this regard.  That the actions required of CCC in that timeframe involved so many areas of its operations and, in some cases, entailed substantial and even structural changes can only further support the notion that any determination of "reasonableness" would necessarily be arbitrary, capricious, and/or an abuse of ACF's discretion.

found [and] that ACF could have articulated the reasons for that finding had CCC questioned it at the time." *Id.* (emphasis added).

The DAB's casual treatment of this issue cannot save ACF's decision from vacatur and remand. The DAB is simply wrong as a matter of law to suggest that ACF was not bound to expend at least some energy toward considering the wisdom of requiring correction within ninety days (as opposed to a QIP process). The DAB's reliance on ACF's reference to 42 U.S.C. § 9836A(d)(1)(B)(ii) to find that ACF had met this obligation is likewise misguided, as merely parroting the statutory language is not synonymous with a finding of reasonableness. *See Getty*, 805 F.3d at 1055 ("Stating that a factor was considered, however, is not a substitute for considering it.").

III.    *ACF Failed to Provide Adequate Notice to CCC of the Need to Address the Conditions Giving Rise to the Finding of a Continuing Deficiency under 45 C.F.R. § 1304.53(a)(10)(viii).*

The Head Start Act makes clear that ACF must show similarity between an initial determination of deficiency and a final determination in order to support a termination action. *See* 42 U.S.C. § 9836A(d)(1)(A). Failure to meet this standard is tantamount to a failure to provide the notice of deficiency required under the Act and the finding should be dismissed.

This principle of law was most recently discussed in the Board's decision in the *Norwalk Economic Opportunity Now, Inc.* ("*NEON*"), DAB No. 2002 (Nov. 28, 2005) (attached hereto as Exh. A). In *NEON*, the Board, quoting from its decision in the *First State*[5] case, wrote: "[p]ast Board rulings requir[e] sufficient similarity between a finding supporting a 'repeat deficiency' and the original deficiency finding related to performance standards where the lack of such similarity might raise a legitimate notice question."

_____

[5] *First State Community Action Agency, Inc.*, DAB No. 1877 (May 1, 2003) (attached hereto as Exh. B).

16

Indeed, in *First State*, the Board dismissed an alleged repeat deficiency on grounds remarkably similar to those found here.  In that appeal, ACF's initial determination was that First State did not accurately count the meals served to Head Start children in violation of 45 C.F.R. § 74.51.  In the follow-up report, ACF confirmed that there was an accurate count of meals but found that First State did not properly track a cost-of-living award and remained, therefore, in violation of § 74.51.  The Board found that there was insufficient similarity between the two deficiency findings to meet the notice requirements of the Head Start Act and refused to allow this finding to serve as a basis for termination.

In this case, ACF stated in the Initial Determination that it found that the Charleston site playground area had pokeberry vines protruding onto the play area, and that the play structure had splinters, rusty nails and leaves inside it.  The review team also found that the "Haynes [sic] site front area was cluttered with trash and leaves" and that "[t]here was no indication of daily cleaning to this site."  AR 00236.  ACF found that these conditions violated 45 C.F.R. § 1304.53(a)(10)(viii), which requires daily cleaning of indoor and outdoor premises.  ACF further found that the conditions at the two sites (none of the other 22 sites operated by CCC were mentioned) constitute a "deficiency [that] threatens the health and safety of staff or program participants" and that "the area(s) of noncompliance constituting this deficiency must be fully corrected within no more than thirty (30) days."  *Id.*  Importantly, there was no finding in the Initial Determination of a systemic or wide-spread failure on the part of CCC to monitor its playgrounds.  The Initial Determination focused solely on the Hayes and Charleston sites.

When ACF returned on March 20, 2006, it found that "[t]he concerns raised in the 2005 Head Start Review Report regarding the Charleston Center and the Hayes Center had been

resolved." AR 00202. However, ACF determined that CCC was still not in compliance because it found an unsafe condition (which CCC disputes as noted below) at a different site – Lois I. *Id.*

These findings do not meet the standard for proper notice laid out in the *First State* and *NEON* cases cited above. There is nothing in ACF's finding that would put CCC on notice that it was required to revamp its entire system of safety inspections or daily cleanings or that there was a dangerous condition at the Lois I site requiring immediate correction.[6] ACF specifically told CCC that it had conditions so dangerous at two specific sites that those conditions threaten the health and safety of staff or program participants. In other words, the deficiency was specific to the two identified sites, Hayes and Charleston, and not to the entire operation of CCC. As noted in the Termination Letter, the dangerous conditions were corrected, and ACF therefore could not rely on the conditions at Lois I as a basis for termination.

ACF attempts to defend its finding of a continuing deficiency under 45 C.F.R. § 1304.53(a)(10)(viii) by suggesting that CCC was on notice of the kinds of conditions that ACF would find deficient by virtue of the January 27, 2006 Initial Determination, and that the presence of such conditions at any CCC site would therefore support a decision to terminate. *See* ACF Br. at 24-25. In support of this position, ACF relies on this Court's decision in *Beverly Health & Rehab. Services, Inc. v. Thompson*, 223 F. Supp. 2d 73 (D.D.C.).

ACF's reasoning on this score simply does not hold water. By ACF's estimation, CCC should have known, based on the language of the Initial Determination, that it was required to

---

[6] In fact, ACF bypassed the opportunity, extensively discussed in the *NEON* and *First State* appeals, to clarify what exactly were the alleged problems with CCC's Head Start Program by using the quality improvement plan process. Instead, ACF left CCC on its own to interpret the findings of the Initial Determination by demanding that all findings be corrected in a very short period of time. CCC's interpretation of the findings is found in its letter of March 1, 2006, AR 00260-67, in which CCC very clearly believed that this finding only concerned the Hayes and Charleston sites.

inspect *all* of the sites it operates as part of its Head Start program to determine its compliance with 45 C.F.R. § 1304.53(a)(10)(viii) and, where necessary, correct any instances of non-compliance - - all within thirty days of CCC's receipt of the Initial Determination.

The law, however, does not support this conclusion.  The Board has articulated the test for determining whether a Head Start grantee has received sufficient notice of a deficiency as follows:  "Where a requirement is clear and a QIP shows that the grantee understood what it was required to do, no notice issue arises."  *See First State*, DAB No. 1977 at 17.  It is on the "understood what it was required to do" criterion that ACF's argument founders.  The Initial Determination indicated only that two of the numerous sites visited[7] as part of CCC's Triennial PRISM Review were deficient under 45 C.F.R. § 1304.53(a)(10)(viii) - - the Charleston site because of the presence of pokeberries, splinters, rusty nails, and leaves in and around an unused wooden play structure, and the Hayes site because of trash and leaves in the front area.  AR 00236.  In terms of the steps necessary to bring CCC into compliance with 45 C.F.R. § 1304.53(a)(10)(viii), the Initial Determination said nothing except to direct that CCC correct the deficiency within thirty days.  AR 00227-28.  CCC was therefore at most on notice of a need to address the conditions at the Charleston and Hayes sites, but had no reason to believe that the conditions at any other site demanded such immediate attention.

---

[7] The January 27, 2006 Head Start Review Report indicates ACF reviewers visited at least fifteen sites in the course of the September 2005 review, including Berlin, North 27th Street, Pierce Street, Centerville, Hayes, Florence, West Atco, Pine Street, Yorkship, Clementon, Hope Memorial, Charleston, Collingswood, Lawnside, and Lois Avenue.  *See generally* AR 00226-57.

IV.    *There Are Material Facts in Dispute Precluding Summary Judgment in Favor of ACF.*

    A.    *Prevention and Early Intervention – Child Health and Developmental Services (45 C.F.R. § 1304.20(a)(1)(ii)(A))*

CCC presented ample evidence before the DAB to dispute the factual findings underlying ACF's determination of a continuing deficiency under 45 C.F.R. § 1304.20(a)(1)(ii)(A):

    1.    *Lead Screening*

Of the seven children listed in AR 00707 as lacking documentation of lead screening, one could not be identified because ACF listed that child only by initials, and there are multiple CCC children with those same initials.  The records of the children that CCC was able to locate revealed that four were screened for lead risk and the parents of one refused to submit to screening but CCC documented follow-up actions.  *See* AR 00713-16, 00717-20, 00748-51, 00783-84, 00785-87.

Therefore, whereas ACF alleged that seven of fifty-one records lacked lead screening, the available documentation does not support this allegation.  Furthermore, as is evident from AR 00316-96, CCC had a system in place to follow-up with parents who are not up-to-date and facilitate needed appointments, and documented those efforts in the records.  This manner of follow-up is precisely what ACF recommends in the guidance to 45 C.F.R. §§ 1304.20(a) and 1304.51(c) with respect to non-compliant parents.

    2.    Dental Examinations

Of the two children lacking dental examinations, the parents of both either failed to submit requested documentation or failed to make/attend a dental appointment.  CCC, however, took the follow-up steps required of it as documented in each of these children's files.  *See* AR 00747, 00776-77.  Thus, while ACF alleged that two of 51 records lacked dental examinations,

ACF did not account for CCC's efforts to assist non-compliant parents with obtaining dental examinations consistent with 45 C.F.R. §§ 1304.20(a) and 1304.51(c).

B.      *Prevention and Early Intervention – Child Health and Developmental Services (45 C.F.R. § 1304.20(b)(1))*

CCC presented ample evidence before the DAB to dispute the factual findings underlying ACF's determination of a continuing deficiency under 45 C.F.R. § 1304.20(b)(1):

1.      <u>Vision Screening</u>

Of the twelve children listed as lacking vision screening listed in AR 00710, one could not be identified because ACF listed that child only by initials, and there are multiple CCC children with those same initials.  That said, the records of the children that CCC was able to revealed that a number have documentation of completed vision screening, and one was listed by the provider as unable to complete the exam. *See* AR 00714, 00717, 00743, 00746, 00778.

Therefore, whereas ACF alleged that twelve of fifty-one records lacked lead screening, the available documentation does not support this allegation and, indeed, tends to demonstrate that CCC was regularly documenting and tracking vision screenings.

2.      <u>Hearing Screening</u>

Similarly, of the ten children's files listed as lacking hearing screening, a number have documentation of completed hearing screenings or showed that the provider as unable to complete the exam.  *See* AR 00715, 00720, 00743, 00745, 00779, 00786.

ACF's conclusion that significant numbers of children's files were deficient due to the absence of hearing screenings is inconsistent with CCC's records.

3.      <u>Developmental Screening</u>

21

Of the three children listed as lacking developmental screening, one could not be identified for reasons already stated, and the remaining two have records of completed developmental screens.  *See* AR 00721-42, 00755-75.

C.    *Record-keeping and Reporting – Management Systems and Procedures (45 C.F.R. § 1304.51(g)): that CCC had not fully established and maintained efficient and effective record-keeping systems to provide accurate and timely information regarding children, families and staff.*

1.    *Nutritional Assessments*

Concerning the files for the seven children listed as lacking nutritional assessments at AR 00711, two could not be identified because they are listed only by first initial and last name, and there are multiple CCC children with those same first initials and last names.  Of the remainder, CCC's records show that the majority contain documentation of completed nutritional assessments.  *See* AR 00753-54, 00781-81, 00789.  Again, the contents of the children's files thus undermines ACF's allegations serving as the basis for its decision to terminate CCC's Head Start grant.

It bears further mention that CCC implemented a new records management policy as of April 27, 2006.  *See* AR 00340-42.  The ninety-day corrective action period that ACF imposed in its Initial Determination was simply not a reasonable amount of time to properly assess CCC's effectiveness in achieving compliance in such a broad area involving the volume of records that CCC is required to maintain.

2.    *Personnel Files*

We note at the outset that New Jersey state law requires that personnel records must be maintained at each Center. *See* AR 00397-410.  The review team did not visit individual centers to review personnel records and accordingly the review was inadequate.  As is evident from AR

00790-936, the records of the sixteen employees reviewed by ACF did, in fact, substantially

comply with Head Start record-keeping requirements.

a.     *Policy Council Approval*

Only one employee file – not ten, as ACF found – lacks documentation of a required

Policy Council approval.  *See* AR 00793, 00804, 00836, 00853, 00901.  Moreover, that one

employee was terminated within the first sixty days of employment, and her termination pre-

dates CCC's receipt of ACF's Initial Determination.  AR 00832 (showing termination date as

"11-5-05"). In light of the fact that it would be unreasonable to expect CCC to obtain and

document Policy Council approval of this hire after-the-fact, this amounts to what is, at best, an

inconsequential non-compliance with CCC's record-keeping obligations.

Further, witness testimony and the documentary evidence will show that CCC has a

policy and process to obtain Policy Council for all new hires, and that there is no requirement to

maintain that documentation in individual employment records.  Significantly, Policy Council

governance was reviewed by ACF, but no systemic deficiency was noted in the governance area.

b.     *Position Descriptions*

The six employee files that ACF found to lack position descriptions all contain such

documentation – again with the sole exception of the terminated employee noted above.  *See* AR

00886-89, 00916-18, 00923-26, 00933-36.  Once again, CCC could not reasonably be required to

correct the terminated employee's file *post hoc*.

c.     *Fingerprint/Background Checks*

ACF was also incorrect in finding that eleven of the sixteen employee files it reviewed

lacked documentation of criminal history clearances.  *See* AR 00795-98, 00805-07, 00813-16,

00822-24, 00844-47, 00882-84, 00891-93, 00902-04, 00928-30.  The two personnel files that

contained no documentation of criminal background checks were both for employees terminated by CCC. *See* AR 00832, 00835.

        d.     *CPR and First Aid Training*

Although ACF contends that twelve (of sixteen) employee files lacked documentation of CPR/First Aid training, all but three – those of a substitute teacher, an administrator, and the employee terminated prior to CCC's receipt of the Initial Determination – contained such records. *See* AR 00799, 00825, 00837, 00848, 00857, 00866, 00876, 00885, 00894, 00905, 00915, 00922, 00931. Further, New Jersey law does not require all staff to be certified in CPR/First Aid, but instead mandates only that one staff member with CPR and First Aid training be in the center when children are present. *See* AR 00465.

Thus, the great weight of the evidence establishes that ACF's review of CCC's record-keeping policies and practices was inaccurate and that the Board should therefore reverse this deficiency finding as a basis for termination of CCC's Head Start assistance.

    D.    *Prevention and Early Intervention – Facilities, Materials and Equipment (45 C.F.R. § 1304.53(a)(10)(viii)).*

Notwithstanding the claims in the Termination Letter, CCC maintenance personnel corrected the one hazardous condition (the fallen tree) that the follow-up review team observed immediately after that condition arose. Staff removed the fallen tree and debris by the end of the day (March 22, 2006). Likewise, a fence physically separated the playground from the parking lot area and the church beyond that where ACF alleged that a barbeque grill and other debris created a safety hazard. CCC had taken appropriate measures to attempt correction of facilities problems at the Lois I site, and, in fact, terminated the lease in May 2006. AR 00661-705.

**CONCLUSION**

For the reasons set forth herein, CCC respectfully requests that the Court grant its motion

for summary judgment and deny ACF's motion for summary judgment.


Respectfully submitted,


/s/ Robert A. Graham
James L. Feldesman (D.C. Bar No. 023796)
Edward T. Waters (D.C. Bar No. 422461)
Robert A. Graham (D.C. Bar No. 450345)
FELDESMAN TUCKER LEIFER FIDELL LLP
2001 L Street, N.W., Second Floor
Washington, D.C. 20036
(202) 466-8960 (telephone)
(202) 293-8103 (facsimile)
jfeldesman@ftlf.com
ewaters@ftlf.com
rgraham@ftlf.com

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CAMDEN COUNTY COUNCIL )
  ON ECONOMIC OPPORTUNITY, )
538 Broadway )
Camden, NJ 08103 )
  )
        Plaintiff, )
  )
        v. )     Civil Action No.: 1:07-cv-01835-RCL
  )
UNITED STATES DEPARTMENT OF )
  HEALTH AND HUMAN SERVICES, )
200 Independence Avenue, S.W. )
Washington, D.C. 20201, *et al.*, )
  )
        Defendants. )
_____)

**<u>COUNTERSTATEMENT OF MATERIAL FACTS</u>**

      Pursuant to L.Cv.R. 7(h) and 56.1, plaintiff Camden County Council on Economic Opportunity ("CCC") respectfully submits this "Counterstatement of Material Facts" in opposition to Defendants' motion for summary judgment and in support of its motion for summary judgment filed contemporaneously herewith.

      1.  CCC is a not-for-profit corporation established and in good standing under the laws of the State of New Jersey, and is exempt from federal income taxation pursuant to Section 501(c)(3) of the Internal Revenue Code of 1986.  Dfts' Statement of Facts ¶ 8.

      2.  Since 1968, CCC has received federal financial assistance under the Head Start Act (codified at 42 U.S.C. §§ 9831-9852) to carry out early childhood educational and related activities in the greater Camden, New Jersey area.  Its combined Head Start and Early Head Start federal funding as of 2007 was under grant number 02CH0799.  Dfts' Statement of Facts ¶ 8.

3.  Defendant United States Department of Health and Human Services ("HHS") is an "agency" of the Government of the United States within the meaning of 5 U.S.C. § 701(b)(1).

4.  Defendant Michael Leavitt is Secretary of HHS and is the federal official statutorily charged with implementation of the federal Head Start and Early Head Start programs authorized under the Head Start Act.  Secretary Leavitt has delegated responsibility for oversight and administration of the Head Start/Early Head Start program to the Office of Head Start within HHS's Administration for Children and Families ("ACF"). 71 Fed. Reg. 59,117 (Oct. 6, 2006).

5.  From September 11, 2005 to September 16, 2005 ACF conducted a monitoring review of CCC's Head Start program using the Program Review Instrument for Systems Monitoring ("PRISM").  ACF performs such reviews to determine a recipient's compliance with the Head Start Program Performance Standards and other legislation, regulatory and policy requirements. Dfts' Statement of Facts ¶ 9; AR 01542-01860.

6.  ACF issued a letter to CCC dated January 27, 2006 (the "Initial Determination") describing the results of its review and stating, among other things, that ACF had identified twelve deficiencies in CCC's Head Start program.  *See* AR 00226-00257. ACF further instructed CCC to correct three of these deficiencies immediately (*i.e.*, within thirty days), and to correct the remainder within ninety days.  AR 00227-29.  ACF cited 42 U.S.C. §§ 9836A(d)(1)(B)(i) and (ii) as authority for the thirty- and ninety-day corrective action periods.  AR 00228-29.

7.  Of the twelve deficiencies listed in the Initial Determination, four are relevant for the purposes of this litigation.  They are as follows:

1.  **Prevention and Early Intervention – Facilities, Materials and Equipment (45 C.F.R. § 1304.53(a)(10)(viii))** – ACF alleged that CCC failed to comply with the regulatory requirement that it ensure that "[i]ndoor and outdoor premises are cleaned daily and kept free of undesirable and hazardous materials and conditions" based on the review team's observation of (1) vines bearing "pokeberries" and a wooden play structure with "splinters, nusty nails, and leaves inside the structure" on the

playground at one site (Charleston), and (2) trash and leaves cluttering the front area at another (Hayes).  *See* AR 00236. ACF directed CCC to correct these conditions within thirty days.  AR 00227.

2.  **Prevention and Early Intervention – Child Health and Developmental Services (45 C.F.R. § 1304.20(a)(1)(ii)(A))** – ACF further found that CCC had not met its obligation to "ensure that all children were up-to-date on their medical and dental care" within ninety days of a child's entry into CCC's Head Start program.  ACF specifically stated that of the fifty-six returning children's files reviewed, "five (5) did not contain signed medical exams; seven (7) did not contain dental screenings; and eight (8) had no lead screenings."  *See* AR 00233.  ACF imposed a ninety-day correction period for this alleged deficiency.  AR 00228.

3.  **Prevention and Early Intervention – Child Health and Developmental Services (45 C.F.R. § 1304.20(b)(1))** – ACF also asserted that CCC was deficient for its failure to "ensure that all children enrolled in the [Head Start] program were up-to-date on a schedule of age appropriate preventive and primary health care" within forty-five days of a child's entry into the program.  *See* AR 00233.  In support of this conclusion, ACF indicated that of the fifty-six returning children's files reviewed, "seven (7) files had no vision screenings; eleven (11) had no hearing screenings; and 22 did not contain any child developmental screenings."  *Id.*  ACF again required correction of this alleged deficiency within ninety days.  AR 00228.

4.  **Record-keeping and Reporting – Management Systems and Procedures (45 C.F.R. § 1304.51(g))** – Finally, ACF cited CCC for a deficiency in its systems of record-keeping "regarding children, families and staff."  *See* AR 00246.  ACF stated that its review of seventeen employee files revealed fifteen that did not contain criminal history checks, seventeen with no child abuse clearances, eleven missing tuberculosis screenings, ten without a record of an initial medical examination, two containing no references, eight with no performance evaluation for 2004, and five missing records of training in 2004.  *Id.*  The review team further found "that in excess of 30% of files [maintained by the Health Manager] contained inaccuracies when compared to hard copy files."  *Id.*  ACF alleged that files for various children and families lacked health and nutrition information, evidence of progress tracking, documentation of parent participation/involvement, and/or adequate documentation of eligibility and enrollment.  AR 00246-47.  ACF directed CCC to correct this alleged deficiency within ninety days.  AR 00228.

8.  ACF then conducted two on-site follow-up reviews of CCC.  The first took place during the week of March 20, 2006, some thirty-four days after notice of the Initial Determination.  The March follow-up review focused on corrections required in thirty days.  The second follow-up

review took place during the week of May 14, 2006. The May follow-up review focused on the deficiencies that were to be corrected within ninety days. *See* AR 00268-310.

9.   Nearly one year later, on April 10, 2007, CCC received a letter from ACF dated April 9, 2007 notifying CCC of the termination of its Head Start grant number 02CH0799. AR 00186-90, 00311. ACF specifically cited three uncorrected deficiencies in the area of Prevention and Early Intervention (deficiencies 1. through 3. discussed above) and one uncorrected deficiency in the area of Record-keeping and Reporting (deficiency 4. discussed above). 00186-90.

10. According to ACF, CCC had not corrected the deficiency under 45 C.F.R. § 1304(a)(1)(ii)(A) identified in the Initial Determination within the ninety-day corrective action period based on the follow-up review team's conclusion that of the fifty-one children's files examined, "seven (7) had no lead screening [14%] and two (2) did not contain a dental screening [4%]." *See* AR 00195.

11. The May 2006 review team further found that CCC remained deficient under 45 C.F.R. § 1304(b)(1) because those same fifty-one files "showed missing screenings: twelve (12) had no vision screening [24%]; ten (10) had no hearing screening [20%]; and three (3) had no developmental screening [6%]." AR 00195-96.

12. As to the deficiency under 45 C.F.R. § 1304.53(a)(10)(viii) alleged in the Initial Determination, ACF contended that CCC was still deficient based on the March follow-up review team's observations at the "Lois I Center" – a site not mentioned in the initial deficiency finding – where there were "leaves and trash inside the playground fence and alongside the walkway used by the children to access the playground," as well as "two grills (one with an attached gas tank), metal poles used for erecting a tent, drink cans, beer caps, a tank with a wooden beam attached, and a tree from next door that had fallen on the fence" in the playground

area.  AR 00201-02.  The review team also observed "a pile of old wood planks with rusty nails sticking out of it" near the fence at the end of the walkway to the playground.  AR 00202. Although the review team acknowledged that CCC staff addressed a number of these conditions immediately after being notified of them, the review team's report stated that:

> the following clean-up still needed to be made:  fill holes where tent poles had been extracted from the ground, removal of cement pieces in upper left hand corner of the playground, removal of tree branch leaning on fence in lower left corner, and removal of other debris which included trash and leaves in the playground and the walkway used to access the playground.

AR 00202.

13. Finally, ACF asserted that CCC's record-keeping practices continued to be deficient under 45 C.F.R. § 1304.51(g) as of the time of the follow-up review.  ACF specifically alleged that of the sixteen personnel files examined in the May 2006 site visit, ten did not contain evidence of hiring approval by the CCC Policy Council, eleven lacked a "fingerprint/background check," twelve were missing "CPR/First Aid Training Certificates," and six had no job description.  AR 00198.  Likewise, of the fifty-one children's files reviewed, the follow-up review team "found that 12 files did not have vision screenings, 10 files did not have hearing screenings, two files did not have dental examinations, seven files had no lead screenings, seven files did not have nutritional assessments, and three files did not have child developmental screenings."  *Id.*

14. After CCC's filing of its initial submission in this appeal and in response to CCC's request for supporting documentation for the findings in the follow-up review team's report, ACF provided, among other things, the review team's notes regarding the fifty-one children's files.  *See* AR 00710-12.  The notes listed the seven children's files (two by first initial and last name, one by first and last initial only, and four by full name) that showed no evidence of lead

screenings, the two (both by full name) without dental screenings, the twelve (three by first initial and last name, one by first and last initial only, and eight by full name) lacking vision screenings, the ten (three by first initial and last name and seven by full name) containing no hearing screening, the three (one by first and last initial only and two by full name) showing no developmental screening, and the seven (three by first initial and last name and four by full name) that had no nutritional assessments.  AR 00710-11.

15. CCC timely filed an appeal from the Final Determination with the HHS Departmental Appeals Board ("DAB") as permitted under 42 U.S.C. § 9841 and in accordance with the procedures set forth at 45 C.F.R. §§ 1303.14 and 1304.60.  As part of that appeal, CCC raised numerous legal and factual arguments disputing the legal and factual underpinnings of ACF's termination of its Head Start grant.  CCC argued, among other things, that (1) ACF's finding of a continuing deficiency under 45 C.F.R. § 1304.53(a)(10)(viii) based on the conditions at the Lois I site was erroneous because ACF failed to notify CCC of any need to address those conditions, (2) ACF did not have the authority under its own regulations unilaterally to impose a ninety day corrective action period, and (3) even assuming that ACF was empowered to require CCC to correct the alleged deficiencies within ninety days, it failed to exercise that power in a manner consistent with the Head Start Act.

16. ACF moved for summary disposition of CCC's appeal.  In doing so, ACF contended that, despite the fact that its initial finding of a deficiency under 45 C.F.R. § 1304.53(a)(10)(viii) made no reference to the Lois I site, CCC was necessarily on notice of the need to ensure that "[i]ndoor and outdoor premises are cleaned daily and kept free of undesirable and hazardous materials and conditions" at all of its facilities, including Lois I.  ACF further asserted that the 1996 amendments to the Head Start Act authorized the agency to instruct a "grantee with

deficiencies" to take corrective action within ninety days, and that Head Start regulations providing only for corrective action according to a negotiated "quality improvement plan" or, in extraordinary circumstances, "immediately" were effectively superseded by this legislative enactment.

17. On September 25, 2007 the DAB issued a decision granting ACF's motion for summary disposition and thereby upheld the termination CCC's Head Start grant. The DAB ruled that 42 U.S.C. § 9836a(d)(1)(B)(ii) – *i.e.*, the 1996 amendment to the Head Start Act referenced above – authorized ACF unilaterally to impose a ninety day corrective action period. AR 00009. According to the DAB, this portion of the statute is self-implementing, and ACF's failure to incorporate the "ninety day authority" into either Head Start regulations or ACF policy guidance is therefore of no moment *Id.* As to CCC's contention that ACF had not made a finding "that . . . a 90-day period is reasonable, in light of the nature and magnitude of the deficiency" as required to avail itself of the provisions of 42 U.S.C. § 9836a(d)(1)(B)(ii), the DAB simply "presume[d] that ACF did make a finding that the 90-day period was reasonable in light of the nature and magnitude of the deficiencies found." The DAB further postulated "that ACF could have articulated the reasons for that finding had CCC questioned it at the time" of its Initial Determination. AR 00014. Finally, the DAB held that ACF's finding in its Initial Determination that CCC was deficient under 45 C.F.R. § 1304.53(a)(10)(viii) provided sufficient notice to CCC of the need to correct any similarly deficient conditions at the Lois I facility. AR 00014-17.

18. Of the seven children listed in AR 00707 as lacking documentation of lead screening, one could not be identified because ACF listed that child only by initials, and there are multiple CCC children with those same initials. The records of the children that CCC was able to locate revealed that four were screened for lead risk and the parents of one refused to submit to

screening but CCC documented follow-up actions. *See* AR 00713-16, 00717-20, 00748-51, 00783-84, 00785-87. Furthermore, as is evident from AR 00316-96, CCC had a system in place to follow-up with parents who are not up-to-date and facilitate needed appointments, and documented those efforts in the records.

19. Of the two children lacking dental examinations, the parents of both either failed to submit requested documentation or failed to make/attend a dental appointment. CCC, however, took the follow-up steps required of it as documented in each of these children's files. *See* AR 00747, 00776-77. Thus, while ACF alleged that two of 51 records lacked dental examinations, ACF did not account for CCC's efforts to assist non-compliant parents with obtaining dental examinations consistent with 45 C.F.R. §§ 1304.20(a) and 1304.51(c).

20. Of the twelve children listed as lacking vision screening listed in AR 00710, one could not be identified because ACF listed that child only by initials, and there are multiple CCC children with those same initials. That said, the records of the children that CCC was able to identify revealed that a number have documentation of completed vision screening, and one was listed by the provider as unable to complete the exam. *See* AR 00714, 00717, 00743, 00746, 00778.

21. Similarly, of the ten children's files listed as lacking hearing screening, a number have documentation of completed hearing screenings or showed that the provider as unable to complete the exam. *See* AR 00715, 00720, 00743, 00745, 00779, 00786.

22. Concerning the files for the seven children listed as lacking nutritional assessments at AR 00711, two could not be identified because they are listed only by first initial and last name, and there are multiple CCC children with those same first initials and last names. Of the remainder,

CCC's records show that the majority contain documentation of completed nutritional assessments.  *See* AR 00753-54, 00781-81, 00789.

23. Only one employee file – not ten, as ACF found – lacks documentation of a required Policy Council approval.  *See* AR 00793, 00804, 00836, 00853, 00901.  Moreover, that one employee was terminated within the first sixty days of employment, and her termination pre-dates CCC's receipt of ACF's Initial Determination.  AR 00832 (showing termination date as "11-5-05").

24. The six employee files that ACF found to lack position descriptions all contain such documentation – again with the sole exception of the terminated employee noted above.  *See* AR 00886-89, 00916-18, 00923-26, 00933-36.

25. ACF was also incorrect in finding that eleven of the sixteen employee files it reviewed lacked documentation of criminal history clearances.  *See* AR 00795-98, 00805-07, 00813-16, 00822-24, 00844-47, 00882-84, 00891-93, 00902-04, 00928-30.  The two personnel files that contained no documentation of criminal background checks were both for employees terminated by CCC.  *See* AR 00832, 00835.

26. Although ACF contends that twelve (of sixteen) employee files lacked documentation of CPR/First Aid training, all but three – those of a substitute teacher, an administrator, and the employee terminated prior to CCC's receipt of the Initial Determination – contained such records.  *See* AR 00799, 00825, 00837, 00848, 00857, 00866, 00876, 00885, 00894, 00905, 00915, 00922, 00931.  Further, New Jersey law does not require all staff to be certified in CPR/First Aid, but instead mandates only that one staff member with CPR and First Aid training be in the center when children are present.  *See* AR 00465.

Respectfully submitted,

/s/ Robert A. Graham
James L. Feldesman (D.C. Bar No. 023796)
Edward T. Waters (D.C. Bar No. 422461)
Robert A. Graham (D.C. Bar No. 450345)
FELDESMAN TUCKER LEIFER FIDELL LLP
2001 L Street, N.W., Second Floor
Washington, D.C. 20036
(202) 466-8960 (telephone)
(202) 293-8103 (facsimile)
jfeldesman@ftlf.com
ewaters@ftlf.com
rgraham@ftlf.com

Department of Health and Human Services
DEPARTMENTAL APPEALS BOARD
Appellate Division

**IN THE CASE OF**

SUBJECT: Norwalk Economic Opportunity Now, Inc.                    DATE: November 28, 2005

Docket No. A-05-92
Decision No. **2002**

**DECISION**                                                                    ...TO TOP

*DECISION*

Norwalk Economic Opportunity Now, Inc. (NEON) appealed the May 20, 2005 decision by
the Administration for Children and Families (ACF) terminating Neon's Head Start grant pursuant
to 45 C.F.R. • 1303.14. Under that section, ACF may terminate a Head Start grant if a grantee
fails to timely correct deficiencies in meeting performance standards. ACF's decision was based
on the results of an on-site review in March 2004 and a follow-up review in November 2004.

Based on the March review, including findings related to the governing body's responsibility
to ensure that appropriate internal controls are established and implemented to safeguard
federal funds, ACF determined that NEON had a deficiency in Fiscal Management. The
findings specified two areas where internal controls were found to be lacking. NEON submitted
a quality improvement plan (QIP) addressing the deficiency and, as directed by ACF, setting a
six-month deadline for correcting the deficiency, i.e., November 2004. In the follow-up review,
ACF determined that the deficiency had not been "fully eliminated" with respect to two types
of internal controls, not cited in the March review or a subsequent financial review. Specifically,
ACF alleged that NEON failed to perform timely, monthly reconciliations of bank accounts and
failed to perform regular analyses of balance sheet accounts, in accordance with "standard practice."

ACF's Regional Administrator initially gave NEON another six months to complete correction of
the alleged deficiency. His termination notice, however, said that ACF had determined that he
had no authority to extend the corrective action period, so he was terminating NEON's grant
based on the November review.

**[Page 2]** NEON appealed, moving for summary disposition on the grounds that the
termination decision was contrary to law and arbitrary and capricious. NEON argues that
ACF's actions were contrary to law because: 1) ACF directed that NEON must correct the
deficiency found in the March review within six months, rather than letting NEON propose a
time period for correction; 2) ACF terminated NEON's grant based on new alleged
deficiencies, rather than NEON's failure to correct the deficiency found in the March review; 3)
the findings from the November review regarding bank account reconciliations and account
analyses on which the new, alleged deficiencies are based are factually incorrect; and 4) the
new, alleged deficiencies do not rise to a violation of the terms and conditions of NEON's
grant. NEON also asserts that ACF acted arbitrarily and capriciously in first granting and
then retroactively rescinding an extension of the time for correcting the deficiency. NEON
asserts, moreover, that it 1) had corrected the deficiency as it was described in the findings from
the March review, and 2) had other internal controls in place that adequately addressed the
new concerns raised by ACF. NEON submitted documentation that it says supports its
factual assertions and proffers testimony about its corrective actions and internal controls.

In response, ACF moved for dismissal on the basis that NEON's appeal failed to meet the
regulatory requirements for the contents of an appeal. [1] ACF asserts that NEON did not
sufficiently identify any factual or legal disputes and that NEON's documentation is not identified
as to source or time period and therefore is insufficient to show compliance. ACF also argues

that the appeal does not provide a basis for reversing the termination because NEON alleges only substantial compliance, not timely correction of the deficiency.

**[Page 3]** In reply, NEON argues that its appeal raises both factual and legal issues. In addition, NEON notes that some of the documents it submitted have dates showing that they were prepared before the November review and asserts that other documents existed at the time of the November review, as shown by the fact that they were produced to NEON from ACF during discovery. NEON asserts that NEON is not merely alleging substantial compliance, but is alleging that it fully corrected the identified deficiency by the time of the November review, taking all of the steps outlined in the QIP. ACF declined to submit a surreply although given an opportunity.

For reasons explained later in detail, we rule as follows:

- We deny summary disposition to ACF since we find that the appeal meets the regulatory requirements for an appeal.

- We grant summary disposition to NEON on the following grounds:

  ○ ACF's assertions that NEON did not timely perform monthly account reconciliations and regular account analyses are new findings related to alleged failures to comply with financial management requirements that were different from, and not reasonably encompassed within, the deficiency cited in the March review. Thus, ACF was obliged to provide notice and an opportunity to correct before terminating NEON based on these additional findings.

  ○ ACF must cite in a termination notice the legal bases for its action. Yet, ACF did not cite in the termination notice (or in response to the appeal) any regulation, policy document, or other written guideline to show that what ACF alleges is "standard practice" is in fact a required practice, or that a grantee's internal controls will not be considered appropriate if the grantee does not follow this practice. ACF did not even submit any documentation to support its assertion about what the "standard practice" is, nor does ACF's description of the areas of testimony it would present at a hearing refer to this assertion.

  ○ Given the findings from the March review and the results of a financial review ACF conducted in May, NEON could have reasonably thought that it would be considered to be in full compliance with the **[Page 4]** performance standard in question if it took the steps in the approved QIP by November 2004 (which ACF concedes that NEON did).

  ○ ACF does not dispute NEON's assertion that it had in place during the period prior to the November review internal controls other than monthly bank reconciliations and regular account analyses that fulfilled the same purpose.

Given these factors, and ACF's admitted action of granting and then retroactively rescinding an extension of the time for correcting any deficiency (which raises questions of fundamental fairness), we see no need for an evidentiary hearing in this case.

Since we conclude that there are other grounds for summary disposition in NEON's favor, we do not address NEON's request for summary disposition on the ground that ACF had no authority to direct NEON to provide a corrective action period of only six months in its QIP.

Legal Background

Head Start is a national program providing comprehensive developmental services, including health, nutritional, educational, social and other services, to economically disadvantaged preschool children and their families. See 42 U.S.C. • 9831; 65 Fed. Reg. 4763, 4764 (February 1, 2000). ACF provides funds to grantees to serve as Head Start agencies within designated communities and periodically reviews their performance in meeting program and fiscal requirements. See generally 42 U.S.C. • 9836.

Central to this appeal is the question of NEON's compliance with Head Start Program Performance Standards. The Program Performance Standards have played a central role in the Head Start program since the 1970s. They provide a standard definition of quality services for community-based organizations nationwide that administer Head Start as grantee or delegate agencies; serve as a training guide for staff and parents on the key elements of quality; articulate a vision of service delivery to young children and families that has served as a catalyst for program development and professional education and training in the preschool field; and provide the regulatory structure for the monitoring and enforcement of quality services in Head Start. 61 Fed. Reg. 57,186 (1996).

**[Page 5]** This Department promulgated the current performance standards effective in 1998, after the Head Start Act Amendments of 1994, Public Law No. 103-252, mandated a review of the performance standards to bring them up to date and to cover new topics, to ensure that all children and families enrolled in Head Start are offered high quality services that are responsive to their needs. 61 Fed. Reg. at 57,187.

This appeal concerns the circumstances under which ACF may terminate a Head Start agency's federal financial assistance and designation as a Head Start agency. Among the grounds for which ACF may terminate financial assistance to a Head Start grantee at 45 C.F.R. • 1303.14 (b) are that the grantee "has failed to timely correct one or more deficiencies as defined in 45 C.F. R. Part 1304;" and that the grantee "has failed to comply with the requirements of the Head Start Act." 45 C.F.R. • 1303.14(b)(4) and (7).

As relevant here, the definition of "deficiency" in section 45 C.F.R. • 1304.3(a)(6) includes the following:

> (i) An area or areas of performance in which an Early Head Start or Head Start grantee agency is not in compliance with State or Federal requirements, including but not limited to, the Head Start Act or one or more of the regulations under parts 1301, 1304, 1305, 1306 or 1308 of this title and which involves:

> \*
> \*
> \*
> \*
> \*

> (C) A failure to perform substantially the requirements related to Early Childhood Development and Health Services, Family and Community Partnerships, or Program Design and Management; . . . .

The Early Childhood Development and Health Services, Family and Community Partnerships, or Program Design and Management cited in the definition of deficiency are categories of program performance standards found at 45 C.F.R. Part 1304, Subparts B, C and D. A deficiency can also be "any other violation" which "the grantee has shown an unwillingness or inability to correct within the period specified by the responsible HHS official, of which the . . . official has given the grantee written notice . . . pursuant to section 1304.61." 45 C.F.R. • 1304.3(a)(6) (D)(iii).

Section 1304.50(g), captioned "Governing body responsibilities," provides in pertinent part:

> (2) Grantee and delegate agencies must ensure that appropriate internal controls are established and **[Page 6]** implemented to safeguard Federal funds in accordance with 45 CFR 1301.13.

In addition to being subject to Head Start performance standards, Head Start grantees like NEON are subject to grant administration requirements in 45 C.F.R. Part 74, including section 74.21(b)(3), which requires that financial management systems provide for "[e]ffective control

over and accountability for all funds, property and other assets. . . .

ACF may terminate a Head Start grant where the grantee has been notified of a deficiency and given an opportunity to correct it. ACF may require that the grantee correct deficiencies either immediately, within 90 days, or pursuant to a QIP. 45 C.F.R. • 1304.60(b).

A grantee required to correct a deficiency pursuant to a QIP must submit to the responsible HHS official a plan "specifying, for each identified deficiency, the actions that the grantee will take to correct the deficiency and the timeframe within which it will be corrected." 45 C.F.R. • 1304.60(c). However, in no case may the timeframes proposed in the QIP exceed one year from the date that the grantee received official notification of the deficiencies to be corrected. Id. ACF must, within 30 days of receipt of the QIP, either notify the grantee of approval of the QIP or specify reasons for disapproval. If ACF disapproves the QIP, the grantee must submit a revised QIP, making the changes necessary to address the reasons that the initial QIP was disapproved.(2) 45 C.F.R. • 1304.60(c)-(e).

Section 1304.60(f) states in relevant part:

> If [a grantee] fails to correct a deficiency . . . within the timeframe specified in the approved [QIP], the responsible HHS official will issue a letter of termination . . . .

A notice of termination must set forth the "legal basis for the termination . . ., the factual findings on which the termination is based or reference to the specific findings in another document that form the basis for the termination . . . , and citation to any statutory provisions, regulations, or policy **[Page 7]** issuances on which ACF is relying for its determination." 45 C.F.R. • 1303.14 (c)(1).

A Head Start agency that has received a notice of termination from ACF is entitled to "a full and fair hearing" on the proposed termination, which this Board is authorized to provide on behalf of the Secretary. 42 U.S.C. • 9841(a)(3); 45 C.F.R. • 1303.16(a); 57 Fed. Reg. 59,260 (December 14, 1992); Mansfield-Richland-Morrow Total Operation Against Poverty, Inc., DAB No. 1671 (1998). Procedures for the conduct of a hearing are set forth at 45 C.F.R. • 1303.16. The Board's procedural regulations at 45 C.F.R. Part 16 apply to these proceedings insofar as they are not inconsistent with Part 1303. 45 C.F.R. • 1303.14(c)(2).

The standards applicable to terminations are well-settled. The Board has previously stated that the provisions of 45 C.F.R. • 1303.14 require ACF to make a prima facie case that there exists sufficient evidence to satisfy the regulatory standards for termination. See Target Area Programs for Child Development, Inc., DAB No. 1615 at 6 (1997) (and cases cited therein). Once ACF has set forth legally adequate reasons to support a termination and provided sufficient specificity for the grantee to respond to the substance of individual findings, the regulations require the grantee to respond.

A grantee always bears the burden to demonstrate that it has operated its federally funded program in compliance with the terms and conditions of its grant and the applicable regulations. See Lake County Economic Opportunity Council, Inc., DAB No. 1580, at 5 (1996); Meriden Community Action Agency, Inc., DAB No. 1501 at 41 (1994); Rural Day Care Association of Northeastern North Carolina, DAB No. 1489 at 8, 16 (1994), aff'd Rural Day Care Ass'n of Northeastern N.C. v. Shalala, No. 2:94-CV-40-BO (E.D. N.C. Dec. 20, 1995); see also 45 C.F.R. • 74.21(b)(2). Moreover, "a grantee is clearly in a better position to establish that it did comply with applicable requirements than ACF is to establish that it did not. Therefore, the Board has held that the ultimate burden of persuasion is on the grantee to show that it was in compliance with program standards." DOP Consolidated Human Services Agency, Inc., DAB No. 1689, at 6-7 (1999).

We set out other applicable law in our analysis below where relevant.

Factual Background

The following facts are undisputed. NEON is a community action agency located in Norwalk, Connecticut that receives grants from **[Page 8]** various federal, state, local and other funding sources. In 2004, it received a grant for a Head Start program to serve 275 children. NEON Ex. 8, at NEON-00165. [(3)] ACF conducted a triennial on-site review of NEON's Head Start program from March 8-14, 2004. By letter dated April 26, 2004, ACF notified NEON that, as a result of this review, ACF had determined that NEON had deficiencies in Program Design and Management relating to Fiscal Management and Human Resources. For each of the latter two areas, the letter identifies several regulations as "[s]tandards applicable to NEON Head Start program." The "standards" cited under "Fiscal Management" include 45 C.F.R. • 1304.50(g)(2) and several provisions of 45 C.F.R. • 74.21(b) (but not section 74.21(b)(3)). NEON Ex. 2, at NEON-00003-00004.

ACF's April 26 letter states that "[t]he areas of noncompliance constituting the deficiency in Fiscal Management must be corrected *within six months* from the date you receive this letter" and that "[t]he areas of noncompliance constituting the deficiency in Human Resources must be corrected within *one year* from the date you receive this letter." Id. at NEON-00004 (italics in original). The letter explains the deficiency in Fiscal Management as follows:

> [NEON] is substantially deficient in fiscal management. The absence of mechanisms for safeguarding, tracking, and monitoring funds, as well as for communicating fiscal information to the Head Start program[,] are negatively impacting operations throughout the program. Correcting the noncompliances in fiscal management must be your agency's priority in order to ensure the success of the NEON Head Start program in delivering quality comprehensive services to children and families.

> ACF is highly concerned about the weaknesses in your internal control systems for fiscal management and the vendor practices identified by the review team. As a result, we intend to pursue a further explanation of your agency's expenditures of Federal funds.

Id.

The review report attached to ACF's April 26, 2004 letter describes ACF's findings relating to section 1304.50(g)(2) as follows:

**[Page 9]** The grantee's governing body had not ensured that appropriate internal controls were established and implemented to safeguard Federal funds and to ensure appropriate internal controls for safeguarding assets, checking the accuracy and reliability of accounting data, and promoting operating efficiency. Upon review of contracted services expenses it was noted that there were three occurrences in which the same service was contracted to the same vendor, identifying different company names, referencing the same amount, and utilizing the same documentation for back up. It was also noted that the same company official signed all authorizations and checks. Additionally, in one of the three occurrences the check signer was not an authorized official (i.e. the signer was the Assistant Treasurer) as stated in the agency's Finance Policy and Procedures manual. Upon further review, it was evident that three checks were endorsed by the same signature, drawn upon the same bank and into the same account. When this issue was brought to the attention of the Finance Director, he explained that the expenses were for three different projects. However, sufficient documentation was not supplied during the review to verify the explanation given.

NEON Ex. 2, at NEON-00017. The review report also cited NEON for some other financial management failings under the grants administration regulations at 45 C.F.R. Part 74. The report did not, however, cite the provision at section 74.21(b)(3) requiring "[e]ffective control over and accountability for all funds, property and other assets . . . ."

On June 28, 2004, NEON submitted its QIP to ACF for approval. The QIP quotes the findings from the review report under section 1304.50(g)(2) and then lists six corrective actions:

- Revise Finance Policies and Procedures to reflect reference to A-122 Cost Principles.

- Revise Finance Policies to add Assistant Treasurer as a check signer as per agency bi-laws (sic).
- Board of Directors and Policy Council approve revised Finance Policies and Procedures.
- Training for Fiscal Department and Board of Directors on revised Finance Policies and Procedures.
- Establish Audit Committee (sub-committee of the Board of Directors) to ensure Board oversight. This committee will work closely with the Finance Department and the Board of Directors to ensure appropriate internal controls are established and **[Page 10]** implemented to safeguard Federal funds. The Audit Committee membership will consist of at least one Certified Public Accountant (CPA).
- Test accounting systems to ensure appropriate internal controls are established.

NEON Ex. 4, at NEON-00043-00044. The QIP specifies an "ACF Timeline for completion" of these actions of 11/2004. Id. at NEON-00043. ACF approved the QIP on July 23, 2004. NEON Ex. 6, at NEON-00064.

On July 16, 2004, ACF advised NEON that the further financial review conducted because of concerns raised during the March on-site review found that budget development procedures and contract procedures were weak. No mention was made of internal controls. NEON Ex. 5.

On August 18, 2004, a report on an independent audit of NEON's financial statements for the year ended December 31, 2003 was issued. The audit was performed pursuant to the Single Audit Act, as amended, and the standards for audits of states, local governments, and non-profit organizations in Office of Management and Budget (OMB) Circular A-133. Although the audit report does not question any costs charged to federal funds, it advises NEON that the auditors--

> noted certain matters involving the internal control over financial reporting and its operation that we consider to be reportable conditions. Reportable conditions involve matters coming to our attention relating to significant deficiencies in the design or operation of the internal control over financial reporting that, in our judgment, could adversely affect NEON's ability to record, process, summarize, and report financial data consistent with the assertions of management in the financial statements.

NEON Ex. 7, at NEON-00103.

One reportable condition identified in the audit report is that "[m]onthly bank reconciliation of the operating accounts is not being performed in a timely manner." According to the audit report, "[t]he Agency should prepare monthly bank reconciliations within 30 days of receiving the bank statements. Any differences noted during the reconciliation process should be investigated and properly adjusted. The reconciled balance should agree with the checkbook balance and the general ledger balance for each month end." The auditors attributed this reportable condition to "inappropriate follow-up control procedures from Finance **[Page 11]** management." Id. at NEON-00126. Another reportable condition identified in the audit report is that "analysis of balance sheet and income statement accounts are not performed on a consistent basis within a reasonable period of time. . . ." According to the audit report, "The Agency must adhere to its internal control procedures and perform on a monthly basis reconciliations and analysis of its balance sheet and income statement accounts." The auditors attributed this reportable condition to "inappropriate follow-up control procedures and excessive workloads from the Finance department's management." Id. at NEON-00127.

ACF conducted a follow-up on-site review of NEON's Head Start program from November 1-4, 2004. In a letter dated December 10, 2004, ACF's Regional Administrator for Region I advised NEON that-

> the deficiency in Fiscal Management has not been fully eliminated. While the majority of noncompliances in Fiscal Management have been adequately addressed, there is still an important concern in regard to internal controls. Monthly reconciliation of bank accounts and analysis of balance sheet accounts are still not occurring. As a result, inconsistencies in fiscal records are not resolved, often for extended periods of time.

NEON Ex. 9, at NEON-00170. The letter continues:

> It is our understanding that your agency will be transitioning to a new accounting software system in the near future and that the new system is expected to facilitate your fiscal staff's ability to address any concerns remaining in this area. In light of the extensive progress that was demonstrated in the fiscal area overall, your agency has an additional six months to complete implementation of the QIP and eliminate the deficiency in Fiscal Management.

Id. at NEON-00170-00171. The letter also states that a second follow-up review has been scheduled for May 16-20, 2005 to "once again evaluate the status of corrective actions in regard to Fiscal Management" as well as to review the status of several other items. Id. at NEON-00171.

The review report attached to ACF's December 10, 2004 letter states that the deficiency in Fiscal Management under section 1304.50(g)(2) has not been corrected. According to this report, "appropriate controls were in place on the disbursement cycle" **[Page 12]** since "disbursements were supported by appropriate documentation" and "checks were approved by authorized check signers." NEON Ex. 9, at NEON-00188. The review report states, however, that the August 18, 2004 audit report included findings "that were potentially relevant to internal controls and the safeguarding of Federal funds." Id. The review report goes on to describe the two reportable conditions found by the auditors that are described above. The review report then describes the findings on these matters from the November review:

> It was determined that not all balance sheet accounts (including cash accounts as noted above) were regularly analyzed. Through document review and interview of the staff accountant, it was determined that the most recent quarterly reconciliation of the Head Start petty cash account was done on July 27, 2004; there had been no account activity and the reconciliation was done on a quarterly basis. The most recent monthly reconciliation for account #11041 was performed on September 16, 2004 and covered the month of August, 2004. In an interview, the Assistant Finance Director explained that the employee pension liability account (#22309) was cleared each month; however, a review of the account detail showed that the account balance had not cleared after July, 2004 because a payment from the operating account had not been recorded. This condition stemmed from the failure to perform timely reconciliation of the operating bank account.
>
> Standard practice calls for monthly reconciliation of bank accounts and analysis of balance sheet accounts with significant balances or transaction volumes as part of an effective system of internal controls to support timely and accurate reporting. The grantee continues in its failure to implement such practices.

NEON Ex. 9, at NEON-00189 (emphasis added).

In a letter dated May 20, 2005, the Regional Administrator advised NEON that he had decided to terminate NEON's Head Start program. The letter indicates that, after consultation with the Commissioner of ACYF, it had been determined that the six-month extension granted in ACF's December 10, 2004 letter "is not allowable under the statute and regulations." NEON Ex. 10, at NEON-00196. The letter notes that "NEON was given six months from the date of receipt of the report (May 4, 2004) to correct the deficiency in Fiscal Management" and that the follow-up review found that NEON had not corrected "the deficiency in Fiscal Management, specifically regarding internal controls (45 **[Page 13]** CFR 1304.50(g)(2))." Id. at NEON-00197-00198. (4) The letter states that ACF had determined that NEON's failure to comply with this requirement was a failure "to perform the requirements related to Program Design and Management" and that NEON "was therefore deficient as defined in 45 CFR • 1304.3(a)(6)." Id. at NEON-00200.

The letter cites as the bases for termination section 1303.14(b)(4)(failure to correct a deficiency) and section 1303.14(b)(7)(failure to meet requirements of the Head Start Act). According to the letter, NEON's failure to timely correct the deficiency under section

1304.50(g) also constituted a failure to comply with the requirements of the Head Start Act, a basis for termination under section 1303.14(b)(7). Thus, if ACF did not have adequate legal grounds for determining that NEON failed to correct a deficiency, it also did not have adequate grounds for terminating NEON's grant.

| ANALYSIS | ...TO TOP |
|---|---|

NEON's appeal met the applicable requirements, so ACF's motion to dismiss is denied.

ACF moved to dismiss NEON's appeal on the ground that the appeal failed to substantially comply with the requirements for filing an appeal in section 1303.14(d). That section provides that a grantee's appeal must, among other things, "[s]pecifically identify what factual findings are disputed;" and "[i]dentify any legal issues raised, including relevant citations." Section 1303.14(d)(2) and (3). The appeal must also include copies of "each document the grantee believes is relevant and supportive of its position." Section 1303.14(d)4); see also 45 C.F.R. • 16.8(a)(1), (2). In addition, the appeal must "[i]nclude any request for specifically identified documents the grantee wishes to obtain from ACF and a statement of the relevance of the requested documents . . . ." Section 1303.14(d)(5). Section 1303.14(e) provides that if the Board determines that "a grantee has failed to substantially comply with [these provisions], its appeal must be dismissed with prejudice" unless the Board **[Page 14]** "determines that the grantee has shown good cause for its failure to comply . . . ."

In moving for dismissal of NEON's appeal, ACF first identifies the following general grounds:

- The appeal "only very briefly set out any alleged factual or legal issues, and it does not contain any substantive documentation which is fully identified as to source, date of creation or identity of the preparer or creator."
- NEON's discovery request "presented ACF with [an] exhaustive and non-specific fishing expedition."

ACF Response at 14. ACF proceeds to argue that NEON has not raised any legal issues, with the possible exception of the issue of whether an allegation of substantial compliance at the time of the follow-up review is legally sufficient to contest the termination. ACF acknowledges that "NEON raises a factual issue by stating that ACF was wrong when it determined that the grantee was not in compliance with Head Start requirements. NEON contends it is in compliance with all of the regulations and has corrected the deficiencies noted in the 2004 Review Reports . . . ." Id. at 15. ACF suggests, however, that NEON proffered no basis for finding that it timely corrected the deficiency under section 1304.50(g)(2) since NEON does not state when it made the corrections and the documents it submitted with its appeal are "undated and unsigned." Id. (5)

In spite of having said that NEON's appeal raises no legal issues (other than possibly the issue of substantial compliance, which NEON says it did not raise), ACF then goes on to address the arguments NEON made regarding whether ACF's decision to limit NEON's corrective action period to six months was a violation of the Head Start Act or regulations, and whether ACF failed to follow the notice and corrective action process required by the Head Start Act. See ACF Response at 17-20. ACF's ability to respond to these arguments belies its own argument that NEON does not identify any legal issues.

ACF's position that NEON did not adequately identify factual issues also has no merit. NEON alleges that "[b]ank **[Page 15]** reconciliations were done by NEON's staff" and that "[b]alance sheet account analysis (sic) have been done by NEON for at least the past three years." Appeal Br. at 6. NEON also alleges that it corrected all of the deficiencies in internal controls identified in the November review report and that it had effective internal controls in compliance with 45 C.F.R. • 1304.50(g)(2). Id. at 10-11. NEON explains the latter allegations in some detail as follows:

> NEON vigorously disputes ACF's claims that it had ineffective governance and/or ineffective internal controls. It had both. NEON's Board, as the minutes show, was actively involved in overseeing the actions of management and ensuring that fiscal controls were in place. A new audit committee was formed during the corrective action period and started work; finance policies and procedures were approved and so on.

ACF's entire case for termination rests on its claim that NEON should have improved on the procedures for bank reconciliations and account analysis. As NEON will show, it had other internal controls that were designed to catch the same types of accounting errors, and it was conducting the reconciliations and analysis in a manner that provided reasonable assurances that NEON was properly accounting for its use of federal funds.

Id. at 11-12. NEON also describes in detail three types of such other internal controls it maintains were in place. See Appeal Br. at 6-7 (items 4.a - c). Moreover, contrary to what ACF states, at least some of the documents submitted by NEON (including ones that indicate NEON took the actions listed in its QIP) clearly indicate they were generated prior to the November review. See, e.g., NEON Ex. 13 and Ex. 29 at NEON-00522-00525. [(6)]

Finally, we find no support in the regulation for ACF's suggestion that NEON's appeal is subject to dismissal on the basis that it included a discovery request that is overbroad. As noted above, section 1303.14(d)(5) requires a grantee to include in its appeal "any request for specifically identified documents the grantee wishes to obtain from ACF" and a statement of their relevance. NEON submitted with its appeal a copy of a letter to the Regional Administrator listing 13 items of information or **[Page 16]** types of documents NEON was requesting, which it stated were relevant to the appeal "in that they shed light on either the process HHS followed in terminating NEON's Head Start grant or on the basis for the decision itself." Letter to Regional Administrator dated 6/23/05, at 2.

A mere assertion that this request was "overbroad" is not sufficient to show that NEON did not substantially comply with section 1303.14(d)(5). The proper procedure to address an overbroad discovery request is to seek a protective order. ACF, however, responded to NEON's discovery request without raising any objection to the request. A request for dismissal on this basis is thus ill-founded.

Summary disposition in NEON's favor is appropriate.

NEON argues that ACF advised it that its grant was being terminated without providing notice and an opportunity to correct its deficiencies as required by the Head Start Act. Appeal Br. at 9, citing section 641A(d)(1)(A) of the Head Start Act (requiring that "the Secretary shall-- (A) inform the agency of the deficiencies that shall be corrected"). NEON maintains that it was "in no way on notice that if it did not complete its bank reconciliations or its account analysis that its program would be terminated." Id. at 10. According to NEON, the review documents show that "the understanding between ACF and NEON concerning deficiencies in internal controls revolved around procedures for making and documenting vendor payments, budget procedures, and budget to actual reporting." Id. NEON asserts that the first time ACF notified NEON that it considered the issues regarding bank account reconciliations and account analyses to be "part of the 1304.50(g)(2) deficiency" was when NEON received ACF's December 10, 2004 letter. Id.

The Board addressed a similar issue in First State Community Action Agency, Inc., DAB No. 1877 (2003), as follows:

> In general, we agree with ACF that the mere fact that a deficiency was exhibited in a certain way in one review does not mean that different evidence may not be used to support a finding that a grantee continued to be deficient in meeting a requirement. Past Board rulings requiring sufficient similarity between a finding supporting a "repeat deficiency" and the original deficiency finding related to performance standards where the lack of such similarity might raise a legitimate notice question. Richmond Community Action Program, Board Docket No. A-95-167, January 31, 1996 Ruling; Home Education Livelihood Program, Inc., **[Page 17]** Board Docket No. A-95-54, February 2, 1995 Ruling. Where a requirement is clear and a QIP shows that the grantee understood what it was required to do, no notice question arises.

DAB No. 1877, at 17. In that case, the Board found that First State lacked adequate notice with respect to one of the deficiencies since "ACF itself approved as adequate to correct

the deficiency action steps that were limited in nature," so that "the failure found in the [follow-up] Review did not stem from a failure to take corrective action steps to which First State committed itself in its QIP." <u>Id.</u> at 18. On the other hand, the Board found that First State had adequate notice of deficiencies in the area of its organizational structure that "go to the essential systems that First State used to deliver Head Start services." <u>Id.</u> at 78. The Board explained that-

> [d]eficiencies in those systems may manifest themselves in different ways which are evidence of the deficiency, rather than the deficiency itself. Addressing a specific manifestation and not the structural or systemic problem that permitted it to flourish does not amount to correction of the deficiency. . . . Limiting ACF's enforcement abilities to individual symptoms of a deficiency would permit grantees to avoid addressing underlying management problems. In sum, First State confuses individual manifestations of a deficiency with the deficiency itself. Corrective measures aimed at those manifestations but not at the underlying problems that made it possible for them to arise are not sufficient to bar a termination action, <u>where ACF has adequately notified the grantee of what is expected</u>.

<u>Id.</u> at 78-79 (emphasis added).

ACF takes the position that the findings in the March review and the findings in the November review are both manifestations of the same systemic problem - lack of internal controls. ACF Response at 20, citing <u>First State</u>. As <u>First State</u> indicates, however, the issue must be viewed from the standpoint of whether NEON had adequate notice that, in order to be considered to have corrected the deficiency, NEON would have to modify its practices with regard to reconciliations of bank balances and analyses of its balance sheet accounts. We conclude that NEON did not have such notice.

First, unlike the requirement on organizational structure that we found sufficiently clear in <u>First State</u>, the requirement at issue here does not specify all of the actions a grantee must take to **[Page 18]** be in compliance. The performance standard in section 1304.50(g)(2) (under the area of "Program governance") provides that the governing body has the responsibility "to ensure that <u>appropriate</u> internal controls are established and implemented to safeguard federal funds in accordance with 45 CFR 1301.13." (Emphasis added.) Neither this requirement nor the referenced section specifies what internal controls are "appropriate" for any particular grantee. Although the referenced provision does indicate that the controls must include controls for "checking the accuracy and reliability of accounting data," it does not describe those controls or state how often the checking must be done.<u>[7]</u> Moreover, the focus of the requirement is on the duties of the governing body. Thus, NEON's approved QIP focused on steps to improve the governing body's role in ensuring that NEON established and implemented appropriate internal controls. NEON's QIP also addressed other areas of financial management where specific noncompliance findings were made, but, as mentioned, no specific findings were made under the requirement in 45 C.F.R. • 74.21(b)(3) that refers to effective controls.

This failing might not be critical if ACF cited to other requirements putting NEON on notice that, in order to fully comply with section 1304.50(g) (and thus avoid termination), NEON needed to be performing bank account reconciliations within a particular time period and needed to be doing regular account analyses on all accounts. But ACF cites no policy documents, generally accepted accounting principles, or other authorities that could constitute such notice. Under section 1303.14(c)(1), ACF was required to cite in its termination letter "any statutory provisions, regulations, or policy issuances on which [it] is relying for its determination." ACF, however, relies on the November review report, which cites only to "standard practice."

Moreover, ACF does not proffer any written or testimonial evidence as to the "standard practice." Thus, we have no reason to believe that ACF would establish at a hearing that the **[Page 19]** "standard practice" is what its findings state. While ACF points out that an audit report for the year ended December 31, 2003 had identified NEON's failure to perform timely

bank account reconciliations and account analyses as "reportable conditions" that might be a cause of concern, that audit report does not identify these as <u>required</u> internal controls, nor necessarily preclude use of another type of internal control that might serve the same purpose. OMB Circular A-133, pursuant to which the audit was performed, does not identify any particular type of internal control as required. (8) We also note that, with respect to account analyses, the "standard practice" described in the November review report applies only to accounts with significant balances or transaction volumes. Yet, ACF did not specifically find that the three accounts for which the reviewers said the analyses were not done in a timely manner had significant balances or transaction volumes. (9)

ACF also relies on the audit report as giving NEON notice regarding the "standard practice." ACF Response at 19-20, citing NEON Ex. 7, at NEON-00113-00127. We can find no reference to standard practice in the audit report, however. (10) In any event, **[Page 20]** even if the audit report did find that NEON was not following standard practice, this would not convince us that ACF's position in this proceeding is legally sound, for several reasons. First, merely because something is standard practice does not mean that it is required practice or that other internal controls could not serve the same purpose. Second, the audit report on which ACF relies was not issued until August 2004 (well into the corrective action period) and addressed NEON's performance in 2003. Third, the August 2004 audit report was issued by an independent auditor, not by ACF.

We recognize that it is commonly understood that it is a good practice to reconcile a bank's reported balance at the end of the month with the ongoing balance in an individual or entity's own records. But the issue here is whether NEON had adequate and timely notice that if it did not do this for each of its accounts within 30 days of receiving the bank statement, its grant would be terminated.

In any event, even if ACF could properly cite NEON for failure to comply with a standard practice (without making any proffer to show what the standard practice is), we would still find that the ACF findings here do not provide an adequate basis for terminating NEON's grant. The findings relate to failures during the corrective action period. ACF accepted, as sufficient to correct the other identified financial management problems, actions that NEON took within the corrective action period but did not complete until shortly before the November review. Yet, ACF offers no explanation for why the corrective actions that NEON admittedly took pursuant to its QIP were not fully adequate to meet the governing body's responsibility to ensure that appropriate internal controls were established and implemented. Those actions included obtaining approval of revised Financial Policies and Procedures, establishing an audit committee to ensure follow-up of audit findings, training staff, and hiring a financial consultant. The audit committee (headed by a certified public accountant) was set up to review the audit report findings, so could be expected to implement further controls for bank reconciliations and account analyses if needed, and the consultant hired in October might also be expected to address any related problems.

**[Page 21]** Finally, there are other reasons why we do not think a hearing is needed in this case. First, ACF does not directly dispute NEON's assertion that it had other internal controls in place prior to the November review that provided adequate safeguards for federal funds, nor describe even generally any testimony ACF will present to rebut NEON's proffered testimony in support of the assertion. While ACF raises some questions regarding when NEON's documents were generated, ACF left unchallenged NEON's assertion that some of the documents were obtained by ACF from NEON during the November review, and, as mentioned above, other documents have dates from periods prior to the review. We also note that the audit reports for 2002 and 2003 show that the auditors did not question any of the costs NEON charged to Head Start or other federal funds. This tends to support NEON's assertion that it did have appropriate internal controls to safeguard federal funds.

Second, NEON asserts that ACF's action in first granting and then retroactively rescinding an extension of the period for correcting the deficiency was arbitrary and capricious. NEON asserts that ACF's past practice was to permit such extensions, citing <u>Community Action of Greene County, Inc.</u>, DAB No. 1674 (1998). Reply Br. at 7. ACF's only response is that ACF

decided that the Regional Administrator, who granted the extension, did not have the authority to do so because the regulations say that ACF must terminate a grant if a deficiency is not corrected within the timeframe specified in the approved QIP. ACF submits a series of e-mails (at Respondent Exhibits 1 and 5) indicating that this position was taken on the advice of the Office of the General Counsel, but does not provide a copy of a written opinion or any other support for the position.

Since the Regional Administrator acted as the "responsible HHS official" in approving the QIP (and in issuing the termination letter), a question arises as to why his action in extending the time for correction may not be viewed as effectively approving a revised timeframe for corrective action under the QIP, and, therefore, as an action within his authority to approve a corrective action period of up to one year. ACF could, of course, determine not to grant a regional administrator such authority. But ACF does not deny that regional administrators previously considered it within their authority to grant extensions, and this at least suggests that the regulation may reasonably be interpreted to permit them to do so, absent some express limitation on their delegated authority. If, as appears to be the case here, the Regional Administrator was authorized to extend the original six-month period for correcting the deficiencies cited in the March review report for another six **[Page 22]** months, then arguably ACF could not legally terminate the grant based on its determination that NEON failed to correct those deficiencies by November 2004.

We therefore conclude that summary disposition in NEON's favor is appropriate and that there is no need for a hearing in this case.

This conclusion does not preclude ACF from terminating a Head Start grant on the ground that a grantee failed to correct a deficiency under section 1304.50(g)(2) involving inadequate internal controls where ACF first gives notice sufficient to enable the grantee to correct such a deficiency. Nor is ACF precluded from terminating NEON's Head Start grant if ACF concludes based on a further review that NEON failed to timely correct the deficiency regarding Human Resources.

Conclusion

For the reasons discussed above, we deny ACF's motion for summary disposition and grant summary disposition for NEON.

## JUDGE                                                                    ...TO TOP

Cecilia Sparks Ford

Donald F. Garrett

Judith A. Ballard
Presiding Board Member

## FOOTNOTES                                                                ...TO TOP

1. In acknowledging the appeal, the Board directed ACF not only to respond to NEON's motion for summary disposition but also to submit all documents that relate to the findings on which the termination is based and any documents relevant to any additional facts, asserted by NEON, that ACF disputes. In addition, the Board directed ACF to identify each proposed witness by name and title and to state the areas on which the witness may testify. Letter to parties dated 7/5/05, at 2. When ACF filed only a response to NEON's motion and its own motion for summary disposition with any supporting documents or a witness list, the Board gave ACF additional time to complete its submission. Board letter to parties dated 8/22/05.

2. We note that the fact that ACF had discretion to disapprove a QIP proposing a correction period of more than six months undercuts NEON's challenge to ACF's action in directing correction of the deficiency within six months.

3. We cite to the page numbers added by NEON rather than to the document's internal pagination.

4. The letter also notes that NEON "was allowed up to one year to correct the deficiency in Human Resources (to be determined in May 2005)." Id. at NEON-00197. There is no indication in the record that a follow-up review had been conducted with respect to this deficiency as of the date of the letter.

5. ACF correctly points out that the Board has held that an allegation that a grantee came into compliance after the time provided for correction ended is not relevant to a determination of whether termination is warranted. ACF Response at 16-17, citing DOP Consolidated Human Services Agency.

6. NEON Exhibit 29 is an earlier version of NEON Exhibit 12, and appears to indicate that analyses of most accounts were performed each month through August or September of 2004.

7. Section 1301.13 states that, upon request by the responsible HHS official, "each Head Start agency or its delegate agency shall submit an accounting system certification, prepared by an independent auditor, stating that the accounting system or systems established by the Head Start agency, or its delegate, has appropriate internal controls for safeguarding assets, checking the accuracy and reliability of accounting data, and promoting operating efficiency." The responsible HHS official here did not require NEON to submit such a certification as part of its corrective action.

8. The Circular states in relevant part:

> Internal control over Federal programs . . . means a process-effected by an entity's management and other personnel-designed to provide reasonable assurance regarding the achievement of the following objectives for Federal programs:
> (1) Transactions are properly recorded and accounted for to:
>
> (i) Permit the preparation of reliable financial statements and Federal reports;
> (ii) Maintain accountability over assets; and
> (iii) Demonstrate compliance with laws, regulations, and other compliance requirements . . . .

9. The review report notes that there had been no account activity in the petty cash account (one of the three accounts) as of July 27, 2004. NEON Ex. 9, at 17. It is possible that this account continued to be inactive and that is why it was not analyzed.

10. The audit report does imply that monthly reconciliations and analysis of balance sheet accounts were part of NEON's "internal control procedures." However, NEON's Finance Policies and Procedures, which were revised pursuant to the QIP and which ACF apparently reviewed, do not specify that monthly reconciliations and analysis of balance sheet accounts will be required. See NEON Ex. 18.

**CASE** | **DECISION** | **ANALYSIS** | **JUDGE** | **FOOTNOTES**

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL    Document 20-5    Filed 03/03/2008    Page 1 of 56

CASE | DECISION | ANALYSIS | JUDGE | FOOTNOTES

Department of Health and Human Services
DEPARTMENTAL APPEALS BOARD
Appellate Division

Documents in PDF format require the Adobe Acrobat Reader®. If you experience problems with PDF documents, please download the latest version of the Reader®.

**IN THE CASE OF**

SUBJECT: First State Community Action Agency, Inc.         DATE: May 1, 2003

Docket No. A-02-122
Decision No. **1877**

**DECISION**                                    ...TO TOP

*DECISION*

First State Community Action Agency, Inc. (First State) appealed the July 17, 2002 decision by the Administration for Children and Families (ACF) terminating First State's Head Start grant pursuant to 45 C.F.R. • 1303.14. Under that section, ACF may terminate a Head Start grant if a grantee fails to timely correct deficiencies in meeting performance standards. ACF's decision was based on the results of an on-site review in February and March 2001, and a follow-up review in April 2002. Based on those reviews, ACF determined that First State had uncorrected deficiencies in areas including health and mental health services, program governance, having a proper organizational structure, having sufficient qualified health care and bilingual education staff, the management of

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL    Document 20-5    Filed 03/03/2008    Page 2 of 56

Head Start funds, and providing adequate classroom space. First State timely appealed ACF's decision.

During the appeal process, we dismissed one deficiency finding and ACF withdrew one finding. While some of First State's factual and legal arguments regarding the remaining findings have merit, we conclude that First State failed to meet its burden to show by a preponderance of the evidence that it had corrected deficiencies in the areas of health and mental health services, program governance, and organizational structure. Accordingly, we sustain ACF's determination to terminate First State's funding as a Head Start grantee.

Below, we first summarize the key reasons why we uphold the termination. After setting out the legal and factual background of the case, we then discuss some threshold legal issues which either apply generally or are dispositive. Next, we discuss in general the testimonial evidence presented by the parties. Finally, we provide a detailed analysis of the factual and legal arguments specific to each of the remaining deficiencies or areas in which there were deficiency findings.

## Summary of Our Decision

Below, we provide a more detailed analysis of the issues raised, but here we summarize the key reasons why we uphold ACF's decision to terminate First State's Head Start program.

First State presented a case that was well-argued and on its surface sympathetic. First State had corrected many deficiencies between the two ACF reviews and raised legal issues concerning remaining deficiencies, some of which had merit. Upon close scrutiny, however, First State's case for many of the deficiencies simply did not hold up.

First State argued that, under the regulations, it should be considered to have "timely corrected" deficiencies ACF found in its first review if it was substantially performing Head Start requirements a year later. The statute and regulations, however, clearly require a quality improvement plan that specifies timeframes for corrective action for each deficiency, provide that the timeframes may not exceed a year, and provide for termination if the grantee fails to correct a deficiency within the specified timeframe. First State's arguments failed to recognize the importance of the quality improvement plan. First State did not adequately explain why it let many of the timeframes in the plan slip by many months, even when the action step was minimal (such as advertising for a key staff position or implementing a pre-existing computer program to track children's health care needs), or why it failed to take other specified actions. Moreover, applying the "substantial performance" standard to the requirements at issue (rather than the full compliance standard ACF advocated) does not help First State here because First State did not prove, by a preponderance of the evidence, that it was substantially performing all of the requirements. First State's legal arguments concerning notice and an opportunity to correct deficiencies largely fail because they are based on a misconception that, merely because ACF cited different evidence of non-compliance in the second review than in the first, the notice was inadequate, even where the requirement was clear and First State's quality improvement plan showed that it understood what it had to do to correct the deficiency and document compliance.

irst State's factual case rested largely on its attack on ACF's witnesses (which we find had no merit) and on its own testimonial evidence. Very little of the testimony was supported by documentation, even where the program and/or the quality improvement plan required a particular type of documentation. Much of the testimony was unreliable, probative only with respect to part of the program, or evaded the key issues. First State failed to meet its burden to show, by a preponderance of the evidence, that it had timely corrected deficiencies in the areas of health and mental health services, program governance, and organizational structure. Notably, these deficiencies related to requirements amended effective in 1998 to improve program quality by ensuring input into program planning and oversight from content experts, parent and governing bodies, and program management. Yet, rather than timely taking the action steps set

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL    Document 20-5    Filed 03/03/2008    Page 3 of 56

out in the quality improvement plan or substituting other meaningful corrective actions, First State largely relied on staff to fill in the gaps on an ad hoc basis or fell back on inadequate systems it had used in the past, and declined some of the technical assistance offered by ACF. First State was not running the quality program that the performance standards envision for Head Start children.

Based on our analysis of the legal and factual issues, we conclude that termination was warranted based on the following:

- First State was not substantially performing the requirement that it have a system of ongoing communications to facilitate implementation of follow-up plans for children with identified health needs. First State did not timely develop the follow-up plans nor did it implement an automated system to track health care needs, as it said it would in its quality improvement plan. Letters were sent to parents with the results of some health screenings, but not with respect to other identified needs and not in a timely fashion. While First State staff did communicate orally with parents about some health-related matters, very little of that communication was about identified needs and then, generally, the parent initiated the communication unless it was related to a child's absence. First State did not even maintain a manual system to track whether identified needs had been met, and there is no persuasive evidence that the staff who were communicating with the parents were aware of the needs. Some (but not all) teachers may have been aware of some results of hearing and vision screenings because they distributed the letters informing parents of results, but there is no evidence that they kept track of whether the needs had been met. Contrary to what First State argued, First State had notice that, in order to have a meaningful system of ongoing communications as contemplated by the performance standard, it needed to develop follow-up plans, track whether needs had been met, and document in the children's records how the needs were met. For half of the children whose records were reviewed (15 out of 30), First State provided no documentation that an identified health need had been met. ACF reasonably inferred from this that First State's communication system was inadequate. In light of evidence that Head Start programs generally meet 95% of identified health needs, this finding also supports a conclusion that First State's failure to take the corrective actions it committed to take to improve its program had a significant impact on the children. First State failed substantially to provide the required services.

- First State's failure in the health services area was attributable in part to the fact that it did not hire a content expert for that area until more than two months after the timeframe for doing so in its quality improvement plan. The person whom First State did ultimately hire was not well-qualified, nor did she fully understand her responsibilities, such as her responsibility to develop follow-up plans. She performed hearing screenings without adequate training and recorded some screenings on children who had left the program. There is no evidence that she communicated with parents about follow-up needs, even though the performance standards contemplate that the health content expert will assist parents in understanding children's needs and the health care system.

- In the mental health area, ACF had found multiple deficiencies in its first review, attributable in part to the lack of a content expert. First State did not timely correct the deficiencies. First State said it would contract with a mental health consultant with at least a nursing degree by July 30, 2001, a deadline which it failed to meet. As late as April 2002, First State's progress reports to ACF indicated First State still did not have the contract contemplated in the quality improvement plan; the report referred to negotiations with a consulting organization, but the record shows that this organization did not sign a contract with First State until after the 2002 Review. First State's reliance on a different contract (signed in November 2001) with a State-run mental health training and consultation program is misplaced. Even assuming that the program staff qualified as mental health professionals (which ACF disputed), the record shows that First State did not intend in fact to rely on this contract to meet requirements other than training. Instead, First State

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL    Document 20-5    Filed 03/03/2008    Page 4 of 56

committed to other corrective actions, which it either failed to take or did not take in a timely fashion.

- In light of limitations in the contract with the State-run program, First State could not reasonably expect that program to function as a consultant and otherwise serve to meet Head Start performance standards in the mental health area unless First State took certain steps, such as actually obtaining the training for its teachers and actually requesting on-site consultations to identify mental health needs and to intervene when needed. Yet, what training First State did obtain was too little and too late, and only a few consultations were ever requested. Further, First State's evidence does not show that it had a meaningful referral system for timely and effective intervention for children with behavior problems. While some First State staff and parents did receive some mental health training, First State presented no evidence that it had planned a mental health education program for staff and parents with input from a content expert, as required. Contrary to what First State suggested, more than a few of its children had mental health needs. The record specifically identifies five children with mental health needs, and the undisputed fact that staff generally expressed frustrations with the lack of mental health services and any satisfactory referral system evidences that other needs were unmet. Thus, First State's failures to meet mental health requirements significantly affected its ability to provide needed services.

- First State failed to timely correct deficiencies in program governance. First State's plan said that meeting minutes would document attendance at Policy Council meetings by Board of Directors representatives and vice versa, to correct its lack of shared governance. Only seven out of 14 Policy Council minutes show Board representatives present, however, and no Board minutes were produced. While program goals may have been developed as part of a self-assessment process in June 2001 with input from a few Policy Council members, the Policy Council minutes do not show that it approved the goals. No evidence was presented that the Board approved the goals, or that the goals were ever modified (even when program changes were made) or used in budget planning. First State presented evidence that we accept as showing that some personnel policies and procedures had been approved by the Policy Council in December 2000 (even though this was not mentioned during the first review). First State did not, however, show that these approved policies were in effect unchanged during the review period and were the same as the policies later approved in May 2002, after the second review.

- First State failed to perform substantially requirements for organizational structure. In addition to problems with not acting timely to obtain content experts for health and mental health, First State ultimately hired a Health Coordinator who lacked qualifications to meet her responsibilities without more training and oversight, which First State failed to provide. She did not fully understand her responsibilities. First State also hired a Head Start Director (after the position was empty for an extended period) who had responsibilities under the quality improvement plan that she did not timely fulfill and to whom First State never formally assigned duties it later said she had. Overall, the evidence indicates that First State's organizational structure did not provide the type of oversight required for quality program planning and oversight.

- We do not rely on two of the deficiency findings - one related to classroom space and one related to bilingual staff in classrooms with a majority of Spanish-speaking children - as independent bases for termination. The evidence in these areas shows some improvement although it does not fully support First State's arguments, nor show that First State met all of the related commitments in its quality improvement plan. Some evidence related to these findings does support the conclusion that First State's organizational structure was lacking.

Based on our conclusions, which we explain more in detail below, we uphold the termination.

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL    Document 20-5    Filed 03/03/2008    Page 5 of 56

Legal background

Head Start is a national program providing comprehensive developmental services, including health, nutritional, educational, social and other services, to economically disadvantaged preschool children and their families. See 42 U.S.C. • 9831; 65 Fed. Reg. 4763, 4764 (February 1, 2000). ACF provides funds to grantees to serve as Head Start agencies within designated communities and periodically reviews their performance in meeting program and fiscal requirements. See generally 42 U.S.C. • 9836.

Central to this appeal is the question of First State's compliance with Head Start Program Performance Standards. The Program Performance Standards have played a central role in the Head Start program since the 1970s. They provide a standard definition of quality services for community-based organizations nationwide that administer Head Start as grantee or delegate agencies; serve as a training guide for staff and parents on the key elements of quality; articulate a vision of service delivery to young children and families that has served as a catalyst for program development and professional education and training in the preschool field; and provide the regulatory structure for the monitoring and enforcement of quality services in Head Start. Thus, their importance to the Head Start program and to preschool education generally goes far beyond the typical role of Federal regulations. 61 Fed. Reg. at 57,186.

This Department promulgated the current performance standards effective in 1998, after the Head Start Act Amendments of 1994, Public Law No. 103-252, • 101, 108 Stat. 623 (May 18, 1994) mandated a review of the performance standards to bring them up to date and to cover new topics, to ensure that all children and families enrolled in Head Start are offered high quality services that are responsive to their needs. 61 Fed. Reg. 57,187 (1996). Each grantee is required to develop, with the advice and concurrence of its parent policy council, a written plan to implement the performance standards for each component area, and to update it at least annually. 45 C.F.R. • 1304.51(a)(2).

This appeal concerns the circumstances under which ACF may terminate a Head Start agency's federal financial assistance and designation as a Head Start agency. Among the grounds for which ACF may terminate financial assistance to a Head Start grantee at 45 C.F.R. • 1303.14(b) are the following that ACF cited in its termination letter:

> (4) The grantee has failed to timely correct one or more deficiencies as defined in 45 C.F.R. Part 1304;. . .

(7) The grantee has failed to comply with the requirements of the Head Start Act; . . .

(9) The grantee fails to abide by any other terms and conditions of its award of financial assistance, or any other applicable laws, regulations, or other applicable Federal or State requirements or policies.

45 C.F.R. • 1303.14(b). [1]

As relevant here, the definition of "deficiency" in section 45 C.F.R. • 1304.3(a)(6) includes the following:

(i) An area or areas of performance in which an Early Head Start or Head Start grantee agency is not in compliance with State or Federal requirements, including but not limited to, the Head Start Act or one or more of the regulations under parts 1301, 1304, 1305, 1306 or 1308 of this title and which involves:

. . .

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL    Document 20-5    Filed 03/03/2008    Page 6 of 56

(C) A failure to perform substantially the requirements related to Early Childhood Development and Health Services, Family and Community Partnerships, or Program Design and Management; . . . .

The Early Childhood Development and Health Services, Family and Community Partnerships, or Program Design and Management cited in the definition of deficiency are categories of program performance standards found at 45 C.F.R. Part 1304, Subparts B, C and D. A deficiency can also be "any other violation" which "the grantee has shown an unwillingness or inability to correct within the period specified by the responsible HHS official, of which the . . . official has given the grantee written notice . . . pursuant to section 1304.61." 45 C.F.R. • 1304.3(a)(6)(iii).

ACF may terminate a Head Start grant where the grantee has been notified of a deficiency and given an opportunity to correct it. ACF may require that the grantee correct deficiencies either immediately or pursuant to a Quality Improvement Plan (QIP). 45 C.F.R. • 1304.60. The QIP is a plan prepared by the grantee subject to ACF's approval, that specifies, for each deficiency, "the actions that the grantee will take to correct the deficiency and the timeframe within which it will be corrected." <u>Id</u>. However, in no case may the timeframes for the correction of deficiencies exceed one year from the date that the grantee received official notification of the deficiencies to be corrected. 45 C.F.R. • 1304.60(c). If ACF disapproves the QIP, the Head Start grantee must submit a revised QIP, making the changes necessary to address the reasons that the initial QIP was disapproved. 45 C.F.R. • 1304.60(c)-(e). ACF is required to terminate a Head Start grantee that fails to correct deficiencies within the time frame specified in its QIP. 45 C.F.R. • 1304.60(f).

A Head Start agency that has received a notice of termination from ACF is entitled to "a full and fair hearing" on the proposed termination, which this Board is authorized to provide on behalf of the Secretary. 42 U.S.C. • 9841(a)(3); 45 C.F.R. • 1303.16(a); 57 Fed. Reg. 59,260 (December 14, 1992); <u>Mansfield-Richland-Morrow Total Operation Against Poverty, Inc.</u>, DAB No. 1671 (1998). Procedures for the conduct of a hearing are set forth at 45 C.F.R. • 1303.16. The Board's procedural regulations at 45 C.F.R. Part 16 apply to these proceedings insofar as they are not inconsistent with Part 1303. 45 C.F.R. • 1303.14(c)(2).

The standards applicable to terminations are well-settled. The Board has previously stated that the provisions of 45 C.F.R. • 1303.14 require ACF to make a <u>prima facie</u> case that there exists sufficient evidence to satisfy the regulatory standards for termination. <u>See Target Area Programs for Child Development, Inc.</u>, DAB No. 1615 at 6 (1997) (and cases cited therein). Once ACF has set forth legally adequate reasons to support a termination and provided sufficient specificity for the grantee to respond to the substance of individual findings, the regulations require the grantee to respond. Specifically, section 1303.15(d)(3) provides that a grantee's appeal "must set forth the grounds for the appeal and be accompanied by all documentation that the grantee believes is relevant and supportive of its position." <u>See also</u> 45 C.F.R. • 16.8(a)(1), (2).

A grantee always bears the burden to demonstrate that it has operated its federally funded program in compliance with the terms and conditions of its grant and the applicable regulations. <u>See Lake County Economic Opportunity Council, Inc.</u>, DAB No. 1580, at 5 (1996); <u>Meriden Community Action Agency, Inc.</u>, (<u>Meriden</u>) DAB No. 1501 at 41 (1994); <u>Rural Day Care Association of Northeastern North Carolina</u>, DAB No. 1489 at 8, 16 (1994), <u>aff'd Rural Day Care Ass'n of Northeastern N.C. v. Shalala</u>, No. 2:94-CV-40-BO (E.D. N.C. Dec. 20, 1995); <u>see also</u> 45 C.F.R. • 74.21(b)(2). Moreover, a grantee is clearly in a better position to establish that it <u>did</u> comply with applicable requirements than ACF is to establish that it did not. Therefore, the Board has held that the ultimate burden of persuasion is on the grantee to show that it was in compliance with program standards.

Regarding the question of how the Board should analyze the record developed under Part 1303 in conjunction with Part 16, the appropriate standard to be applied to competing evidence is preponderance of the evidence. That standard requires "evidence which is of greater weight or

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL    Document 20-5    Filed 03/03/2008    Page 7 of 56

more convincing than the evidence which is offered in opposition to it; that is, evidence which as a whole shows that the fact sought to be proved is more probable than not." Black's Law Dictionary 1182 (6th ed. 1990). This is the commonly accepted standard for administrative proceedings. See Lake County, at 5-6 (1996).

Factual background

First State is located in Georgetown, Delaware and provides Head Start services at six centers located in the surrounding area. First State's Head Start program served approximately 196 children during the 2001-2002 program year. ACF Post-hearing Brief (Br.) at 2; ACF Exhibit (Ex.) 30, at 2. First State employs 46 Head Start staff, including 12 teachers, 16 assistant teachers, and one child development supervisor, four family workers, and one family and community partnership supervisor. ACF Ex. 30, at 4-5. For the 2002 calendar year, First State applied for at least $1,161,238 in federal Head Start grant funds. First State Ex. 18.

Representatives of ACF conducted an on-site review of First State's Head Start program during February 25 through March 1, 2001 (2001 Review). During the review, the ACF representatives examined records pertaining to the Head Start children and the services they received, inspected First State's facilities, and interviewed teachers and staff as well as parents of children enrolled in First State's Head Start program. Reviewers attended meetings of First State's Policy Council and parent committee. On April 24, 2001, ACF issued a 20-page report that found in excess of 30 deficiencies in First State's Head Start program. The report instructed First State to submit a QIP for approval addressing the identified deficiencies within 30 days.

First State submitted a proposed QIP in May 2001, which the responsible ACF official deemed incomplete. Curatola Decl. at • 12. Rather than formally disapproving the QIP, however, ACF provided First State the opportunity to submit a revised QIP, which First State did on June 6, 2001; this QIP was approved. (2) Id.; Hearing Transcript (Tr.) at 309-10. For each area of deficiency, grouped by citation to the Head Start regulatory requirements cited in the 2001 Review Report, the QIP listed steps that First State would take to correct the deficiency, a timetable for completion of each step, and the First State staff responsible for the each step. As regards deficiencies at issue in this appeal, the QIP indicated that First State would correct the deficiencies before the end of 2001, with one exception for a deficiency for which the last specified action date was May 2002. First State Ex. 10. (3) ACF approved the QIP in a letter dated June 19, 2001.

ACF offered intensive technical assistance to First State, but First State did not avail itself of all of the training opportunities offered. ACF advised First State in June 2001 that continued vacancies in key positions were delaying effective implementation of the QIP. ACF Ex. 1, at 1-2.

ACF conducted the follow-up review April 15 though 19, 2002 (2002 Review). The review focused on those areas in which First State had been found deficient or out of compliance in the 2001 Review. ACF issued a report of the 2002 Review on May 30, 2002. The report found 13 deficiencies grouped in three general categories corresponding to the categories of performance standards in Part 1304: childhood development and health services, family and community partnerships, and program design and management.

On July 17, 2002, ACF issued its official notification terminating First State's designation as a Head Start agency. First State timely appealed the termination and requested an in-person evidentiary hearing. ACF moved for summary disposition without a hearing, and First State moved for dismissal of several deficiency findings. In a ruling October 29, 2002, the Board denied ACF's motion, and dismissed one deficiency finding. The Board declined First State's motion to dismiss any other deficiency finding.

The Presiding Board Member convened the hearing in Lewes, Delaware on December 2-5, 2002, and took additional testimony by telephone in Washington, D.C. on December 9, 2002. Prior to

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL    Document 20-5    Filed 03/03/2008    Page 8 of 56

the hearing, both sides submitted direct testimony in the form of prepared written direct testimony as required by 45 C.F.R. • 1303.16(d). During both phases of the hearing, First State and ACF, both represented by counsel, presented witnesses and documentary evidence, as well as briefs before and after the hearing. [4]

Threshold legal issues

First State raised a number of legal arguments in its appeal. In this section, we address threshold legal issues which either apply generally or are dispositive.

*What does it mean to timely correct a deficiency?*

First State acknowledged that, under section 1304.60, "a repeat deficiency is sufficient to support the termination of a Head Start grant." First State Post-Hearing Br. at 3. First State argued, however, that "the standard for a deficiency in the areas of Early Childhood Development and Health Services, Family and Community Partnerships, or Program Design and Management" is "a failure to perform [the legal requirement] substantially." Id. at 3-4 (brackets in original). First State asserted that it "has demonstrated that its program, while not perfect, meets the standard of substantial performance required in the Head Start regulations." Id. at 2.

ACF argued that, since the regulations provide that ACF must terminate funding for a grantee that does not "timely correct" any deficiency, a grantee must come into full compliance with the requirements in order to avoid termination. ACF pointed out that the Head Start Act requires that the QIP specify "the deficiencies to be corrected" and "the actions to be taken to correct such deficiencies" and also requires that the grantee "eliminate each deficiency identified, not later than the date for elimination of such deficiency" specified in the QIP. ACF Post-Hearing Br. at 3, citing 42 U.S.C. • 9836a(d)(2)(A)(i), (ii). ACF argued that the fact that the statute uses the terms "correct" and "eliminate" interchangeably supports its position that a grantee must come into full compliance. ACF cited the definition of "correct" as to "set or make right; remove the errors or faults from" and the definition of "eliminate" as "to remove or get rid of especially as being incorrect, offensive, not up to standard," arguing that it follows from the plain meaning of these terms that Congress intended that any deficiencies must be "set or made right," or fully corrected. ACF Post-hearing Br. at 3-4, citing Random House Dictionary of the English Language (Unabridged Edition). [5]

First State replied that ACF's arguments beg the question. According to First State, "if a particular regulatory violation no longer meets the definition of the term 'deficiency' then, logically, it is eliminated and the Act's mandate is met." First State Reply Br. at 2. Given the type of deficiencies at issue, First State argued, it must prevail "if First State is substantially performing each requirement at issue . . . ." Id.

We agree that ACF's arguments beg the question. The issue is whether a grantee should be considered to have corrected (and eliminated) a deficiency found on the basis that the grantee was failing to substantially perform requirements, if the grantee has taken steps so that it is substantially performing the requirements. The issue arises because, if the grantee is substantially performing the requirements, the remaining non-compliance would no longer meet the definition of "deficiency" in the regulation. This is an issue of first impression, raised by the amendments that went into effect in 1998.

ACF acknowledged that this issue is not addressed in the legislative history, but argued that its interpretation is consistent with the goal of the amendments to improve program quality. This argument has merit, but does not establish that ACF's interpretation is the only reasonable one. Nor did ACF claim that First State had adequate notice of the interpretation ACF advanced here. The preamble to the final rule explains the concept of "deficiency" as follows:

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL    Document 20-5    Filed 03/03/2008    Page 9 of 56

We also have revised substantially the definition of "deficiency" at 45 C.F.R. 1304.3(a)(5) in order to clarify the types of determinations which could result in a grantee being found deficient and which, therefore, would have to be addressed either immediately or under a Quality Improvement Plan. Our goal in revising this definition, and particularly in referring to a "failure to perform substantially" in 45 C.F.R. 1304.3(a)(6)(i)(C), was to make it clear that a determination that a grantee is out-of-compliance with one or more requirements will not, in and of itself, constitute a deficiency. Rather, these areas of non-compliance must be of a level of significance that results in the failure of the grantee to substantially provide required services or to substantially implement required procedures. As used in the revised definition, the term "substantially" does not necessarily mean that a majority of the requirements are not being met but, rather, that a knowledgeable person reviewing the findings would determine that the grantee agency is not operating a quality program.

61 Fed. Reg. 57,186, 57,207 (1996). The preamble further states:

The standard at 45 C.F.R. 1304.60(f) also has been expanded to state that a "deficiency that is not timely corrected shall be a material failure of a grantee to comply with the terms and conditions of an award * * *." This provision is part of the implementation of the requirement at Section 641A(d)(1)(C) of the Head Start Act, as amended, that the Secretary must initiate proceedings to terminate the designation of an agency as a Head Start grantee unless the grantee corrects the deficiency; it also is consistent with past agency interpretation that the failure to comply with any of the Program Performance Standards and other requirements constitutes a material breach of the terms of the grant. The language also further establishes that, since a deficiency, by its nature, materially impairs the accomplishment of program goals, the failure to correct a deficiency in a timely manner will constitute grounds for termination.

Id. Thus, the preamble suggests, on the one hand, that any continued non-compliance is sufficient as a basis for termination. On the other hand, by also referring back to the definition of "deficiency" -- which it explains incorporates the concept of materiality -- the preamble simply adds confusion on the issue of whether termination is required if even a de minimis level of non-compliance remains, or is required only if the non-compliance that remains amounts to a "deficiency."

Since there is a question of whether ACF provided adequate and timely notice of the interpretation it advanced here, we do not rely on that interpretation in reaching our decision. After examining the facts of this case, we conclude below that First State did not demonstrate that it had timely made sufficient improvements based on which we could find that it was substantially performing each of the requirements at issue. We find that, while First State did timely make some improvements, areas of non-compliance that remained beyond the time frames for improvement set in the QIP and at the time of the 2002 Review were of a level of significance that resulted in the failure of First State to substantially provide required services and also the failure to substantially implement required procedures. Thus, the remaining failures continued to meet the definition of "deficiency" in section 1304.3(a)(6)(i)(C).

In reaching this conclusion, we note that First State's assertion that it was substantially performing the requirements was premised on its view that it had a year to correct the deficiencies found in the 2001 Review. This view is inconsistent with the plain wording of the regulations, however. The regulations require correction within the timeframe specified within the QIP and further provide that the timeframe may not exceed one year.

Section 1304.60(c) states that "[i]n no case can the timeframes proposed in the [QIP] exceed one year from the date the grantee received official notification of the deficiencies." In response to comments on this provision, the preamble to the final rule explained:

We did not make any changes with respect to the one-year timeframe within which a deficiency

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL    Document 20-5    Filed 03/03/2008    Page 10 of 56

must be corrected or the date on which the one-year period begins, as both requirements are established by Section 641A(d)(2)(A)(ii) of the Head Start Act, as amended. In the final rule, these timeframe requirements appear in 45 C.F.R. 1304.60(c). It should be noted, however, that a grantee can be required to correct a deficiency immediately or within less than a 12-month period. Deficiencies which endanger the health and safety of Early Head Start or Head Start children, families and staff, among others, would fall into this category.

Id. The preamble further stated:

The requirement that grantees develop Quality Improvement Plans specifying the actions they will take to correct identified deficiencies and the time frames within which they will do so will enable both agency and Federal staff to focus in a more comprehensive and holistic manner on the improvements that are needed and how they should be addressed.

Id. Thus, the regulations further provide that if a grantee fails to correct a deficiency "immediately, or within the timeframe specified in the approved Quality Improvement Plan, the responsible HHS official will issue a letter of termination . . . ." 45 C.F.R. • 1304.60(f).

By adopting timeframes for various actions, First State's QIP recognized the importance of moving quickly to take certain steps toward improving its program. Our overall conclusions about the significance of First State's failures thus take into account the fact that, even where First State ultimately took some actions to improve the program, First State's delays in meeting the QIP deadlines for those actions meant that for significant periods of time, the program continued without the improvements having been made. Yet, First State did not show any good cause for failure to meet the timeframes, nor did it seek and obtain approval from ACF to substitute other actions or to extend the time for corrective action.

*Did First State have adequate notice of the deficiencies and an opportunity to correct?*

First State argued in its notice of appeal and in its cross-motion for summary disposition that several of the findings in the 2002 Review were so different from the findings under the same requirements in the 2001 Review that First State did not have the notice and opportunity to correct contemplated by the regulations. We agreed with respect to one finding (concerning adequate shade in playground areas) and dismissed it, but reserved ruling on the other findings until after the hearing. With respect to another one of these findings (to the effect that First State was making provision of social security numbers a prerequisite to enrollment), ACF withdrew the finding after the hearing.

First State continued to press the question of notice with respect to other findings. In general, we agree with ACF that the mere fact that a deficiency was exhibited in a certain way in one review does not mean that different evidence may not be used to support a finding that a grantee continued to be deficient in meeting a requirement. Past Board rulings requiring sufficient similarity between a finding supporting a "repeat deficiency" and the original deficiency finding related to performance standards where the lack of such similarity might raise a legitimate notice question. Richmond Community Action Program, Board Docket No. A-95-167, January 31, 1996 Ruling; Home Education Livelihood Program, Inc., Board Docket No. A-95-54, February 2, 1995 Ruling. Where a requirement is clear and a QIP shows that the grantee understood what it was required to do, no notice question arises. With respect to each of the deficiency findings that we uphold below, we conclude that First State did have adequate notice of what was required and more than adequate opportunity to correct the deficiency.

With respect to one remaining deficiency, however, we conclude that First State raised a legitimate notice question, and therefore we do not rely on this deficiency finding as an independent basis for termination. Specifically, First State argued that it did not have notice that it could be found deficient in meeting the regulatory requirement at 45 C.F.R. • 74.51(a) based on a

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL    Document 20-5    Filed 03/03/2008    Page 11 of 56

failure to timely grant increases in teachers' salaries using Quality Improvement funds awarded specifically for that purpose. First State did not dispute (and the evidence shows) that, while it had made some minor cost of living adjustments (COLAs) in teachers' salaries and increased some staff hours, it did not make the base salary increases until the failure to do so was pointed out during the 2002 Review. The terms of the grant award, however, provided that permanent increases in base salaries were to be made before other increases. Tr. at 404-05 (Hill); 676-79 (Edwards). First State pointed out that the findings under section 74.51(a) in the 2001 Review related to First State's failure to match invoices for meals with meals actually received and that its QIP addressed only this "meal count" issue. Thus, First State said, the failure to timely grant the salary increases is not a "repeat deficiency" that can be a basis for termination. First State also argued that this failure was caused by the Head Start Director not timely submitting the paperwork for the increases and did not evidence any systemic lack of monitoring of the program. ACF argued that the requirement in section 74.51(a) broadly refers to monitoring of grant activities, projects, etc., and that the "deficiency" found in the 2001 Review was a deficiency in meeting the regulatory requirement, not tied to the specific factual findings made in the 2001 Review.

With respect to this particular deficiency, ACF itself approved as adequate to correct the deficiency action steps that were limited in nature, addressing only the "meal count" findings and not implying any need for corrections in monitoring of activities generally. First State Ex. 10, at 136. The 2002 Review found that First State did take these action steps to address the "meal count" issue. Thus, unlike for other findings, the failure found in the 2002 Review did not stem from a failure to take corrective action steps to which First State committed itself in its QIP. In light of this concern, we do not rely on any failure to meet the monitoring requirement at section 74.51(a) as a basis for our decision. We note, however, that the undisputed facts about the failure to award the salary increases support our conclusions about First State's organizational structure.

*What effect should be given to ACF's approval of the QIP?*

First State argued that, since ACF had approved First State's QIP permitting First State time to take specified action steps to correct the deficiencies, ACF improperly relied on findings that referred to First State's lack of compliance during the corrective action period. Specifically, First State cited statements by ACF referring to vacancies in the Health Coordinator position and Head Start Director's position. Contrary to ACF's claims, First State argued, there is no requirement for a grantee to be in continuous compliance during the corrective action period and interpreting the statute to require this would be nonsensical. First State Opposition to ACF's Motion for Summary Disposition at 4.

We agree that lack of compliance during the corrective action period in the approved QIP is not a basis for termination. As discussed below, however, First State had committed in its QIP to hiring a Health Coordinator by July 30, 2001 and did not do so until October 2001. Thus, while First State cannot be cited for having the position vacant prior to July 30, its failure to have anyone in the position from July 31 until October is appropriately relied on by ACF. Moreover, ACF is reasonable in pointing out the vacancy since it is relevant to other findings. For example, the long-term vacancy in the position likely contributed to First State's failure to implement the health tracking system referred to in its QIP. Similarly, the vacancy in the Head Start Director's position, while not directly relevant to a deficiency finding, helps explain why First State did not timely make some of the improvements to which it committed, especially to the extent that the QIP or the position description assigned responsibilities to the Head Start Director. [6] See, e.g., First State Ex. 10, at 125, 127.

First State also argued that ACF had claimed that its approval of the QIP was not significant and that ACF's position was absurd and outrageous. First State Opposition to ACF's Motion for Summary Disposition at 4. We agree that ACF's action in approving a QIP does have significance, both in setting the time frames for corrective actions and in ensuring that the grantee understood

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL    Document 20-5    Filed 03/03/2008    Page 12 of 56

each deficiency. On the other hand, the point that ACF was making (and had made in approving the QIP) is that the grantee has the responsibility, if the steps set out in the QIP are not correcting the deficiency, to take other steps necessary to do so. In other words, the grantee has an ongoing responsibility for monitoring whether it is complying with the applicable requirements and for doing what is necessary to comply. Here, however, First State did not even take all of the steps to which it committed in its QIP, and many of the steps it did take were not taken in a timely manner. With the exception of a few findings which we resolve in First State's favor, it is First State's arguments which fail to recognize the importance of the QIP, both in showing that First State understood what it needed to do and in showing that First State did not timely take the corrective actions it said it would make.

<u>General evaluation of witness testimony</u>

In this section, we discuss First State's argument that we should discount the testimony of ACF's reviewers since ACF was biased against First State and explain why we reject that argument. We further explain why we considered the reviewers' testimony to be reliable generally. In addition, we describe generally the key testimony on which First State relied and explain why we do not give it much weight in reaching our findings on specific factual issues.

*First State's argument that ACF was biased against it lacks merit.*

First State's allegations of bias were based primarily on reports by Patricia (Trish) Sowers of comments made to her by Robert L. Curatola, Jr. in conversations during the period March through August 2002. Ms. Sowers was First State's Head Start Director at the time of the hearing and had acted in that position while it was vacant during part of 2001, but was Program Development Specialist at the time of the Reviews. Mr. Curatola was the ACF Head Start and Youth Program Specialist for Region III, who led both reviews of First State's program. These conversations touched on Ms. Sowers' frustrations about her workload at First State, the status of First State's efforts to attain compliance, ACF's determination to terminate First State's Head Start program, and First State's appeal of that determination. During these conversations, Ms. Sowers reported, Mr. Curatola told her that he "could not wait to get" to First State to conduct the follow-up review, that First State's best option would be to relinquish the Head Start program rather than to appeal the termination (asking if she were aware that the federal government wins 99% of Head Start termination appeals), and that relinquishing the Head Start program would permit First State staff to keep their jobs. Sowers Decl. at ●● 32-41. Ms. Sowers also reported that Nancy Goldsmith, grantee liaison at the Head Start Quality Improvement Center, expressed the belief that there was no hope of First State retaining its Head Start program and encouraged her to look for work elsewhere. <u>Id</u>. These conversations (which ACF did not deny occurred) gave Ms. Sowers the impression that Mr. Curatola hoped that First State would fail the re-review. She described his tone of voice and laugh on one occasion as "menacing," and said she considered his remarks to be an inappropriate effort to pressure her into getting First State to relinquish the Head Start grant. <u>Id</u>. As evidence of bias, First State also cited some deficiency findings that it accused ACF of having made in the face of greater evidence of compliance, for example, ACF having found that there was no mental health professional despite having been given a copy of a contract with a Delaware organization. [7]

While, like Ms. Sowers, we consider Mr. Curatola's remarks about First State's appeal to be inappropriate, we do not believe that they evidence any ACF bias against First State. Given that Mr. Curatola oversaw the 2001 Review that detected numerous deficiencies, it is not surprising that he believed that First State's Head Start program had problems. Mr. Curatola also reviewed First State's monthly QIP progress reports, and so would have been aware that First State was tardy and in some cases had failed to implement the corrective actions it agreed to in the QIP. Curatola Decl. at ● 13; Tr. at 322-23; ACF Exs. 7, 25. The mere fact that he readily discussed his concerns about First State with program staff as part of ongoing communications does not establish that he was biased against the program, or call into question the accuracy of the review

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL    Document 20-5    Filed 03/03/2008    Page 13 of 56

findings that led ACF to terminate the program.

In any event, even if Mr. Curatola or other reviewers were biased, First State had ample opportunity to dispute their findings before us. While some of those findings did not ultimately hold up, ACF did provide explanations of its position that indicate it was not wholly unreasonable and had some basis in what reviewers were told during the reviews. For example, while ACF ultimately withdrew for legal reasons a deficiency determination based on the finding that First State was making provision of social security numbers a prerequisite for enrollment, ACF did have an evidentiary basis for this finding, both in what reviewers were told during interviews and what First State's own document appeared to imply. [(8)] Moreover, ACF reviewers explained that their underlying concern was that the effect of requiring social security numbers might be to deny enrollment to undocumented children. Tr. at 316-17 (Curatola). This is a legitimate concern and explains why ACF might pursue the finding, even in the face of some contrary evidence submitted by First State.

First State also suggested that the reviewers were biased because they were also involved in the 2001 Review. Based on our review of the record as a whole, we find that the reviewers gave First State the benefit of the doubt in many areas and that there is no basis for a finding that they were biased. While they may have misunderstood some statements by interviewees or failed to ask some questions in a clear enough fashion, substantially all of their findings about what First State staff said were not even disputed by First State. Nor did First State produce the kind of documentation that would have been expected if the reviewers had ignored evidence of compliance. While it would have been preferable if they had more carefully measured First State's classrooms (an issue we discuss below) and if each reviewer used the same review instrument for reviewing children's records, overall they were thorough and careful in their review.

*The reviewers were highly qualified and their testimony reliable.*

The individuals who conducted the review and testified, other than Mr. Curatola and Trisha Smith, were all independent contractors who had experience in operating Head Start programs. All of the reviewers had extensive training and experience in conducting reviews. Lesko Decl. at •• 1, 2, 4; Mullins Decl. at •• 1-3; Mentzer Decl. at •• 1-2; Curatola Decl. at •• 1-4; Wirth Decl. at •• 1-5. Some of them had additional relevant experience. For example, the primary reviewer for the health services area had experience as the director of a school for nurses. Tr. at 122-23 (Mentzer).

All of the reviewers were articulate in explaining the reasons why the statements that they heard in interviews or the findings they made based on reviews of documentation raised concerns in their minds about the quality of the program run by First State. Most of what they said they heard in their interviews or discovered in their documentation reviews is undisputed, and very few of their factual findings were rebutted by any persuasive evidence. While there were some minor differences in expectations about what a quality program should entail, what is striking is the extent to which the reviewers surfaced similar concerns about the program.

Thus, not only do we find that the reviewers were not biased, but we also find that their testimony was generally credible and reliable.

*The testimony of First State's witnesses, while generally credible, was not always reliable or probative.*

First State in general relied more on testimonial evidence than on documentary evidence, even where the QIP called for particular documentation or one would have expected documentation of a particular type. First State relied most heavily on testimony of David Hill, Executive Director of First State, and Bernice Edwards, Deputy Director. For the most part, however, their testimony did not purport to be based on any first hand knowledge of what was occurring in the program during the period covered by the review. (For example, Mr. Hill said that the Policy Council had approved

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL     Document 20-5     Filed 03/03/2008     Page 14 of 56

program goals, but admitted that he was not at any meeting at which this occurred. Tr. at 385.) In some instances, the testimony was clearly based on misinformation about what documentation First State had provided in response to the review. (For example, Mr. Hill clearly thought that First State had come up with documentation that follow-up health needs of the children identified by reviewers were met. Tr. at 371-72.) Other parts of their testimony were based on their views of systems that had been established in the past, rather than on any direct knowledge of the extent those systems were still in place and being implemented in the Head Start program. This is not surprising since First State ran numerous other programs and relied on Head Start program staff to manage that program. Hill Decl. at ¶ 35; Tr. at 415-16. In addition, their testimony showed a lack of understanding of some requirements. (For example, Mr. Hill's testimony indicated that he did not understand the Head Start requirement for follow-up plans for identified health needs. Tr. at 360-61, 366-67.) Some of their testimony was ultimately more damaging than helpful to First State. (For example, Mr. Hill acknowledged that First State never implemented the automated HSFIS tracking system, discussed below, even though the QIP said the system would be updated and staff trained in the system.) Very little of what they said was corroborated by any documentation. Thus, while these witnesses were clearly proud of the work that First State does in the community and convinced that it had and could run a good Head Start program, we found very little of their testimony to be reliable and probative on the key factual issues.

First State also relied heavily on testimony by Trish Sowers, identified above. She was clearly hard working, competent, and dedicated to the program. Her testimony indicated that she strongly felt that the reviewers did not give the program credit for what it was doing well. While we rely on her testimony for some findings in First State's favor, we also note that her testimony was in some ways carefully crafted and evaded certain key issues raised by the review. Her testimony is in part notable for what she did not say, as we point out with respect to some specific issues below. Moreover, she did not deny making statements to the reviewers at the time of the review that evidenced her own frustrations with First State's management of the program, and she was the one who raised questions she had about the integrity of some of First State's records or reports, particularly those of the Health Coordinator, and about management's failure to award salary increases for which it had been awarded funds. Curatola Decl. at ¶¶ 42-44, 49. She also acknowledged disagreements with the former Head Start Director, Germaine Adams, who was hired in the first half of 2001, and who in effect second-guessed some decisions that Ms. Sowers had made while she was Acting Head Start Director. Id. Thus, we were not convinced that the systems and policies that Ms. Sowers viewed as in effect were officially adopted and implemented by the program as a whole. The most important flaw in First State's heavy reliance on her testimony, however, is that her responsibilities as Program Development Specialist extended only to two of the Head Start centers for which First State received funding. Tr. at 769. The other Program Development Specialist, Alison Taylor, did not testify, and the record as a whole indicates that, while she was respected, questions were raised about the extent to which she was fulfilling her responsibilities.

Moreover, while Ms. Sowers clearly worked well with the lead teacher at the Central Sussex Center, Mary Knapp (who also testified and corroborated some of what Ms. Sowers said), no other teachers testified. Both Ms. Sowers and Ms. Knapp gave the impression of being experienced and conscientious individuals who would compensate for gaps in program management to the extent they had time. Thus, while we give credence to their testimony to the extent it shows their understanding of First State's systems and goals, we do not consider it reliable as evidence that in other classrooms and centers for which they were not responsible there was the same understanding, especially since much of the testimony is totally unsupported by (or even inconsistent with) any documentary evidence and was contradicted by statements made to the reviewers.

With respect to Carolyn Collie, who supervised the Family Resource Coordinators at First State, we found her credible in describing generally what the responsibilities of the position were. The key questions about the Family Resource Coordinators were more specific, however, relating to whether they were communicating with parents about follow-up plans for identified health needs

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL    Document 20-5    Filed 03/03/2008    Page 15 of 56

and were involved in mental health interventions preliminary to referral to a consultant. The testimony was general on these points, rather than addressing specific children, and not really probative on the key issues. Moreover, the documentary evidence simply does not support all of the assertions about what the Family Resource Coordinators did.

The Head Start parents who testified were ones who were active on the Policy Council and who were loyal to First State, which had in some instances helped them by providing services (for example, by finding a home for one parent and his family). They were upset with the ACF review, in particular with the suggestion that Policy Council input into matters like budget was not meaningful. They pointed out that they had received training and assistance in understanding their duties, and had initiated certain activities, such as an effort to get fathers more involved in the program. They also praised First State staff, such as teachers and Family Resource Coordinators, for their assistance. Some of their testimony was vague, however, particularly with respect to timing of events and the exact nature of the input they had into decision making. Some of the testimony on matters such as reporting at parent meetings about what went on at Policy Council meetings was contradicted by the documentary records of those meetings. Thus, while we found them generally credible (and rely on their testimony for some findings), we also found that some testimony on specific matters was outweighed by other evidence or simply was not probative. Moreover, the mere fact that some staff interacted well with parents does not necessarily mean that the program being provided met performance standards and was the quality program to which Head Start children are entitled.

We discuss testimony of each of these witnesses, and of First State's other witnesses whose testimony was more limited, in more detail with respect to specific findings below.

Analysis of the evidence regarding specific deficiency findings

In this section, we analyze the evidence and arguments related to the remaining deficiencies or areas in which multiple deficiencies were found. After generally describing the area, we set out the related performance standards, the findings from the 2001 Review and the provisions of First State's QIP, and the findings from the 2002 Review. Next, we set out generally the arguments First State made related to the area. We then provide our analysis of the evidence and the reasons for our conclusions.

A. Deficiencies related to health care services for Head Start children

One of the principal areas in which ACF found First State deficient in meeting the Head Start program performance standards involved health care services for Head Start children. ACF found First State deficient under two performance standards, citing First State for failing to have a system of ongoing communications to facilitate implementation of follow-up plans for identified health needs, and for failing to have a properly qualified content expert to oversee and coordinate the health care aspects of First State's Head Start program.

Performance standards

ACF found First State deficient under two performance standards related to health services.

First, 45 C.F.R. • 1304.20(c)(1), "Extended follow-up and treatment," requires that--

Grantee and delegate agencies must establish a system of ongoing communication with the parents of children with identified health needs to facilitate the implementation of the follow-up plan.

The term "follow-up plan" refers back to section 1304.20(a), which requires that Head Start grantees "[i]n collaboration with parents" arrange for health screenings, and "develop and

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL    Document 20-5    Filed 03/03/2008    Page 16 of 56

implement a follow-up plan for any condition identified." 45 C.F.R. • 1304.20(a)(1)(iv). That section also requires that grantees establish procedures to track the provision of health services. 45 C.F.R. • 1304.20(a)(1)(ii)(C).

In promulgating section 1304.20(c)(1) and its requirement for ongoing communication, ACF noted that "Head Start staff will continue to have an important role in determining the health status of children by working with parents to ensure that health care professionals conduct an initial determination of the status of the child's health and provide any further diagnostic testing, examinations and treatment as needed." 61 Fed. Reg. 57,192. Guidance that ACF has published for this regulation notes that "collaboration and communication between parents and staff is essential for optimal child health outcomes," and states more generally:

The objective of 45 C.F.R. 1304.20 is to ensure that, through collaboration among families, staff, and health professionals, all child health and developmental concerns are identified, and children and families are linked to an ongoing source of continuous, accessible care to meet their basic health needs.

Guidance at 41. [9]

The Guidance further states:

To support an ongoing system of communication, program staff and parents regularly compare observations of the child, refine goals, discuss progress, ask questions, talk about the quality of care, and address difficulties and concerns as they arise.

Agencies help parents to locate transportation; find assistance to pay for medications, aids, or equipment; determine where to go to obtain prescription medications, aids, or equipment; and discuss any issues or questions parents raise. Staff assist parents in learning how to communicate and work with health professionals.

Guidance at 49.

The second performance standard concerns the grantee's organizational structure. As relevant to the provision of health care services, sections 1304.52(a)(1) and (a)(2)(ii) require that--

(1) Grantee and delegate agencies must establish and maintain an organizational structure that supports the accomplishment of program objectives. This structure must address the major functions and responsibilities assigned to each staff position and must provide evidence of adequate mechanisms for staff supervision and support.

(2) At a minimum, grantee and delegate agencies must ensure that the following program management functions are formally assigned to and adopted by staff within the program: . . .

(ii) Management of early childhood development and health services, including child development and education; child medical, dental, and mental health; child nutrition; and, services for children with disabilities; . . .

ACF's Guidance for this regulation states:

> The objective of this regulation is to ensure that Head Start grantees recruit and select dynamic, well-qualified staff who possess the knowledge, skills, and experience needed to provide high quality, comprehensive, and culturally sensitive services to children and families in the program.

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL    Document 20-5    Filed 03/03/2008    Page 17 of 56

Sound and rational program management requires that responsibilities of staff be clearly stated and that someone be placed in charge of major functions.

Guidance at 190, 191.

<u>Initial findings and First State's promise of corrective action</u>

The 2001 Review found that First State's education specialist and Family Resource Coordinators maintained a manual system for tracking medical, dental and sensory screenings. 2001 Report, ACF Ex. 3, at 3. Although First State had some documentation of follow-up of as a result of the screenings, there was no documentation of follow-up of medical conditions, specifically, no documentation of any follow-up activities for a number of children with asthma and allergies or of efforts to address growth problems in two children with significant overweight conditions. The report of the 2001 Review grouped this deficiency under the heading "health care tracking and follow-up" within the area of "childhood development and health services." In its summary of findings for that area, the 2001 Report noted First State's lack of a person designated to be responsible for the oversight of health services, and noted a vacancy for a Health Service Content expert. <u>Id.</u> at 1.

The actions that First State in its QIP agreed to take to remedy this deficiency centered on use of the Head Start Family Information System (HSFIS), an automated case management record keeping system that, along with technical support, ACF makes available to Head Start grantees, and which permits tracking of whether required Head Start services are complete and whether follow-up on those services is needed. Tr. at 125. First State agreed to: update the HSFIS health tracking services by June 1, 2001; participate in HSFIS 101 training by July 13, 2001; prepare individualized health plans for children identified as needing health services by October 30, 2001, and record follow-up in children's health files on a monthly basis. The expected result of these steps was that First State would "establish a system of documentation of follow-up plans for children with identified medical conditions." First State Ex. 10, at 150. The First State staff responsible for implementing the QIP included the Head Start Administrator, Program Development Specialist, Health and Nutrition Coordinator, and "Data Entry." <u>Id</u>.

In a related deficiency finding concerning health care (that First State failed under 45 C.F.R. • 1304.52(a)(1) and (a)(2)(ii) to ensure that the management of childhood health services was formally assigned to and adopted by staff within the program), First State agreed to sign a contract with "a health person who has a minimum of a LPN" by July 30, 2001. First State Ex. 10, at 125. To that end, First State stated that it would: advertise the open position in a local newspaper and on the Internet by June 11, 2001; select a Policy Council member or parent to participate on the interview panel, by June 30, and submit recommendations for a contract to the Board and Policy Council by July 30, 2001. <u>Id</u>.

<u>Findings of the 2002 Review</u>

The 2002 Review again found First State deficient. The review found that the Health Coordinator First State had hired employed a written tracking system that did not identify follow-up needed for any condition. ACF examined 30 children's files; 16 of these children had identified needs, but the Health Coordinator could not produce evidence of follow-up for any of those children's needs. (The 16 children had needs identified in the following areas: dental (10 children), vision (1), hearing (2), speech (1), medical (1), and immunization (1).) [10] Two vision screening records were found for children who had been dropped from the Early Head Start program more than one month prior to the screenings. The reviewers' interviews with staff and parents found that there was no system to communicate follow up health needs to parents. ACF Ex. 2, at 1, 4.

In the "area summary" for childhood development and health services, the 2002 Review also

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL    Document 20-5    Filed 03/03/2008    Page 18 of 56

found: the Health Coordinator completed hearing screenings using an audiometer but had not received training on the use of this specialized instrument, so that all hearing screenings were invalid for the program year; health files and attendance records for the month of November 2001 showed that six children received and passed hearing and vision screenings on days when attendance records showed they were absent from the program; First State's manual health tracking system did not provide space for recording the results of the screenings, and did not document the need for follow-up on any screenings performed either in the program or by other professionals. Id. at 1-2.

In the related deficiency finding concerning health care, under sections 1304.52(a)(1) and (a)(2)(ii), the 2002 Review determined that First State had failed to correct findings based on First State's failure to have a content expert for health services. Although First State had hired a Health Coordinator, First State had not done so until October 2001, and the Health Coordinator had not received sufficient orientation or training to fully understand Head Start requirements and documentation necessary for initial screenings and follow-up services. Id. at 9-10, 13-15.

Arguments

First State made two principal arguments in response to the deficiency finding under section 1304.20(c)(1). First, First State argued that it had a system of communication, consisting of information imparted to parents upon enrollment, letters from the Health Coordinator informing parents of the results of initial screenings and the need for follow-up, and regular parent contact by teachers and Family Resource Coordinators. Second, First State argued that the absence of follow-up care alleged by ACF was not a basis for a deficiency because the cited performance standard addresses only communication, and not the delivery of services.

First State argued that its Health Coordinator, Family Resource Coordinators and teachers maintained an open and continuous dialogue with parents, through which they repeatedly offered First State's assistance in obtaining follow-up treatment, including assisting parents in making and keeping appointments, working with providers, and getting to their offices. First State reported that upon enrollment, parents were informed of their role in their children's health care, including their responsibility for managing any needed follow-up care. First State further reported that the Health Care Coordinator's follow-up letters to parents encouraged them to make appointments, and told them to contact their Family Resource Coordinator if they needed assistance in getting follow-up. The Family Resource Coordinators, First State argued, met with parents during enrollment, meetings, trainings, and home visits, and spoke to them by telephone. During enrollment they discussed the parents' and First State's roles in their children's health care, explained the purposes of consent forms, and provided a list of local providers. Thereafter, they called parents to remind them of needed follow-up, to ensure appointments were kept, and to learn the results of the follow-up appointments. The parents would likewise contact the Family Resource Coordinators to discuss concerns and receive help. First State said that these communications were reflected in the Family Resource Coordinator's monthly contact logs. The Head Start teachers kept daily records on children, tracking absences, reasons, and communications with parents regarding children's health, including attendance sheets that documented when an absence was for a medical reason.

First State also argued that ACF's findings regarding whether children received follow-up services were not a basis for a deficiency under section 1304.20(c)(1), as that regulation addressed only the establishment of a system of ongoing communication, and not the actual receipt of services. First State cited the regulation and ACF's guidance as establishing that programs are required only to have a system of communication with parents to facilitate the implementation of the follow-up plan, not to provide the services themselves. First State Reply Br. at 4, 5-10. The actual delivery of health care, First State argued, is covered by other regulations in part 1304 which were not cited as the basis of deficiency findings. First State thus asked the Board to dismiss this finding, arguing that ACF failed to notify First State of the specific deficiency and provide an opportunity to correct,

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL    Document 20-5    Filed 03/03/2008    Page 19 of 56

as required by the Head Start Act at 42 U.S.C. • 9836A(d), and the Board's decision in <u>Human Development Corp. of Metropolitan St. Louis</u>, DAB No. 1703 (1999).

In response to First State's arguments, ACF countered that the communications described by First State on appeal did not constitute the "system of ongoing communication" required by the regulation, because First State's records showed that contacts regarding health care were sporadic and in the context of non-health related activities, such as the doctor's notes that parents would submit to excuse their children from class.

ACF also argued that First State's claim that its staff maintained ongoing communication and tracking of children's health care needs was not borne out by the personnel descriptions (PDs) for those positions, which do not specifically mention any health care tracking function. Those PDs, ACF argued, confirm that the teaching staff primarily provide education services and are not charged with implementing a system of ongoing communication with parents about children's follow-up health needs. First State Ex. 58, at 779, 781.

## ANALYSIS    [...TO TOP](...)

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL    Document 20-5    Filed 03/03/2008    Page 20 of 56

Compliance with the performance standards regarding children's health care is crucial to assure that children's health care needs are met. A Head Start agency must maintain a centralized tracking system capable of apprising it of children's health care needs on an ongoing basis, and, just as important, the grantee must also have clearly identified staff to utilize such a system, as part of their overall responsibility for the oversight and management of the agency's obligations towards its children and their health care needs. The regulations thus require that, at a minimum, grantees must ensure that management of health services be assigned and adopted by specific program staff, and ACF's guidance states that management of the program's health care function requires that the responsibilities of staff be clearly stated and that someone be placed in charge of major functions. Guidance at 191; • 1304.52(a)(1),(a)(2)(ii). Head Start staff have an important role in providing any needed follow-up health care. 61 Fed. Reg. 57,192. Although the evidence shows First State staff concerned about the health care needs of the children in their care and taking action to address those needs of which they were aware, the evidence also shows that these efforts were hindered by the absence of a system to track and alert them of those health care needs, and by the absence of qualified staff to assume overall responsibility for assuring that those needs were met.

Characteristic of First State's difficulties in the health services area was the process by which First State endeavored to address the deficiency in the 2001 Review resulting from its failure to have a specific staff person to oversee its health care function. First State's original QIP said it would hire a content expert for health services with a minimum of an LPN, by August 30, 2001. First State Ex. 10, at 92. The revised QIP said that First State would complete this step by July 30, 2001. Id. at 125. First State did not deny that it did not do so until October 2001, or that the Health Coordinator that it did hire in October had training only as a Certified Nursing Assistant, not an LPN. (See our discussion of this below.) First State also did not deny that this Health Coordinator performed audiology screenings without being qualified to do so and that she reported health

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL    Document 20-5    Filed 03/03/2008    Page 21 of 56

screenings as having been done on two children who were not enrolled in the program at the time of the alleged screenings.

The QIP also said that the Health Coordinator would be responsible for developing individualized follow-up plans (by October 30, 2001) for children identified as needing health services and for documenting follow-up in the children's health files on a monthly basis. First State Ex. 10, at 150. First State's QIP progress report submitted April 9, 2002 said that the Health Coordinator was in the process of developing follow-up plans. ACF Ex. 7, at 27. The Health Coordinator did not view herself as responsible for any follow-up plans, however, informing the ACF reviewer that she did not have a way of knowing who needed follow-up. First State did not deny the accuracy of this report or present testimony of the Health Coordinator. The reviewers examined the files of 30 children still in the program and found that 16 of them had identified health needs, many of them dental, with no documentation in the record of follow-up services having been obtained and/or communication with the children's family about follow-up. Mentzer Decl. at • 7; ACF Ex. 2, at 4. ACF subsequently withdrew that finding for one child, based on Family Resource Coordinator notes showing an inquiry from the child's parent. ACF Post-Hearing Br. at 9. However, despite having sought and received from ACF the names of these children, First State did not specifically allege that it had in fact developed follow-up plans for these particular needs, and the child whose care First State cited in its Post-Hearing Brief as an example of the provision of follow-up care was not among the 16 identified by ACF. First State's own progress report in effect admitted that it did not meet the October 30, 2001 deadline in the QIP for developing follow-up plans. ACF Ex. 7, at 27.

The QIP said that First State would "update" the HSFIS computerized system for tracking health services by June 2001 and train its data entry clerks and Program Development Specialists on the system. First State's self-assessment report dated June 6, 2001 indicated that First State used the HSFIS system, and apparently some staff did receive training. First State's Executive Director David Hill admitted, however, that First State did <u>not</u> implement the computerized HSFIS system during the review period. Tr. at 364. The only explanation he gave was that "we began to develop our own database in order to track the children." <u>Id</u>. First State offered no evidence that it timely implemented any such automated system. [(11)]

Not only did First State fail to implement the computerized version of HSFIS, but it did not even use the written version during the review period. Mentzer Decl. at • 5. While the Health Coordinator did keep a written chart concerning screenings performed (of somewhat dubious value considering the undisputed evidence that she recorded screenings that she could not have performed), there is no evidence that she <u>or anyone else</u> at First State had any meaningful system for keeping track of what follow-up health needs had been identified by the screenings and whether those needs had been met. Although the evidence as a whole indicates that some information regarding the screening results was placed in the children's health files, information in the files would not be as readily available as if it were in a computerized tracking system, or other form of centralized system. David Hill testified that children's health needs identified by the screenings would be documented in the Family Resource Coordinators' files. Tr. at 361. No documentary evidence was submitted in support of this assertion, however, and review of the Family Resource Coordinators' contact notes indicates that Family Resource Coordinators generally did not know of the needs unless informed by the parents. <u>See</u>, <u>e.g.</u>, First State Ex. 55, at 640-41.

As noted in our introduction to this section of the decision, First State directed much of its case on the health care deficiencies towards establishing that it had a system, administered by its Heath Coordinator, Family Resource Coordinators and teachers, in which it: 1) informed parents of their responsibility to obtain any medical services needed for their children and gave them lists of health providers; 2) sent letters to parents regarding results of screenings; and 3) relied on its Family Resource Coordinators and teachers to communicate with parents and offer assistance, if needed, to obtain services. The evidence on each of these points, however, was not convincing to show that the regulatory requirement was met.

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL    Document 20-5    Filed 03/03/2008    Page 22 of 56

First, even if it is consistent with Head Start standards to encourage parents to be self-sufficient, that goal, however admirable, must be secondary to assuring that the children's needs are actually met. Informing the parents of their responsibilities and options does not absolve First State of its responsibility to communicate on an ongoing basis with parents to facilitate follow-up plans. Moreover, First State was clearly aware that Head Start parents are not always diligent in following up on their children's health needs. See, e.g., Tr. at 367 (Hill). For this reason, the regulations as amended effective 1998 require collaboration between parents and grantees to meet health needs. 61 Fed. Reg. at 57,192-93.

Second, while there is some evidence that the Health Coordinator sent out letters regarding results of hearing and vision screenings, there is no convincing evidence that such letters were systematically sent for results of dental screenings or when any other health needs were identified. (12) Further, the reviewers found and First State did not deny that the letters that were sent were not sent until almost three and a half weeks after the screenings were performed. Mentzer Decl. at • 6. (This delay came on top of the delays in performing some screenings caused by the late hiring of the Health Coordinator.)

Third, the Family Resource Coordinator's notes about contacts with parents show only a few contacts about follow-up needs, some of them occurring in early 2001 before the first ACF review. First State Exs. 40 and 55. None of these contacts relate to identified needs the reviewers found during the 2002 Review had not been met, with one exception. See ACF Ex. 10 (list). Family Resource Coordinator's notes about a child with asthma refer to a child on the reviewers' list, the one child among the 16 identified for which ACF withdrew its finding that no follow-up occurred (initials J.W.). The Family Resource Coordinator's notes, however, show that it was the parent who raised the issue of the asthma, after the child had an attack at the center and at several later points. First State Ex. 55, at 641, 642. (13)

Similarly, most of the other contacts about identified needs were initiated by parents, not by the Family Resource Coordinators. The Family Resource Coordinators did initiate some contacts about obtaining physicals or to obtain information about why children were absent (and then to assist parents to follow up on a few major medical needs). This evidence falls far short of showing that the Family Resource Coordinators were systematically communicating on an ongoing basis to facilitate implementation of follow-up plans for identified health needs, as required. Also, while First State provided evidence that Family Resource Coordinators would set goals with Head Start families that might include health-related goals, First State provided no documentary evidence that any of the needs that the reviewers found were unmet (or any other identified health needs, for that matter) were ever included in such goals. One reviewer testified that the supervisor of the Family Resource Coordinators told her that the Family Resource Coordinators did not know when follow-up was needed. Mentzer Decl. at • 6. The supervisor, Carolyn Collie, testified but did not deny that report.

One teacher testified about communications with parents and Family Resource Coordinators about children's health needs. Each of her examples, however, showed awareness of the need either because the child was absent from school or the parent mentioned the need. Knapp Decl. at •• 2-7. She testified that she was aware of letters regarding dental follow-up needs. Tr. at 792. She did not say when this occurred, however. Moreover, she relied on her general awareness of the needs and did not assert that she had any written system for keeping track of those needs and whether they were met or that she ever got any reminder from the Health Coordinator about an unmet need, other than the letters regarding dental follow-up. Tr. at 792. First State admitted that some of the letters providing results of screenings were sent directly to the parents, rather than being distributed by the teachers, so there was no assurance that teachers were informed of the screening results. See, e.g., Tr. at 366 (Hill).

First State also provided documentation regarding some doctor or dental visits of which First State became aware because the children were absent from class. First State Exs. 41-43. None of these

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL    Document 20-5    Filed 03/03/2008    Page 23 of 56

relates to the specific identified needs found by the reviewers not to have been met, however. Compare First State Exs. 41-43 with list of children at ACF Ex. 10. The testimony by parents on which First State relied was similarly unrelated to these specific children's identified needs. Baker Decl.; Cox Decl.; and Ayers Decl.; see First State Post-Hearing Br. at 11-12. Also, the testimony generally went to the parents' comfort in talking with Head Start staff about their children. Only one parent who testified related a specific instance of a contact (other than the initial letter after a screening) to follow up on an identified need. That contact was initiated by a teacher because of the child's absence. [(14)] No instance was cited that evidenced First State developing a follow-up plan for an identified need, and then communicating that plan to a teacher, to a Family Resource Coordinator, or to anyone else, who then followed up to facilitate implementation of that plan.

Thus, even if we viewed First State's evidence as establishing a system that included some communications about health-related issues, that system was neither the system envisioned by section 1304.20(c)(1), nor the system planned in First State's own QIP.

First State argued that, at most, it had a deficiency in documentation. In support of this, David Hill suggested in his testimony that the services were likely provided, but just not documented. Tr. at 363-64, 368-69. First State further argued that it was irrelevant to the issue of whether it was complying with section 1304.20(c)(1) that it did not have a tracking system or follow-up plans. We fail to see and First State did not explain, however, how a grantee could have an effective "system of ongoing communication with the parents of children with identified health needs to facilitate implementation of the follow-up plan" unless those communicating knew of the identified needs, developed or knew of a plan for following up on the needs, and knew whether or not those needs had as yet been met. This requires both record documentation and a tracking system that is updated on an ongoing basis. First State's own QIP shows that it well understood this.

Thus, contrary to what First State argued First State had adequate notice of this deficiency and ample opportunity to correct it.

First State also argued that the issue is not whether the children received the needed services, but whether First State had an ongoing system of communication. We agree with ACF, however, that it is reasonable to infer from the fact that so many of the needs were unmet that First State did not have the required system of ongoing communication. As indicated above, 15 children out of the 30 whose records were reviewed had not had some identified health needs met by the time of the 2002 Review, well into the school year. (First State's own report for the school year shows 25 children as needing "medical treatment," only 13 of whom had received or were receiving that treatment. ACF Ex. 30.) One reviewer testified that, in her experience, Head Start grantees typically provide 95% of needed health care follow-up. Tr. at 90-92 (Mentzer). While having the system required would not have necessarily ensured that all of the follow-up services were actually received by the children who needed them, failure to have the required system did, we find, contribute to the substantial failure to timely meet children's health needs.

First State's deficiency in tracking children's health care needs and communicating to facilitate implementation of a follow-up plan was undoubtedly due, in part, to aspects of the organizational structure deficiency under sections 1304.52(a)(1) and (a)(2)(ii). We further address that deficiency below.

B. Deficiencies related to mental health services

Another significant area in which First State was found deficient was in its provision of mental health services. ACF determined that First State failed to secure the services of a mental health professional (either as an employee or consultant) on a regular basis or with a frequency sufficient to comply with the program performance standards. ACF also determined that the failure to have sufficient access to mental health professionals contributed to First State's failure to comply with other program performance standards related to the mental health education program that the grantee

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL    Document 20-5    Filed 03/03/2008    Page 24 of 56

is required to provide for parents and staff. Our findings that First State failed to provide sufficient access to mental health professionals informs our determinations regarding those other program performance standards.

Performance standards

ACF determined that First State's lack of a mental health professional resulted in deficiencies under four specific requirements of 45 C.F.R. • 1304.24(a), "mental health services," and three requirements of section 1304.40(f)(4), "Family Partnerships" and "Parent involvement in health, nutrition, and mental health education."

Section 1304.24(a) provides:

(1) Grantee and delegate agencies must work collaboratively with parents (see 45 C.F.R. 1304.40 (f) for issues related to parent education) by: . . .

(vi) Supporting parents' participation in any needed mental health interventions.

. . .

(2) Grantee and delegate agencies must secure the services of mental health professionals on a schedule of sufficient frequency to enable the timely and effective identification of and intervention in family and staff concerns about a child's mental health; and

(3) Mental health program services must include a regular schedule of on-site mental health consultation involving the mental health professional, program staff, and parents on how to:

(i) Design and implement program practices responsive to the identified behavioral and mental health concerns of an individual child or group of children;

(ii) Promote children's mental wellness by providing group and individual staff and parent education on mental health issues; . . .

Section 1304.40(f)(4) provides:

Grantee and delegate agencies must ensure that the mental health education program provides, at a minimum (see 45 C.F.R. 1304.24 for issues related to mental health education):

(i) A variety of group opportunities for parents and program staff to identify and discuss issues related to child mental health;

(ii) Individual opportunities for parents to discuss mental health issues related to their child and family with program staff;

(iii) The active involvement of parents in planning and implementing any mental health interventions for their children.

ACF's Guidance on section 1304.24(a) notes that Head Start agencies are better able to secure appropriate services in a regular and timely manner when they have an ongoing relationship with a mental health provider or a group of providers. Accordingly, grantees "make arrangements for mental health professionals to be available to help the program." Mental health professionals represent a variety of disciplines, including, but not limited to:

○ psychiatry,

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL    Document 20-5    Filed 03/03/2008    Page 25 of 56

- ○ psychology
- ○ psychiatric nursing,
- ○ marriage and family therapy,
- ○ clinical social work,
- ○ behavioral and developmental pediatrics, and
- ○ mental health counseling.

The Guidance further states that by consulting with their mental health professionals, agencies can determine which services may be provided only by licensed or certified mental health professionals or under their supervision. "Schedules need to be frequent enough to allow the mental health professional to become familiar with the needs of children requiring assistance, to provide information and consultation, and to help locate any needed treatment or services in a timely fashion." Guidance at 121.

<u>Initial findings and First State's promise of corrective action</u>

ACF's principal finding concerning mental health services in the 2001 Review was that First State failed to have a mental health professional available and accessible to children, parents and staff on a regular basis. Thus, under section 1304.24(a)(3)(i), ACF found that First State had no regular schedule of on-site consultation by a mental health professional to support parents and staff in order to meet the needs of children. 2001 Report, ACF Ex. 3, at 2-3. Similarly, under section 1304.40(f)(4)(ii), ACF found that there was no mental health professional for parents to discuss mental health issues. <u>Id.</u> at 7. Finally, under sections 1304.24(a)(2) and (a)(3)(ii), ACF found that First State had not contracted with a mental health professional to provide sufficient, frequent, effective and timely on-site visits to identify and provide intervention of family and staff mental health concerns, and also that First State did not have a content expert responsible for mental health. <u>Id.</u> at 14. This absence of a mental health consultant, ACF determined, limited the opportunity to strengthen nurturing, supportive environments and relationships in the home and in the program, identify with parents the appropriate responses to their children's behavior, and guide and support parents in any needed mental health interventions. The report stated that First State staff had indicated during an interview that there was no one available to discuss mental health concerns identified in the classroom. As a result of not having a mental health professional available for consultation, and on-site visits, the Report continued, First State's teaching staff felt that several children who displayed behavioral problems were not receiving services. <u>Id.</u> ACF's other finding relating to mental health services, under sections 1304.24(a)(1)(vi) and 1304.40(f)(4)(i), was that First State did not provide a variety of group opportunities for parents and program staff to identify and discuss issues related to child mental health. <u>Id.</u> at 7.

In response to the deficiency findings that were based on the absence of a mental health professional, First State agreed to: advertise an open position in a local newspaper, the Sussex Guide, and on the Internet; select a Policy Council member or parent to participate on the interview panel; submit a recommendation for a contract to the Board and the Policy Council; contract with a mental health person qualified, at the minimum, as an LPN, by July 30, 2001. The expected outcome of these actions was that "a mental health person will be responsible for mental health services to children and families according to performance standards." First State Ex. 10, at 127. First State also agreed to make hires, dismissals, and resignations an official part of monthly Board and Policy Council reports. <u>Id.</u>

The QIP also addressed the deficiency cited under section 1304.40(f)(4)(i), characterized as "the grantee does not provide for a variety of group opportunities for parents and program staff to identify and discuss issues related to child mental health." ACF Ex. 10, at 144. First State agreed to a seven-step process to remedy this deficiency. First State agreed to: schedule parenting sessions for Head Start programs; refer families and staff to Managed Care Organization for mental health services; refer uninsured families to a mental health consultant until medical homes could be found for the families; obtain parental permission for the release of information related

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL   Document 20-5   Filed 03/03/2008   Page 26 of 56

to intervention plans; develop IEPs [Individualized Education Plans] for children with severe mental health problems, inclusive of parents and teaching staff; register teaching staff in the Positive Behavior Support Training Program; and monitor children experiencing stressful situations for possible intervention. Discrete goals listed above were to be accomplished by October 1, 2001; ongoing activities were to be performed monthly. The expected outcome of these measures was that First State would provide a variety of group opportunities for parents and program staff to identify and discuss issues related to child mental health.

<u>Findings of the 2002 Review</u>

Upon its 2002 Review, ACF again concluded, based on interviews with the "Acting Executive Director" and the Health Coordinator, that the program had no regular, scheduled on-site consultation by a mental health professional, and that there was no mental health staff member or contracted mental health consultant. ACF Ex. 2, at 1-2, 3-4. The report noted that First State was using some of the training provided by the Community Consultation Program (CCP), a program run by the State of Delaware, but ACF concluded that these services were not sufficient to remedy the defects noted in the 2001 Review. ACF noted that First State was using a CCP supplemental curriculum named "I Can Problem Solve" (ICPS), but found that First State "did not adopt the promotion of mental wellness for staff or 'parents trainings.'" The Report noted that only two instances of on-site mental health services could be documented, both related to a child at First State's Discovery Island Learning Center. ACF also found that although Head Start staff had signed a contract for mental health services on March 21, 2002, with a mental health agency called Children and Families First, the contract had not been signed by that agency. <u>Id.</u> at 15-16.

<u>Arguments</u>

First State argued that it complied with the requirements related to making available the services of mental health professionals in two ways. First, it provided them through its agreement with the CCP, which provided training for some members of First State staff as well as classroom observations under the ICPS and "Positive Behavioral Support" programs. Second, First State argued that it was able to make mental health services available through agreements with various state and community organizations such as Early Choices, Delaware Prevent, Delaware Head Start Association, various school districts, and other listed organizations. First State argued that the CCP agreement fulfilled the Head Start requirements for mental health services by furnishing mental health professionals who provided: staff training, curriculum development, monitoring of individual children, and a system of follow-up with parents. First State argued that the combination of the CCP agreement and other available area sources constituted the regular schedule of on-site mental health consultation involving mental health professionals contemplated by the performance standards. [15]

ACF argued that the CCP was primarily a training program, that First State staff had not mentioned the CCP contract when asked about a contract for a mental health consultant, that CCP staff who provided consultations were not licensed or certified mental health professionals, and that services through the school districts and the Early Choices program were limited to children designated as having developmental disabilities (only 10 percent of the children in the program). ACF also argued that there was no schedule of services or regular schedule of onsite visits that would provide for input on program planning and training activities contemplated by the regulations.

<u>Analysis</u>

Below, we first set out what the evidence shows about the CCP, and why we conclude that, in order to make reliance on a contract with the CCP reasonable as a means to meet the performance standards, First State would have had to take steps beyond merely entering into a contract with the CCP. We then discuss what the evidence shows about whether First State did, in

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL    Document 20-5    Filed 03/03/2008    Page 27 of 56

fact, consider CCP as its mental health consultant, about whether First State took the steps specified in its QIP, and about whether First State took the steps that would have been required to make reliance on the CCP reasonable. Next, we address why we conclude that First State did not have an effective system for referring children in need of mental health services. Finally, we summarize why we conclude that First State's failures with respect to mental health services were significant.

*The CCP program provided training and consultation, but only if certain requirements were met.*

The CCP was administered by the Delaware Department of Services for Children, Youth and Their Families (DSCYF). For some 15 years, during which it was part of the Division of Child Mental Health Services within DSCYF, until approximately April 2002, the CCP provided free training and consultations to Head Start and pre-school programs statewide in an effort to assist those programs with the goal of developing a greater degree of social competence with children. Rosas Decl. at 1-2; Tr. at 427-31. During the 2001-2002 fiscal year, DSCYF began moving the CCP from the Division of Child Mental Health Services to the Division of Family Services, and its Office of Prevention and Early Intervention (OPEI). As a result of that change, in April 2002, the CCP began providing only consultations, and not training. Id.

The CCP provided two training programs, both entailing some degree of consultation. "I Can Problem Solve" was a structured curriculum geared towards helping children learn how to solve problems within the classroom, and on helping teachers learn how to apply the curriculum. Tr. at 431 (Rosas). ICPS was mainly a tool to teach children how to process their emotions appropriately and communicate effectively with others in a socially acceptable manner. Knapp Decl. at • 11; Tr. at 431. "Positive Behavior Support" (PBS) taught teachers to recognize and analyze children's challenging behaviors and to work with parents through consultations to address those behaviors, during six or seven classes which met twice a month for one and a half hours each time. Knapp Decl. at • 12; Tr. at 432. Consultations were available under both ICPS and PBS. Under ICPS, the CCP provided classroom consultations involving providing technical assistance and assessing teacher implementation of the ICPS curriculum. Rosas Decl. at 2. The CCP contract, however, provided that an ICPS classroom consultation had to be requested by individuals who demonstrated a commitment to attendance at the training program. First State Ex. 44. An addendum clarified that a teacher who had received the training in a prior year could also request a classroom consultation, but there is some question about whether this addendum was attached to the contract signed by First State in November 2001. Id.; compare First State Ex. 21; see Edwards Decl. at • 13.

The contract also provided for "collaborative intervention plans," for individual children to be developed during a PBS consultation (which would include the parent) and be implemented by First State staff. Id. The contract required, however, that a specific referral process be followed for a PBS consultation at a specified program site. Id. The consultation could be requested either by a teacher who had taken the training or by a center liaison who had completed the training. Id.

ACF viewed the CCP as a training program and questioned whether it could ever perform the functions of a mental health professional as set out in the Head Start regulations. ACF pointed out that the CCP staff who did ICPS classroom observations and PBS consultations were not licensed professionals. First State pointed out that the contract referred to First State's desire to obtain the services of mental health professionals, and argued that state employees do not need to be licensed.

ACF also argued that the classroom consultations were for the purpose of observing the teachers, rather than children, and therefore could not qualify as an on-site observation under the regulations. First State maintained that these classroom consultations necessarily entailed observations of the children, and that a CCP consultant who observed a child in need of mental health services would refer the child to appropriate treatment.

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL    Document 20-5    Filed 03/03/2008    Page 28 of 56

ACF's position regarding the CCP is not fully supported. Dr. Scott Rosas, the OPEI Administrator, testified that the CCP training programs were developed by professionals, and that the CCP staff who provided the consultations were under the supervision of professionals, and that the consultations could involve observations and referrals if needed. Tr. at 456-57, 462. One of ACF's own witnesses, testified, moreover, that some Head Start programs may have relied on the CCP alone to meet Head Start requirements, prior to changes in CCP's focus. Tr. at 639-40 (Lesko). [16] He indicated that, to his knowledge, programs had not been specifically notified that the CCP could not meet Head Start requirements. Id.

We do not here need to decide conclusively whether services provided by the CCP, alone or together with use of other resources, could ever suffice to meet the mental health requirements. As discussed below, the record shows that, in fact, First State did not intend to rely on CCP to meet the requirements (other than providing some staff training), that First State ultimately decided to enter into a contract with another organization to act as its mental health consultant but did not do so in a timely manner, and that, in any event, First State did not take the minimal steps that would have been needed to make reliance on the CCP reasonable as a means of meeting key requirements that were not met in any other way.

Contrary to what First State suggested, entering into a contract with CCP was not all First State needed to do to "secure the services of a mental health professional on a schedule of sufficient frequency to enable the timely and effective identification of and intervention in family and staff concerns about a child's mental health," as required. [17] The way the CCP program was set up, the contract did not "secure" mental health professional services on any schedule. Under the contract, ICPS classroom consultations, as well as consultations to plan interventions for individual children, could be secured only if specified steps were taken. Under the contract, First State was responsible for providing access to training for its teachers. Teachers who had received the ICPS training had to arrange for classroom consultations. [18] Only teachers trained in PBS (or a trained center liaison) could request a consultation on an individual child and then a particular referral process had to be followed. Thus, to make reliance on the CCP program reasonable as a means to meet the plain regulatory requirements, First State would have had to, at a minimum: 1) train all its teachers in ICPS, 2) ensure that they requested ICPS observations, 3) ensure that it had the capability, through the PBS program, to request consultations on any individual child (at whatever center) who needed intervention, and 4) ensure that teachers were aware of the referral process for how to request consultations.

As discussed below, First State did not do so.

*The evidence shows that First State did not intend to rely on the CCP to meet the requirements related to mental health.*

Based on the following, we find that First State did not in fact make any kind of timely, reasoned judgment that it could rely on the CCP contract to correct the deficiencies:

- Testimony by David Hill indicates that First State made a decision not to rely on CCP to meet the mental health requirements because it was aware that the state program had gone through some changes and would be going through more changes. See, e.g., Tr. at 382-383.

- First State made a commitment in its QIP to advertise for a mental health consultant, who would then be responsible for meeting the Head Start requirements. The QIP said that First State would contract "with a mental health person who has a minimum of an LPN." First State Ex. 10, at 127. The advertisement First State ultimately published refers to full-time employment of a mental health consultant with an appropriate license or certification. ACF Ex. 25, at 4. While the QIP mentioned obtaining PBS training as one action step, the QIP did not mention ICPS training, nor did it mention consultations or on-site observations by

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL    Document 20-5    Filed 03/03/2008    Page 29 of 56

CCP staff as part of First State's mental health program.

- First State's organizational chart shows a "mental health consultant" reporting to the Child Development Administrator. First State Ex. 64. No adjustment was made to this chart to show a decision to rely on a contract with an organization, instead of an individual consultant, as indicated in the QIP and organizational chart. First State presented no evidence, in fact, that any reasoned decision was made about how to comply with the requirement in the absence of being able to meet the commitment in the QIP to contract with a qualified person to function as mental health consultant for First State.

- First State's budget justification included an amount to pay for a contract with a mental health consultant. ACF Ex. 26, at 3. The CCP program was free, however.

- First State's Program Management and Services Plans indicated that it intended for a Mental Health Consultant (nowhere identified as the CCP) to assume responsibilities for its mental health program that are inconsistent with the limits on the CCP program. ACF Ex. 24. These activities included participation in parent meetings, workshops, and field trips, as well as parent discussions. Id.

- None of First State staff who were interviewed during the 2002 and 2001 Reviews ever identified the CCP as First State's mental health consultant. These staff, including teachers, when asked about how they would deal with children requiring mental health services, consistently failed to identify the CCP as a source of mental health services, and, moreover, consistently reported that there were no mental health services available. Curatola Decl. at • 58; Mullins Decl. at • 10-21; Lesko Decl. at • 8-10, 12; Mentzer Decl. at • 20; Sowers Decl. at • 35; Tr. at 95-98 (Mentzer); 158-62 (Mullins).

In light of this evidence, we do not find credible suggestions by several of First State's witnesses that First State was relying all along on a CCP contract for more than training and that the steps it committed itself to in its QIP were merely to "enhance" the mental health services CCP was providing. Tr. at 378 (Hill); Tr. at 665, 683 (Edwards); see, also, Tr. at 772 (Sowers).

*The evidence shows that First State did not timely take steps to correct the deficiencies identified in the 2001 Review.*

The following evidence shows that First State did not timely take the steps to which it committed in its QIP, nor timely seek alternative means of meeting the requirements:

- First State said it would advertise the "open position" by June 15, 2001. The progress reports submitted on March 8 and April 9, 2002 indicate that First State did not advertise for a mental health consultant until February 28, 2002, **over eight months late.** First State Ex. 10, at 127; compare ACF Exs. 7, at 2; and 25, at 4. The only explanation for why the position was not advertised on time was that the contract was still being developed. Id.

- While First State presented some testimony from Trish Sowers that the Head Start Director was responsible for entering into a mental health contract, First State presented no testimony from the Head Start Director at the time of the reviews, Germaine Adams, indicating that she understood this as her responsibility. The QIP shows shared responsibility for the contract between the Executive Director and the Health and Nutrition Coordinator. First State Ex. 10, at 127.

- At some point, First State decided to contract with an organization called Children and Families First, apparently after meeting with them in January 2002. First State's April 9 progress report indicated it had developed a contract on March 30, 2002, and would have the Policy Council review it on April 9 to make recommendations, if any, and vote on the contract. ACF Ex. 7, at 3. At the time the 2002 Review began, however, the contract with

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL    Document 20-5    Filed 03/03/2008    Page 30 of 56

Children and Families First still had not been approved by the Policy Council, nor signed by Children and Families First. The Policy Council did not approve the contract until its May 2002 meeting. ACF Ex. 8. [19] The QIP had said that the Policy Council would vote on a contract with a mental health consultant by July 30, 2001. Thus, First State **missed this deadline in the QIP by over nine months**. Moreover, as one reviewer noted, this contract did not provide for any classroom observations. Wirth Decl. at • 21.

- The QIP indicated that the Health and Nutrition Coordinator would refer "families and staff to Managed Care Organization for mental health services" as documented through referral forms. There is no evidence that First State ever informed staff that this referral option might be available, much less any referral form documenting that this option was exercised.

While First State presented some testimony to the effect that it was difficult to obtain services of a qualified mental health professional in the area it served, we find this somewhat disingenuous in light of the fact that First State failed to timely take even the minimal first step of advertising for a professional.

*The evidence shows that First State did not take steps that would have been necessary to make reliance on the contract with CCP reasonable.*

The evidence shows that First State did also enter into a contract with the CCP, signed by the First State's Head Start Director on November 15, 2001 and by the CCP representative on November 20, 2001. [20] This action was also significantly after the July 30, 2001 deadline in the QIP for a contract with a mental health consultant.

In any event, First State did not establish that it took the steps that would have been needed to make reliance on the CCP contract reasonable. As discussed above, the needed steps would have been, at a minimum, to: 1) train all its teachers in ICPS, 2) ensure that they requested ICPS observations, 3) ensure that it had the capability, through the PBS program, to request consultations on any individual child (at whatever center) who needed intervention, and 4) ensure that teachers were aware of the referral process for how to request consultations.

Instead, the evidence shows the following:

- Not all of First State's teachers received the training. According to First State's Program Information Report for Head Start for the year, First State had 12 teachers and 16 aides, for 12 Head Start classes (one operated directly by First State, as well as one class where children were served through a child care center partner). ACF Ex. 30, at 3, 4. [21] In addition, the termination letter stated that six teachers had ended their employment during the period from September 2001 to the time of the review. The evidence of CCP training during the review period shows <u>at most</u> only two teachers and three teachers' aides as having received ICPS training and only <u>six</u> teachers as having received PBS training (for one, First State did not have a certificate). First State Ex. 52. Assuming the teachers who got the PBS training had previously received the ICPS training, that still means only eight teachers trained in ICPS, leaving one out of three classrooms without a teacher trained in ICPS (or more if any of the trained teachers were ones who left during the school year).

- The only documentary evidence that any staff member trained in the ICPS curriculum actually had CCP staff observe her in the classroom related to Janet Davis, a teacher's aide, who was observed three times. CCP records showed, however, that during the time period between the 2001 and 2002 Reviews, CCP conducted a total of five ICPS classroom consultations, including the three for Janet Davis, and one each for teacher Wanda Webb and teacher's aide Mary Stalvey. Tr. at 433, 952-54, 957-60 (Rosas). [22]

- Bernice Edwards testified that First State "tried to ensure that all relevant staff received the

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL    Document 20-5    Filed 03/03/2008    Page 31 of 56

'I Can Problem Solve' certification." Edwards Decl. at • 20. Teacher Mary Knapp also testified that First State "really tried to make sure that everyone had received the 'I Can Problem Solve' training." Knapp Decl. at • 9. Neither one, however, specified what steps First State took to ensure this training was received. Nor did either one allege that First State also tried to ensure that all teachers who received the training requested on-site observations.

- The teachers who received PBS training did not complete the training until February or March 2002 (although the registration forms for several teachers indicate that they had previously obtained PBS training). Id.; First State Ex. 14. [(23)]

- One of the Program Development Specialists at the time of the Reviews, Trish Sowers, testified that both Program Development Specialists could request CCP consultations on behalf of teachers who had not been trained. Tr. at 760, 769, 772-73. The other Program Development Specialist, Alison Taylor, did not testify, however, and no documentary evidence was presented that she had received the training. In any event, the evidence as a whole indicates that not all of the teachers were aware that they could obtain a consultation, even if they were not presently attending the training. See, e.g., Mentzer Decl. at •• 16, 19.

- First State requested PBS consultation for only one child (initials M.F.) that consisted of three PBS consultation sessions; one on February 11, 2002 and two combined into a single visit on February 20, 2002. A follow-up visit scheduled for March 18, 2002 was canceled after the child's mother removed the child from the program. Tr. at 433, 952-54, 957-60 (Rosas).

Viewing the evidence as a whole, we conclude that First State did not take the steps that would have been necessary in order to reasonably rely on its contract with CCP as the contract referred to in its QIP and as its primary means of meeting the performance standards.

*First State did not rebut the evidence that it had no effective referral system.*

We further find that First State did not effectively rebut the testimony that some teachers had informed reviewers that there was no one to whom to refer children.

Former Program Development Specialist Trish Sowers testified that First State did have a mental health referral system (in addition to that used for children with disabilities), under which it would first use Family Resource Coordinators and case management meetings with the Program Development Specialist to address problems, before requesting a consultation from the CCP. Sowers Decl. at •• 11-15. One teacher, Mary Knapp, testified that the referral system was as follows: teachers were to contact the Program Development Specialist, who would observe the child, provide advice to the teacher, and, if necessary, convene a case management meeting, and then, if necessary, refer the child for services. Knapp Decl. at •• 8-14.

The documentary evidence does not support this testimony, however. Instead, it shows that First State had a written "Child Consultation Referral Form" to be filled out by teachers (although there is no evidence that this form was, in fact, never used by any teacher). First State Ex. 49. While the Program Development Specialist position description requires working "cooperatively with staff and consultants in encouraging parents to complete referral process," it does not specify what other staff nor what referral process. First State Ex. 58, at 773-74. The position description for teachers does not reflect any referral system, and the Family Resource Coordinators' duties for scheduling parent meetings and assisting parents with referrals for mental health services do not describe how these duties interact with any duties of the teachers, Program Development Specialists, or consultants. First State Exs. 58, at 778-79; 74; ACF Ex. 31. Moreover, none of these documents mention the CCP, and First State provided no documentation that teachers were informed of the system the witnesses described.

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL    Document 20-5    Filed 03/03/2008    Page 32 of 56

The documentation First State did provide does not support a finding that First State staff knew of this alleged system and consistently followed it in a timely fashion. Instead, the documentation shows the following:

- The child with initials M.F. was the only child who actually received any CCP consultation. The documentation regarding this child shows involvement of the Family Resource Coordinator only after behavior problems had reached the point that the child had been terminated from the program twice, first in November 2001 and later in January 2002. The Family Resource Coordinator's notes indicate that behavior problems were recognized as early as September 2001, but there is no evidence that the Family Resource Coordinator, Bonnie Van Lier, or the Program Development Specialist, Alison Taylor, were informed of the problems before January 7, 2002. The Family Resource Coordinator's notes further indicate that on January 7 the Family Resource Coordinator informed Alison Taylor of discussions about obtaining mental health services for M.F., and that there were some further meetings and discussions of options, but not until February 4 was a referral form for a CCP consultation completed (by the teacher). Although the Family Resource Coordinator's notes indicate that the responsibility for exploring other possible sources of help for the child was assigned to Alison Taylor, there is no evidence that she made any attempt to actually obtain such services. First State Exs. 23 and 53.

- For a child with initials J.W., a weekly site report dated February 14, 2002 from Trish Sowers refers to a behavior problem with the child and says "have had conferences with parents" (but does not specify when or how long the problems had been occurring). The weekly site report dated February 22, 2002 refers to a meeting held on February 20, 2002 with Ms. Sowers, the child's teacher, and "Dawn from Early Choices", regarding the child's behavior and notes that the Family Resource Coordinator will be notified. Notes from a February 26 meeting with the teacher, the teacher's aide, the parents, and Ms. Sowers (but not the Family Resource Coordinator or the specialist from Early Choices) laid out steps to deal with the child's behavior problems, with the last step being to request a CCP consultation "if no progress." [24] First State Exs. 24 and 53. The evidence shows that no consultation was ever requested from CCP. Yet, First State provided no documentation that shows that progress was in fact made over the next few months, or that shows any other intervention to address the child's problems.

- For the child with initials K.C., the Family Resource Coordinator had noted on January 19, 2001 that she would like to see the child observed by a mental health consultant. On January 24, 2001, the Family Resource Coordinator met with the parents and worked out a plan for addressing the home situation that seemed to be affecting the child's behavior, but these notes do not indicate any change in the Family Resource Coordinator's evaluation that the child should be observed. Family Resource Coordinator notes from the period July 18, 2001 through March 4, 2002, seem to indicate that the Family Resource Coordinator thought that the child was doing better in her second year in the program, but there is no evidence that the child was ever seen by a mental health consultant, or that any intervention other than the Family Resource Coordinator's meeting with the parents in January 2001 (prior to the first ACF review) was tried. First State Ex. 53. No involvement by the Program Development Specialist is documented.

- A child with the initials D.S. had a sufficiently severe mental health problem that First State attempted to refer the child to an LEA (Local Education Agency), but that referral was rejected in a letter dated December 14, 2001 because First State provided "no evidence of pre-referral intervention." ACF Ex. 27. First State provided no evidence that it had in fact provided any intervention (either before or after the referral) or had taken any other steps to address this child's mental health issues. [25]

- A child with the initials N.A. was withdrawn from the program because of discipline and

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL    Document 20-5    Filed 03/03/2008    Page 33 of 56

behavior problems. ACF Ex. 14. First State argued that ACF did not provide any evidence about the nature of these problems or to show that First State took no steps to address them, and that it is a parent's right to withdraw a child from the program. ACF did present unrebutted evidence, however, that one of the reviewers had reviewed the records, had asked the supervisor of the Family Resource Coordinators about whether the child had been referred for services, and was told that there was nowhere to refer him. Mentzer Decl. at • 21. Moreover, First State is the party that would have this child's records. Yet, First State presented no evidence regarding this child to show that it took steps to address this child's behavior problems, or to show that it followed its alleged referral system to meet the child's needs.

As mentioned above, no teacher other than Ms. Knapp (whose Program Development Specialist was Trish Sowers) testified that she was aware of the alleged referral system. Moreover, Ms. Knapp testified that she was aware that "some of the staff felt that one former Program Development Specialist was not as available as the other Program Development Specialist." Knapp Decl at 4, • 13. In addition, some teachers who expressed frustrations about lack of support with mental health issues told the reviewers that they were informed that kindergarten would take care of behavior problems. ACF Ex. 13, at 3. First State did not provide any evidence to rebut this.

Thus, we conclude that, even if some staff were aware of an internal system for referral and intervention, not all staff knew of it, and, with respect to some children with identified needs, the system was neither timely nor effective.

*First State's continuing failures to have a mental health professional and to meet other requirements were significant.*

To minimize the significance of its failures in providing mental health services, First State presented some testimony to the effect that not many of its children had mental health needs. This testimony was contradicted by the reviewers' testimony that they had observed some problems and were told of teachers' frustrations in not being able to refer children whom they felt had mental health needs. Mentzer Decl. at • 16; Mullins Decl. at • 10.; Wirth Decl. at • 46; Curatola Decl. at •• 37, 40; Tr. at 167-68 (Mullins). [26] Moreover, First State was required to have teachers complete behavioral checklists for each child and planned to do so three times during the year. Mentzer Decl. at • 29. Trish Sowers testified that "when the behavior observation checklist was completed, they are all turned in to the Program Development Specialists, and that person is required to review those . . . ." Tr. at 762. She did not testify that, in fact, these checklists were timely completed, turned in, and reviewed, however. First State submitted the checklist form as an exhibit, but did not submit any completed forms. The reviewer who focused on mental health issues noted their absence. Mentzer Decl. at • 29. First State's failure to provide any Behavior Observation Checklists completed by the teachers leads us to infer that they would not support First State's assertion that its children had few mental health needs.

First State did establish that obtaining actual direct mental health services (diagnosis and treatment) for children is difficult in the area First State serves. First State also established that there were mental health components to some training it made available to parents, and that one of its lead teachers (Leonia Robinson) received some training in mental health issues in addition to the CCP training. Moreover, First State did provide some information to parents on providers of mental health services and did establish some relevant community relationships. In addition, First State showed that parents had an opportunity to discuss mental health issues with staff. Despite the efforts of some First State staff members, however, the evidence as a whole shows a failure on the part of First State to timely take all of the steps it committed to in its QIP to correct the deficiencies in providing mental health services, or to timely develop and communicate a substitute way of meeting key requirements.

The lack of any on-site observation by a mental health professional in at least nine out of 12

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL    Document 20-5    Filed 03/03/2008    Page 34 of 56

classrooms by itself is a significant failure. ACF witnesses testified that some mental health problems in children may not be exhibited as behavior problems, but as withdrawal or in other ways. Tr. at 628-29 (Lesko); 455 (Rosas); see also Tr. at 728-29 (Sowers). Moreover, behavior problems may be affected by the classroom environment. Mentzer Decl. at • 22; Tr. at 628-29 (Lesko); 145 (Mullins). While testimony by an ACF reviewer indicated that some programs rely on professionals training teachers to do observations, she also indicated that the professional would usually supervise and would review the observations. Mullins Decl. at • 9. In any event, what teacher training was obtained was too little and too late to substitute for hiring a mental health consultant with appropriate qualifications who, pursuant to the QIP, would be responsible for oversight and ensuring that the performance standards were met.

Further exacerbating this situation was the failure to ensure that, when teachers did identify behavior or other mental health problems that might require professional services, they knew what to do. The evidence as a whole leads us to conclude that a substantial number of First State's teachers did not know even what was available by way of intervention by First State staff, much less how to refer a child for intervention and consultation from a mental health consultant, or, if needed, for diagnosis and treatment.

Finally, we note that, in revising the standards that were effective in 1998, ACF emphasized that, while the services of a mental health professional could be provided either by a staff member or by a consultant on a regularly scheduled or ongoing basis, the content expert was expected "to provide expertise and oversight in activities such as planning, service delivery and staff training and development." 61 Fed. Reg. at 57,203. Trish Sowers testified that CCP staff would occasionally stop by First State's main office to see how things were going. Tr. at 721. First State did not assert, however, that CCP staff were available to interact with parents or that any content expert had any input into planning how First State would meet the mental health requirements. Indeed, Ms. Sowers acknowledged that, although she considered the Program Development Specialists to be responsible for coordinating the mental health program, she could not recall any meeting to develop a mental health education program. Tr. at 745. Thus, we conclude that, even though some training in mental health issues was obtained for staff and parents, it was not part of an overall mental health education program developed with input from a mental health professional, as contemplated by the regulations.

In sum, we conclude that, while First State took some steps to improve its mental health program, First State failed to timely take all of the corrective action steps outlined in its QIP or to develop a meaningful substitute. As a result, that area still had deficiencies at the time of the 2002 Review.

- Deficiencies related to program governance

In this area, ACF essentially found that there was no shared governance of First State's Head Start program as required by the regulations. ACF found that Policy Council members did not attend Board meetings, did not participate in development of First State's long and short term goals, and had not approved First State' personnel policies and procedures.

Performance standards

Under the heading of Program Design and Management, ACF determined that First State was not in substantial compliance with two requirements related to program governance. Section 1304.50 (d) provides:

(1) Policy Councils and Policy Committees must work in partnership with key management staff and the governing body to develop, review, and approve or disapprove the following policies and procedures: . . .

(iv) The program's philosophy and long- and short-range program goals and objectives (see 45 C.

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL    Document 20-5    Filed 03/03/2008    Page 35 of 56

F.R. 1304.51(a) and 45 C.F.R. 1305.3 for additional requirements regarding program planning); . . .


(ix) Program personnel policies and subsequent changes to those policies, in accordance with 45 C. F.R. 1301.31, including standards of conduct for program staff, consultants, and volunteers; . . .


ACF's Guidance demonstrates that Policy Councils and grantee governing bodies are expected to be deeply involved in the governance and operations of their Head Start agencies. Guidance applicable to section 1304.50(d)(1)(iv) illustrates the importance of active participation by the Policy Council in planning and in the development of long and short term goals, as well as the level of participation expected:

Active policy group participation in program planning is critical to the continuous process of program improvement. The following are suggestions for involving Policy Councils and Policy Committees in program planning and in shaping the program's philosophy and long- and short-range goals and objectives:

- Ensure that members are aware of established agency time frames and procedures for program planning;
- Ensure that the Policy Council and Policy Committee participate in discussions concerning program vision;
- Establish subcommittees, as needed, to work with the director, the governing body, and appropriate staff on developing and analyzing program plans, long-range goals and short-term objectives for each program area;
- Obtain recommendations from Parent Committees;
- Provide input on relevant community issues;
- Review financial statements of the program and explore program resources to determine if adequate resources exist to support goals and objectives; and
- For Policy Councils of agencies with delegate agencies, ensure that the grantee agency's planning procedures describe how delegate agencies will integrate their planning activities into those of the grantee.

Guidance at 166. Similarly, the Guidance for section 1304.50(d)(1)(ix) reflects the importance of Policy Council involvement in hiring and the development of personnel policies:

Policy groups are knowledgeable about personnel policies, because of their roles in approving or disapproving decisions to hire or terminate staff. Elements to consider during the review of personnel policies include:

- The effectiveness of the personnel policies in securing qualified staff who can provide appropriate services and who reflect the families served;
- The potential need for modifications or addendums to agency-wide personnel policies and procedures, so that program staff are treated in accordance with 45 C.F.R. 1301.31; and
- The possible desirability of focusing the review on a particular area, such as benefits, recruitment, promotion procedures, salaries, job descriptions, or grievance procedures, during any given year.

Guidance at 168. [27]

Initial findings and First State's promise of corrective action

The 2001 Review found the following deficiencies in First State's compliance with the program governance regulation: [28]

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL    Document 20-5    Filed 03/03/2008    Page 36 of 56

- The grantee does not have a system in place that ensures the governing bodies, the Board of Directors and the Policy Council, participate in key decision making and oversight of the program. In an interview and in a presentation, the Executive Director stated that the oversight of the Head Start program, decision making, and the implementation of program objectives occur at the program staff level. The Executive Director further stated that the Board of Directors relied on the Board liaison person to the Policy Council to keep the Board informed on key matters, performance and financial information. However, a review of the Policy Council minutes and sign in sheets for the 1999-2000 program year showed that the Board liaison person had not attended any Policy Council meetings. At the Policy Council meeting consisting of first and second year Policy Council members, the question was raised as to who from the Board of Directors attended the Policy Council. The Policy Council was not familiar with anyone from the board attending the Policy Council meetings.

- Observance of a Policy Council meeting and an interview with the Policy Council demonstrated that the Policy Council had not worked in partnership with key management staff and the governing body to develop, review and approve (or disapprove) the refunding application, program planning, the program's philosophy, long or short term program goals and objectives, the composition of Policy Council or the parent committee and the procedures by which policy groups members are chosen, criteria for defining recruitment, selection and enrollment priorities, and program personnel policies.

ACF Ex. 3, at 10-11.

The Program Design and Management area summary in the 2001 Report noted that "the lack of substantial Parent involvement and participation has led to the inability of Policy Council to make 'informed decisions' on program governance and failure to participate in the program's planning and self-assessment" and that First State's "present organization structure does not support the accomplishment of the grantee's stated goals and objectives. There is little shared governance between the Board of Directors and the Policy Council." Id. at 9.

As relevant to the deficiencies that ACF found uncorrected in the 2002 Review, First State's QIP promised the following corrective actions: (29)

- Board of Directors will appoint an alternate Board member to serve on Policy Council in absence of regular representative, by April 18, 2001.

- Board of Directors will implement a plan to include Policy Council representatives on the Board of Directors, by July 30, 2001.

- Board and Policy Council will participate in all key decisions and oversight of the program including: A. Hiring/firing; B. budget/fiscal reports; C. parent activity funds; D. Curriculum; E. Service Plans; F. Policies/procedures; G. self-assessment.

First State Ex. 10, at 120. The QIP listed the date for the third step as May 2002. Persons responsible for the corrective measures were the Chair of the Board of Directors, and the Executive Director. Verification was to consist of minutes from Board of Directors and Policy Council meetings.

Findings of the 2002 Review

The 2002 Review Report focused on the Policy Council's lack of required involvement in the development of First State's goals and personnel policies, finding as follows:

- The November 12, 2001 Policy Council minutes indicate that the Policy Council needed to participate in development of the program's long and short range program goals, but there

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL    Document 20-5    Filed 03/03/2008    Page 37 of 56

was no documentation on follow-up for this participation.

- During the management team interview, it was stated that program goals were exclusively based on the results of the self-assessment. When asked at the interview where the program would be in five years, the Acting Executive director stated that she wanted the program to have qualified staff.

- There was no evidence of any development by program staff or Policy Council of program goals.

- It was not shown that the Policy Council approved the Personnel Policies and Procedures. First State staff could not find documentation in prior years that would indicate such approval.

ACF Ex. 2, at 12-13.

As relevant here, the area summary for Program Design and Management in the 2002 Report noted the following as relates to these deficiencies:

- Although there was evidence of increased shared governance and communication between governing Board and Policy Council in the 2002 Review, only one or two Board members attended seven of the 15 Policy Council meetings from February 2001 through March 20, 2002 for which minutes were reviewed.

- The Policy Council member elected to the Board attended only one Board meeting from April 18, 2001 through January 16, 2002.

- There was no notation in the meeting minutes that any Head Start-required approvals were made by the governing Board, although the Policy Council had approved many of the program requirements. There was evidence in the Policy Council minutes that the Policy Council approved Head Start grants before they had seen them, and would receive the narratives later.

Id., at 9-10.

ACF's termination letter reported that despite evidence of increased shared governance and communication between governing Board and Policy Council, the Policy Council did not work in partnership with the Board and key management in the development of long and short term program goals, and was not given the opportunity to make informed decisions on goal setting. There was also no documentation in current or prior years as to when the Policy Council had ever approved the personnel policies or subsequent changes to those policies.

Arguments

First State argued that its Policy Council members were involved in making First State's key management decisions and in the development of its long and short term goals. Much of this participation, First State argued, occurred through its self-assessment program, under which parents and staff formed teams that examined and reported on different aspects of the Head Start program, including those found deficient in the 2001 Review. First State cited primarily testimony from Policy Council members and also Policy Council minutes and agendas as reflecting examples of parents being involved in setting Head Start program goals and participating in program activities such as reviewing grant applications, redesigning the playground, making the program year round, creating Policy Council job descriptions, planning menus, discussing field trips, reviewing budgets, reviewing and approving job applications, restructuring classrooms, discussing the curricula, and reorganizing the Head Start program.

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL    Document 20-5    Filed 03/03/2008    Page 38 of 56

First State also argued that communication between parents and Head Start staff occurred through each Head Start center's parent committee having a representative on the Policy Council, and through attendance at Policy Council meetings by First State Head Start staff. First State also described interaction between parents and First State management though a system of "cross-board representation," under which a Policy Council member would attend meetings of the First State Board of Directors, and vice versa. First State Post-Hearing Br. at 40. First State argued that through these means, and through parents being able to access First State staff, parents were able to communicate their concerns to the Policy Council and the Board and receive information about the Head Start program, such as explanations of the Head Start program budget. First State cited parent involvement in creating a "Male Involvement Initiative" and Father's Day Breakfast programs designed to increase the involvement of fathers in their children's Head Start activities.

ACF disputed First State's interpretation of the Policy Council minutes, arguing that those minutes and Board meeting minutes do not demonstrate parent or Policy Council involvement in setting long or short-term goals, reflect a self-assessment process that was not completed, and show that the Policy Council approved grant applications without reviewing them, and a nutritionist's consulting contract that had already been signed. First State replied that ACF focused solely on its interpretation of Policy Council meeting minutes, to the exclusion of the testimony of Policy Council members as to what actually occurred at those meetings, and what their understandings were. First State also challenged the legal basis of the deficiency finding, arguing that the regulations do not require that the Policy Council document follow-up of its goal-setting.

As to Policy Council approval of the personnel policies, First State argued that the Policy Council did approve the policies, but that they were mistakenly referred to in the minutes as bylaws. First State noted that it had not revised its bylaws since 1998, so there would have been no reason for the Policy Council to have reviewed or approved them. First State presented evidence that the Policy Council had approved personnel policies at a meeting on December 13, 2000 (following meetings in August and November at which there had not been a quorum present). Upon discovering this error, First State reported, the Policy Council reapproved the policies at its meeting on May 15, 2002. [30]

## Analysis

First State did not take some of the steps to correct problems with lack of shared governance that it committed to in its QIP. Specifically, First State committed to sharing governance by having a representative of First State's Board, or an alternate, attend Policy Council meetings. First State Ex. 10, at 120. Yet, the minutes of seven out of 14 Policy Council meetings in the record show no Board representative in attendance. [31] First State also failed to provide any documentation of attendance at Board meetings of any Policy Council representative, pursuant to the QIP. Although the Policy Council members who testified clearly were committed to the program, and sought and received training to understand their duties, some of their assertions are not supported by the written record. For example, Linda Baker testified that Policy Council members reported at parent meetings on what happened at Policy Council meetings. Baker Decl. at • 4. The minutes of parent meetings do not support a finding that this in fact occurred on any regular basis, however. [32] Some Policy Council minutes show that some centers were not represented at the meetings.

Moreover, while First State asserted that it had corrected the problem of no shared governance in developing short and long term goals, the evidence does not support a finding of compliance with this requirement, for the following reasons:

- First State relied on the Self-Assessment process, asserting that short and long term goals were developed as part of that process and approved by the Policy Council. Not all of the copies of the Self-Assessment in the record (which were dated June 2001) include the goals, however. Compare First State Exs. 11, 60. One reviewer testified that she was not given a copy of the goals during the review. Wirth Decl. at • 6. Moreover, the minutes for

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL    Document 20-5    Filed 03/03/2008    Page 39 of 56

the November 12, 2001 Policy Council meeting referencing review of the Self-Assessment state: "Policy Council needs to develop short and long term goals." First State Ex. 20, at 215-17 and Ex. 62, at 825-26. Three meetings later, on January 16, 2002, the minutes report that the Self-Assessment report was "finalized" but also state that it was "tabled." First State Ex. 22 at 222-24. No reference to the Self-Assessment or to goals development occurs in the minutes of the interim Policy Council meeting, held on December 12, 2001, or in the minutes to the meetings held after January 16, 2002. First State Ex. 62. Thus, this evidence falls far short of showing any awareness on the part of the Policy Council as a whole of what the short and long term goals were, much less approval of such goals.

- First State provided no documentary evidence that the Board was made aware of any goals developed as part of the Self-Assessment process (or at any other time) and approved them. The testimony that First State relied on to show Board involvement was vague and unconvincing. The reviewers found that the Board minutes did not reflect any review of the Self-Assessment. ACF Ex. 22, at 13.

- The performance standards require not only that the grantee have goals and objectives, but also that the grantee develops the goals with input from both the Policy Council and governing body, revises them as necessary, and uses the goals and objectives in program planning. See Guidance, above; see also First State Ex. 60, at 789.

- First State provided no evidence that either the Policy Council or the Board ever developed objectives or ever monitored or adjusted any goals after June 2001, when the Self-Assessment Report was completed. [33]

With respect to approval of personnel policies and procedures, we accept First State's evidence that the Policy Council approved the use of First State's personnel policies and procedures for Head Start in December 2000. In the QIP, however, First State committed to documenting in the minutes of the Board and the Policy Council that both entities had participated in all key decisions and in oversight of the program, including policies and procedures by May 2002. First State showed that the Policy Council approved personnel polices in May 2002, but did not provide written evidence that the Board had approved those same policies. Nor did First State provide any evidence that no change was made to the personnel policies between December 2000 and May 2002. First State Director David Hill testified that First State revises the personnel policies periodically, generally, "at least three times a year or as necessary when there are going to be personnel changes." Tr. at 393. There is no documentation showing that the policies approved by the Policy Council in December 2000 were the ones in effect at the time of the 2002 Review, and the record shows that personnel changes were made in that period. This failure is significant because the Human Resources Manager told a reviewer that he did not know that the personnel policies needed to be approved by the Policy Council. Wirth Decl. at • 26. Since First State did not provide a copy of the personnel policies at either ACF review, we have no assurance that the policies approved in December 2000 were the ones First State was applying in later years, and that were approved in May 2002. Even before us, First State provided only excerpts from its personnel policies, so we also lack assurance that the approved policies included all of the elements required for such policies, such as standards of conduct.

Moreover, while First State provided testimony from several members of the Policy Council to the effect that they believed that they understood the budget and provided meaningful review, First State provided no evidence from any member of the First State Board to show that the Board provided any meaningful oversight of the budget or financial reports. On the other hand, it is undisputed that permanent increases in teachers' salaries were not made until the time of the 2002 Review, even though grant funds had been specifically awarded for that purpose. We cannot imagine how any meaningful oversight by either the Policy Council or Board could have failed to detect this failure to expend these funds for the purposes awarded, especially in light of the fact that there was turnover in the teaching staff during this period.

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL    Document 20-5    Filed 03/03/2008    Page 40 of 56

Finally, while there is some evidence that the Policy Council was involved in developing the QIP submitted in May 2001, there is a disturbing lack of evidence of any meaningful oversight from either the Policy Council or the Board regarding whether First State was living up to its commitments made in the QIP.

In sum, while First State rebutted some of the ACF findings, First State did not provide evidence sufficient to show that it had corrected the deficiencies related to shared governance.

- Deficiencies related to organizational structure

This deficiency related primarily to the lack of adequate and appropriately trained staff in key positions, as well as systems for implementing needed program changes and oversight. The lack of staff and systems increased the work pressures on First State staff and kept them from properly performing their normal assigned job responsibilities.

Performance standards

ACF found First State deficient in meeting the Head Start requirements for a grantee's organizational structure, which are found in the Human Resources Management regulation at 45 C. F.R. • 1304.52(a). ACF determined that First State out of compliance with the following requirements:

(1) Grantee and delegate agencies must establish and maintain an organizational structure that supports the accomplishment of program objectives. This structure must address the major functions and responsibilities assigned to each staff position and must provide evidence of adequate mechanisms for staff supervision and support.

(2) At a minimum, grantee and delegate agencies must ensure that the following program management functions are formally assigned to and adopted by staff within the program: . . .

(ii) Management of early childhood development and health services, including child development and education; child medical, dental, and mental health; child nutrition; and, services for children with disabilities;

ACF's Guidance states that the objective of 45 C.F.R. • 1304.52 "is to ensure that grantee and delegate agencies recruit and select dynamic, well-qualified staff who possess the knowledge, skills, and experience needed to provide high quality, comprehensive, and culturally sensitive services to children and families in the program." Guidance at 190. The rationale for section 1304.52(a)(1) notes that "[a] well-developed organizational structure establishes clear lines of communication and supervision, helps individuals understand their jobs, and assists staff in the smooth running of the agency." Id.

Initial findings and First State's promise of corrective action

ACF's 2001 Review findings at issue here centered on the effect of shortages of qualified staff in key positions and on First State's ability to deliver quality Head Start services. [34] In the area summary for Program Design and Management, which included the findings related to Organizational Structure, ACF found that lack of a good organizational structure had caused First State's Head Start program to experience difficulty implementing and delivering high quality education, health, mental health and nutrition services to families, and that systems to monitor classroom activities, health service follow-up, fiscal expenditures and nutrition services were not in place. ACF Ex. 3, at 9.

ACF found that First State did not have content experts for health services, parent involvement,

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL    Document 20-5    Filed 03/03/2008    Page 41 of 56

mental health and child nutrition. The lack of a health service content expert resulted in the two child development content experts and the Head Start Director performing the duties and responsibilities of a health service content expert, which caused the two Child Development content experts to fall behind in their duties, responsibilities, and oversight of the classroom teaching staff. ACF reported that a child development content expert had stated in an interview that there was not sufficient time to get all the requirements met and that she did not feel that she had the expertise to perform the duties and responsibilities of a health service content expert. ACF found that First State did not have a content expert responsible for parent involvement, and that the Policy Council was thus not trained in its roles and responsibilities in shared decision making, program planning, the program's long and short term goals and objectives, enrollment and selection criteria, fiscal reports and parliamentary procedures for conducting a meeting. ACF also found that First State's organizational structure did not support the program's objective and the implementation of delivery of quality and comprehensive services to Head Start children and families, noting that First State Board members had indicated that decision making and implementation of the Head Start program occurred at the program staff level. Id. at 13-14.

The portions of First State's QIP addressing the organizational structure deficiencies on appeal committed First State to hire content experts for parent involvement, health services, child mental health services, and child nutrition services. First State committed to sign a contract with "a health person who has a minimum of a LPN" by July 30, 2001. First State Ex. 10, at 125. To that end, First State stated that it would: advertise the open position in a local newspaper and on the Internet by June 11, 2001; select a Policy Council member or parent to participate on the interview panel by June 30, and submit recommendations for a contract to the Board and Policy Council by July 30, 2001. Id. The QIP contained similar commitments and deadlines for filling the other positions. First State agreed to "designate a Parent Involvement Specialist with training, experience, and skills in assisting the parents of young children," and to "contract with a Nutritionist/Dietician person who is a registered Nutritionist or Dietician," by July 30, 2001. Id. at 124, 126. The nutrition content expert was to be found by advertising the open position in the local newspaper and on the Internet by June 15, 2001. First State also agreed to make hires, dismissals, and resignations an official part of its Board and Policy Council reports on a monthly basis. Id. at 125-26.

Findings of the 2002 Review

In the 2002 Review, ACF found that:

- The Health Coordinator had not received sufficient orientation or training to fully understand Head Start requirements and documentation necessary for initial screenings and follow-up services.

- Record reviews could not substantiate that follow-up on referrals to LEAs for speech assessments occurred. Without documentation to support the resolution of special education referrals, there was no way to know if the child received the assessment.

- The two Program Development Specialists had a variety of non-job related duties, such as substituting in the classrooms, that made it impossible for them to observe, monitor and support the education staff. Lewes Center staff stated in an interview that they had seen their Program Development Specialist only three to four times during the program year. Newly hired staff interviewed indicated that they did not feel they had been prepared for their job responsibilities nor given the orientation and training by their supervisors that would allow them to fully understand all the Head Start requirements. Lewes Center staff further indicated that they did not know what was expected of them as they had little or no supervision.

- The few bilingual staff were unable to fully function in their own jobs due to the constant need for basic translation services outside their work responsibilities.

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL    Document 20-5    Filed 03/03/2008    Page 42 of 56

- There was no qualified mental health consultant or professional responsible for the provision of mental health services, thus no ongoing mental health services for children and families.

ACF Ex. 2, at 13-14.

In the area summary for Program Design and Management, ACF found that First State's organizational structure did not provide adequate means for the supervision and support of staff and monitoring of program services, noting that no Health Coordinator had been hired until October 2001, that the Head Start manager did not receive or utilize the written monthly reports that the education/disabilities and social service staff supervisors maintained, and that other program mid-managers did not develop written monthly status reports. Id. at 9-10.

In its termination letter, ACF further explained and summarized the deficiencies in First State's organizational structure. ACF found that First State had no effective system for staff training and supervision, with adequate training opportunities not being provided to or utilized by all of First State's Head Start staff, and management not providing oversight of the training needs of new employees. ACF reported that First State had failed to respond to most of more than a dozen attempts by the Head Start Quality Improvement Center, a training and technical assistance provider, to assist First State management staff in implementing its QIP.

ACF also addressed the effect of staff shortages, reporting that management staff had expressed a belief that the intensity and volume of job responsibilities had been overwhelming, including responsibilities not related to their jobs that left them unable to conduct their regular monitoring of classroom staff. ACF again noted the pressures that staff shortages placed on the two Program Development Specialists, and pointed out that their duties had been increased because six teachers had ended their employment from September 2001 until the time of the 2002 Review. ACF found that the staff's workload increased because First State failed to monitor its management staff and had been unwilling to involve "stakeholders" such as field staff, community partners, the Board, and the Policy Council in providing additional support. Among the staff shortages was the vacancy in the Health Coordinator position, which went unfilled from several months prior to the 2001 Review until October 2001; the Health Coordinator First State did hire was not trained in the use of specialized hearing instruments or the Head Start requirements and documentation necessary for initial screenings and follow-up services.

Finally, ACF found that because First State had failed to devise mechanisms to support the successful implementation of the systems developed, the implementation of those systems depended on separate individuals rather than the Head Start team. There was little or no follow-through by senior management outside of the Head Start program to ensure that necessary changes occurred systematically or that support was provided to assist staff with implementation of those systems.

Arguments

First State argued that section 1304.52(a)(1) gives grantees the discretion to use the structure that is best for them. First State argued that it had the required organizational and human resource management structure that supported the accomplishment of program objectives, and ensured adequate mechanisms for staff supervision and support by creating an established chain of command and supervision. The organizational structure was set out in its organizational chart, job descriptions, and personnel policy, which, First State argued, help ensure adequate mechanisms for staff supervision and support by creating an established chain of command and supervision, and clearly required all Head Start staff to attend orientation, ongoing training, and development.

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL    Document 20-5    Filed 03/03/2008    Page 43 of 56

First State also disputed that the two Program Development Specialists had duties unrelated to their jobs, noting that the 2002 Review found no deficiency in the Program Development Specialist's area or employment, education, and early childhood development. First State also pointed out that it had filled the various vacant positions by April 2002.

Analysis

The essence of this deficiency was that First State was inadequately staffed in positions of key responsibility, and that its organizational structure failed to lay out clearly responsibilities in such a way as to assure the proper delivery of the services First State was obligated to provide as a Head Start grantee. In response, First State cited its organizational chart and personnel descriptions to demonstrate compliance with this regulation, and basically argued that it delivered required services. However, compliance here requires more than having an organizational chart and job descriptions: in addition to addressing major staff functions and responsibilities, there must be adequate mechanisms for staff supervision and support, and the management of key functions must actually be assigned to and adopted by program staff.

While First State is correct that grantees have discretion in establishing an organizational structure, that is precisely why the regulations also require that certain functions be formally assigned, and why the Guidance contemplates documentation of the structure.

We disagree with First State's argument that it delivered all required Head Start services. Our analyses of the deficiencies related to ongoing communication of health care needs and the provision of mental health services demonstrates the problems attributable to First State's lack of adequate staff and its failure to be guided by a clearly defined organizational structure. Those problems are apparent from questions raised by the organizational documents First State provided, and by evidence that staff were unclear as to division of responsibility, and were often unable to perform critical assigned job responsibilities due to these uncertainties and the absence of needed staff.

We first note that the documents First State submitted raised questions on their face as to its organizational structure and were at odds with other evidence in the record. Notably, First State's organizational chart lists the position of Mental Health Consultant, under the supervision of the Child Development Administrator. [(35)] First State Ex. 64. However, First State did not timely obtain the services of a mental health consultant, or clearly assign and formally assign management responsibility for provision of mental health services to Head Start children. Trish Sowers, one of the two Program Development Specialists at the time of the Reviews and subsequently the Head Start Director, testified that mental health services and education were assigned to the Head Start Director and the two Program Development Specialists. Tr. at 743-44. The Head Start Director's position description contains a reference to "other duties as assigned," but does not formally assign any mental health duties to the Director. First State did not rebut testimony that two reviewers were unable to obtain from First State management a definitive answer as to who was responsible for the management of mental health services, with the Health Coordinator referring one reviewer to a Program Development Specialist for an answer, the Program Development Specialist referring her to the Head Start Director, the Director saying that she would look into it but not providing an answer. Mentzer Decl. at • 17; Mullins Decl. at • 11.

We have already addressed First State's failure to have a reliable system of tracking children's health care needs. These findings, and the failure of any Head Start staff during the review to cite the CCP as a provider of mental health services, as discussed in the earlier section of this decision, point to serious problems with First State's overall organizational structure.

The evidence also supports ACF's determination that First State's Head Start program experienced shortages of qualified staff. First State failed to rebut a reviewer's report that both Program Development Specialists, although well-liked by the teachers, had too many responsibilities and

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL    Document 20-5    Filed 03/03/2008    Page 44 of 56

tremendous workloads including office responsibilities and substitute teaching that kept them from spending time that they wanted to spend in the classrooms with teachers, who reported that they did not see their Program Development Specialists often and did not have sufficient training to do their jobs. Wirth Decl. at •• 40-42; Tr. at 648-49; Lesko Decl. at 6, • 23. One of the Program Development Specialists, Alison Taylor, had been on-site at the Lewes Center only three or four times during a school year. Wirth Decl. at 7, • 40. Although Trish Sowers told one reviewer that she spent a lot of extra time each week trying to cover all the areas that needed to be covered, First State did not attempt to explain how, during the additional hours beyond the classroom hours, Ms. Sowers could perform daytime functions such as observing teachers. First State failed to rebut the testimony of two reviewers that staff felt frustrated by lack of access to mental health services. Mentzer Decl. at 6, • 16; Mullins Decl. at • 14. First State did not present evidence to substantiate the argument in its pre-hearing briefing that such statements were likely the complaints of a few disgruntled employees and not a generalized problem.

Additionally, the chart does not list positions that the QIP lists as responsible for completing the corrective steps First State was to take, such as a Health and Nutrition Coordinator, who was identified as responsible for recruitment of content experts for child mental health and child nutrition services. First State Ex. 10, at 126, 127. The organizational chart does not show a Health and Nutrition Coordinator, although it lists a Health Coordinator, a position that, as discussed, was long vacant and not adequately filled, and also a "nutritionist consultant" reporting to the Employment and Training administrator. It was not explained what the nutritionist consultant position was or what the responsibility of that position towards Head Start children was, or between the to-be-hired content expert for child nutrition services and the unlisted position of Health and Nutrition Coordinator. The First State witnesses who cited the chart in their testimony merely referred to it as evidence of organizational structure but did not address or explain its substantive contents or relate it in any way to the process by which First State would fulfill its responsibilities under the Head Start program. See, e.g., identically worded paragraph 37 of Edwards Decl. at 8, Hill Decl. at 8.

Job descriptions and testimony indicate that Program Development Specialists were responsible for health care functions that were properly the responsibility of a Health Coordinator, such as assuring and administering all required dental, hearing, vision and developmental screenings, completing health records and health tracking for all enrolled children, and maintaining a working relationship with dental providers. First State Ex. 57, at 773-74; Wirth Decl. at 8, • 44; Hill Decl. at 2, • 6. First State provided no indication that the Program Development Specialist job description was changed when a Health Coordinator was hired and this oversight of health functions was shifted from Program Development Specialists to the Health Coordinator. Wirth Decl. at 8, • 44. As discussed further below, the Health Coordinator that First State did hire did not possess the credentials that First State specified for that position in its QIP.

Particularly troubling is that there is nothing showing clear lines of authority for implementing the corrective measures that First State committed itself to taking in its QIP, and no clear lines of authority for amending the QIP if necessary to bring the Head Start program into compliance. As noted in our discussions of health care and mental health services, the QIP progress reports showed delays in making the promised changes, but there is no evidence of specific First State staff accepting responsibility for addressing these failures and assuring timely correction of the deficiencies. ACF Ex. 7, at 3, 27. First State's failure ultimately to take many of the steps promised in its QIP is evidence of the problems in its organizational structure supporting this deficiency finding.

Also symptomatic of a deficient organizational structure was First State's failure to hire an appropriately qualified Health Coordinator, by the time specified in its QIP. As noted above, First State did not meet its QIP commitments to hire a content expert for health services with a minimum of an LPN, by July or August 30, 2001, instead hiring a Certified Nursing Assistant (CNA) in October of that year. First State Ex. 10, at 92, 125. The testimony of an ACF reviewer

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL    Document 20-5    Filed 03/03/2008    Page 45 of 56

established that the lack of the minimum credentials required by the QIP to remedy this deficiency rendered the Health Coordinator unable to carry out important responsibilities of her position. LPNs receive much more extensive training than CNAs, qualifying them to interpret medical records and findings and thus understand when follow-up would be required, as well as to communicate this information effectively to parents in an understandable form. CNAs, who usually work under the supervision of an LPN, undergo short-term training that does not equip them for independent interpretation of medical procedures, and are not trained in the LPN's skills of parent communication. Mentzer Decl. at 11, • 35; Tr. at 110-12. First State did not deny that this Health Coordinator performed audiology screenings without being qualified to do so and that she reported health screenings as having been done on two children who were not enrolled in the program at the time of the alleged screenings. First State also did not dispute the reviewer's testimony that the Health Coordinator reported that she had no way of knowing what follow-up was needed, or that she did not regularly notify parents of screening results other than hearing and vision screenings. Mentzer Decl. at • 6, 8. First State did not submit a job description for the position of Health Coordinator or otherwise offer her testimony regarding those statements. In light of these unrebutted findings, we conclude that the lack of a properly qualified and timely hired Health Coordinator contributed significantly to First State's failure to timely correct its deficiency in the health services area.

Overall, we find that the documents First State provided evince at most an attempt at pro forma compliance with the organizational structure regulation that had little bearing on the way First State attempted to fulfill its Head Start program responsibilities. Instead, the overall picture that emerged from the testimony and evidence was one of undue reliance on a few outstanding staff members who were able to utilize those systems that were in place to avoid complete breakdown or non-compliance. First State did not, however, have the organizational structure to run a quality program.

We reject First State's notice argument with respect to this deficiency. First State argued that the 2002 Review Report cited specific findings not noted in the 2001 Report, and that the termination letter cited problems not apparent from the 2002 Review Report. The deficiencies in the area of First State's organizational structure go to the essential systems that First State used to deliver Head Start services. Deficiencies in those systems may manifest themselves in different ways which are evidence of the deficiency, rather than the deficiency itself. Addressing a specific manifestation and not the structural or systemic problem that permitted it to flourish does not amount to correction of the deficiency. Here, First State was notified in 2001 that organizational failures had impacted its ability to deliver services, and that these failures included the lack of qualified staff and poorly defined staff roles. Limiting ACF's enforcement abilities to individual symptoms of a deficiency would permit grantees to avoid addressing underlying management problems. In sum, First State confuses individual manifestations of a deficiency with the deficiency itself. Corrective measures aimed at those manifestations but not at the underlying problems that made it possible for them to arise are not sufficient to bar a termination action, where ACF has adequately notified the grantee of what is expected.

- The deficiency related to classroom size

Performance standard

Under the heading "facilities, materials, and equipment," 45 C.F.R. • 1304.53(a)(5) provides:

Centers must have at least 35 square feet of usable indoor space per child available for the care and use of children (i.e., exclusive of bathrooms, halls, kitchen, staff rooms, and storage places) and at least 75 square feet of usable outdoor play space per child.

ACF's Guidance states:

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL    Document 20-5    Filed 03/03/2008    Page 46 of 56

When agencies find that at least 35 square feet of usable indoor space per child available for the care and use of children is inadequate because of the presence of cribs and cots, they increase the amount of child usable indoor space available in order to accommodate activities that support the optimum development of infants and toddlers. To make good use of indoor space, agencies: Refrain from placing too much furniture or equipment in individual rooms or play areas; Apply these space allocations to the home-based group socialization settings as well as to center-based classrooms; . . . .

Initial findings and First State's promise of corrective action

The 2001 report found that--

- At the Central Sussex Center, one of the classrooms had approximately 441 square feet (21 x 21 ft) which would accommodate 12 children - there were 17 children enrolled in this classroom.

- At the Laurel Center, one classroom had approximately 474 square feet and the other approximately 466 feet, both of which would accommodate 13 children each. Both classrooms had enrollment levels of 17 children. There was an area of approximately 10' x 12' in one of the classrooms that was presently used for cubbies, a computer, and parent information that was not included in the estimation. Even with this space included, the classroom would still only accommodate 15 children.

2001 Report, ACF Ex. 2, at 19-20.

In its QIP, First State said it would "[c]omply with the Performance Standards/facility design recommendations to determine space requirements" by August 30, 2001, and "[c]onduct accurate measurements and allow for equipment when determining usable space in new and exi[s]ting structures" by July 30, 2001. The documentation of these measures would consist of space plans. First State Ex. 10, at 138. First State also agreed to "[c]orrect space when feasible or adhere to enrollment maximums" by June 18, 2001, with documentation in the form of site licenses. Id. Persons responsible for these actions were the Program Development Specialist and the Maintenance and Construction Administrator. Id.

Findings of the 2002 Review

The 2002 Report essentially repeated the findings of the prior review, stating that the Central Sussex Center had two classrooms of approximately 441 and 450 square feet, meaning a maximum of 12 children each, but that there were 14 in the full day and 15 each session in the part day. The Laurel Center's two classrooms were approximately 466 and 474 square feet, meaning a maximum of 13 children each, but there were 15 in the full day class, and in the part day class, 16 in the morning session and 15 in the afternoon session. ACF Ex. 2, at 22-23.

Arguments

First State argued that it met the square footage requirements in both Laurel and Central Sussex Centers, as evidenced by the Delaware licenses for the two centers. First State said that the Delaware space requirements were comparable to the Head Start requirements. First State argued that the evidence showed that measurements by the licensing agents were more accurate than those done by the reviewers and that the architect's drawings for the Central Sussex Center supported its position.

ACF took the position that the Delaware law was not comparable because the federal requirement counted only "usable" space. ACF also pointed out that Delaware law applied to centers, whereas the federal measurements were to be applied to classrooms and other space within which a child

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL    Document 20-5    Filed 03/03/2008    Page 47 of 56

worked. (36) ACF also questioned whether the measurements on which First State was relying took into account all of the non-usable space.

First State did not deny that Delaware law applied to centers, but pointed to language in the Delaware regulations excluding certain areas from the square footage used in computing space.

Analysis

We agree with First State that the standard in the Delaware licensing regulations captures a concept of "usable space" that is basically comparable to the federal standard, for our purposes here. The Delaware regulations provide:

A Center shall have at least thirty-five (35) square feet for each child.

A. Toilet rooms, kitchen areas, isolation areas, offices, storage spaces, hallways, furnace rooms and other areas not used by children for sleep or play on a routine basis shall not be counted in computing required square footage.

First State Ex. 34, at 294. (37)

Our inquiry does not end here, however, since it was undisputed that the Delaware licenses did not break down the acceptable numbers into classrooms and since First State's own QIP indicated that it would not rely on the licenses alone.

Trish Sowers testified that she was responsible for the licensing of the Laurel and Central Sussex Centers. She said she had reviewed the licensing agent's notes for the Laurel Center and the architect's drawings for Central Sussex. Sowers Decl. at 7, • 30. She did not state when she reviewed the notes and drawing, however, nor specifically state that First State had relied on these measurements when deciding how many children could be enrolled in each classroom. Id. When asked about why she did not have any licensing agent's notes for Central Sussex, she clarified that the notes were not given to her at the time the measurements were made, but that First State had requested them at a later time. Tr. at 768. The FAX notation at the top of the licensing agent's notes indicates that they were sent to First State from the Office of Child Care Licensing on November 12, 2002. First State Ex. 72.

The record adds further confusion to this issue of when the licensing agent's measurements were made. There are two licenses for Laurel Center, one that was valid from November 1, 2001 to April 30, 2002, and one that was valid from May 1, 2002 to November 30, 2002. First State Exs. 71 and 25. First State provided no evidence that it obtained a site license for Laurel Center as of June 1, 2001, as it said it would in its QIP, and Policy Council minutes from April 16, 2001 indicate that renovations were taking place and that the licensing applications had been delayed. First State Ex. 69, at 954. The licenses for Central Sussex Center are for the periods April 1, 2002, to June 30, 2002 and from July 1, 2002 to August 31, 2002. First State Exs. 71 and 29. No evidence was provided for Central Sussex Center that shows that First State met the commitment in the QIP to document compliance with a site license by June 1, 2001. While apparently the Central Sussex Center was moved to a newly constructed building, different from the center measured in the 2001 Review, it is clear from the record as a whole that First State was serving children in the Central Sussex Center new building prior to April 1, 2002. The licenses show only total number of children allowable per center.

Notations with respect to the Laurel Center on the 2001 Review report provided by First State indicate that "Bob's calculations" showed that 15 children could fit in one Laurel classrooms and 16 in the other, but that the person making the notations suggested only 15 per classroom. First State Ex. 6, at 27. "Bob's calculations" showed more square footage than the measurements made by the licensing agent, who Ms. Sowers testified used a special measuring tool to measure the

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL    Document 20-5    Filed 03/03/2008    Page 48 of 56

space. Compare First State Ex. 72. The licensing agent's notes show more square footage than that calculated by the ACF reviewers using floor tiles. Even the licensing agent's notes, however, do not support First State's determination that one Laurel classroom was large enough for the 16 children enrolled in that class. Instead, the notes show 553.72 square feet, which when divided by 16 is less than 35 square feet per child. The licensing agent apparently divided the total square footage she calculated by 35 and got 15.8, which she rounded up to 16 (possibly because the licensing is based on total usable square footage in the center, not per classroom). The 35 square feet in the Head Start regulations is a minimum per child in the classroom, however. Rounding up is inconsistent with the federal requirement because it would result in slightly less than 35 square feet per child. Thus, even based on the total square footage calculated by the licensing agent, it appears that the space in the largest Laurel classroom was at most sufficient only for 15 children, not for the 16 children who were enrolled.

In any event, First State failed to meet its commitment in the QIP to document on "space plans" where equipment was in the Laurel classrooms and how that would affect the measurement of usable space. The licensing agent's notations are minimal. Therefore, we do not know whether the licensing agent took into account any equipment, nor can we evaluate whether all of what the reviewers observed in the classroom during the 2002 Review was accounted for in the licensing agent's calculations. The lead reviewer testified that he observed cubbies, file cabinets, and fixed furniture protruding into the floor space. Curatola Decl. at • 45. Moreover, if the licensing agent made her measurements after the 2002 Review, as a basis for the license effective May 1, 2002, it is possible that First State had removed equipment by that time in response to the review.

With respect to the Central Sussex Center, the architect testified that the calculations shown on the architect drawings referred to by Ms. Sowers were done with a computerized design program. He further testified that his calculations excluded the observation areas and the counter top/sink areas. Tr. at 927-951. We agree with First State that this type of calculation generally would be more reliable than space measurements made by counting ceiling tiles, as the ACF reviewers did. On the other hand, the architect's drawings of the Central Sussex Center, like the licensing agent's notations for the Laurel Center, do not give any indication about equipment that may have been in the classrooms at the time of the 2002 Review. Thus, again, First State's failure to live up to its commitment to develop "space plans" documenting equipment makes it difficult to evaluate what part of the space really was usable.

Even Ms. Sowers' testimony does not contradict the reviewers' observations that the classrooms at both centers had some equipment that should be excluded from calculations of usable space. She testified that, before the licensing agent came to inspect the Central Sussex classrooms (changed between the two ACF reviews), she was told they had to be set up like classrooms, so she "had to move all the furniture over." Tr. at 767. Ms. Sowers did not, however, refer to moving over any equipment or testify that the way the classrooms were furnished and equipped at the time the licensing agent measured them was the same as at the time of the 2002 ACF review. Moreover, Ms. Sowers did not deny that she had concurred with reviewers during the 2002 Review that the State's method of measuring a classroom did not account for equipment and obstructions and was by center, and not by classroom, and that she had pointed this out to her supervisor. Curatola Decl. at • 46.

In sum, while First State did rebut some of the evidence on which ACF relied for this finding, First State's own evidence shows that it had, at a minimum, one too many children enrolled in one of the Laurel classrooms. Moreover, First State did not demonstrate that it took all of the steps it said it would take to correct this deficiency, including providing "space plans" showing equipment. The absence of such drawings means that we have no assurance that the amount of usable space indicated by the licensing agent's notes (for the Laurel classrooms) and by the architect's drawings (for the Central Sussex classrooms) was not reduced by the later addition of equipment. The space requirement is not merely a technical one, but is important because overcrowding a classroom can interfere with the children's learning experience.

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL     Document 20-5     Filed 03/03/2008     Page 49 of 56

Finally, while First State likely made some improvement in this area, the failure to timely take the corrective action steps in the QIP evidences a lack of oversight and supports our conclusions regarding organization structure.

- The deficiency related to human resources management and the requirement of bilingual classroom staff

We do not rely on this deficiency as an independent basis for termination, but our findings on this issue support our conclusion about organizational structure above.

Performance standard

ACF determined that First State failed to have sufficient Spanish-speaking classroom staff to satisfy the following staff qualifications requirements of 45 C.F.R. • 1304.52(b)(4), (g)(2):

(4) Staff and program consultants must be familiar with the ethnic background and heritage of families in the program and must be able to serve and effectively communicate, to the extent feasible, with children and families with no or limited English proficiency. . . .

(2) When a majority of children speak the same language, at least one classroom staff member or home visitor interacting regularly with the children must speak their language.

Initial findings and First State's promise of corrective action

The 2001 report found that--

- The grantee's Program Information Report for the 1999-2000 program year indicated that 34.43% of its enrollment population were Hispanic or Latino. Two classrooms, the Central Sussex Georgetown - Class/AM and the Georgetown Annex - Class/AM, were 90% Hispanic. The two teaching staff in the staff focus group (who were in the Georgetown classrooms listed above) were not of Hispanic descent, were not bi-lingual and did not display a familiarity with the ethnic background and heritage of Hispanic families.

- In an interview with the Family Resource Manager it was indicated that there were five bilingual agency-wide staff members, but that of the five only one was in a classroom and only one was part of the Family Resource staff. The lack of teaching staff that could speak the same language as the majority of the children in the classroom resulted in children not being understood, and children and families not able to communicate with teaching and family resource staff.

ACF Ex. 2, at 14.

To correct this deficiency, First State agreed to do the following:

- Identify internal bilingual staff who may be interested in classroom placement inclusive of training support, by June 15 2001.

- Advertise open positions in a local Spanish newspaper, the Sussex Guide, on the Internet, and through local Hispanic organizations, by June 30, 2001.

- Review the qualifications of potential new employees and recommendations of the Human Resources Director with the Policy Council and get approval by July 30, 2001.

- Employ bilingual staff, by August 30, 2001.

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL    Document 20-5    Filed 03/03/2008    Page 50 of 56

First State Ex. 10, at 128.

Findings of the 2002 Review

The 2002 Review determined that First State was still out of compliance. ACF determined that First State had three Spanish-speaking staff members in classrooms, one at the Georgetown Annex in the full day class, and two at the Central Sussex in the AM & PM full day classes, there were no bi-lingual Spanish-speaking staff in the other Central Sussex part day AM class, in which 11 out of 15 children were Spanish speakers, or in the part time PM class, in which seven out of 14 students were Spanish speakers. Thus, there were insufficient numbers of program staff "familiar with the ethnic background" and language of the population at these sites. ACF Ex. 2, at 16.

Arguments and analysis

On appeal, First State initially appeared to contest the finding that a majority of the children in the morning and afternoon part-day classes at Central Sussex Center were Spanish-speaking, arguing that ACF was simply assuming that all children with Hispanic names were Spanish-speaking. After ACF pointed out that the children's enrollment forms supported its finding, First State in effect conceded this issue.

David Hill's testimony shows that First State was aware of the make-up of the classes since it initially hired a bilingual teacher assigned to these classes, who later resigned one month into the school year. Hill Decl. at • 40; Tr. at 398 (Hill). Mr. Hill said that First State had attempted to replace her by advertising the position in a local Spanish language newspaper. Id. The only documentary evidence of advertising for bilingual staff, however, relates to a request to run an advertisement in June and July 2001. First State Ex. 12.

First State also initially appeared to be saying that it met the requirement because a Family Resource Coordinator, Bianca Luna (Brown), was bilingual and made home visits. As ACF pointed out, however, the term "home visitor" has a specific meaning in the Head Start program and is not applicable to a center-based program, such as that run at Central Sussex. 45 C.F.R. • 1304.3(a) (12).

Ultimately, First State relied primarily on testimony from the teacher of the full-day class at Central Sussex Center, Mary Knapp, and the two aides assigned to the full-day class, Yeila Santos and Hector Luciano Rizek. Both of these aides were fluent in Spanish. Ms. Santos worked mornings and Mr. Rizek worked afternoons, and their duty hours overlapped mid-day (although there are some discrepancies in the testimony on exactly how their duty hours overlapped and what activities they performed in this period). These witnesses testified that, although the bilingual aides were assigned to Ms. Knapp's class, they provided translation services in the part-day classrooms as well, switching with the aides assigned to the part-day classes if necessary. They further testified that they were available to speak with parents of these children when the parents telephoned with questions or came during the mid-day hours to pick up children or drop them off. They indicated that they could more easily perform these services because there was a door between the two classrooms at Central Sussex Center and because each classroom had a telephone. Ms. Knapp testified that she spoke a little Spanish and that the children's ability to understand basic English improved as the year progressed. First State argued that this arrangement met the children's needs. We found this testimony generally to be credible, especially since three witnesses with direct personal knowledge of the situation testified, and it was corroborated by Trish Sowers, who was a Program Development Specialist.

ACF pointed out that the bilingual aides were assigned to the full-day classroom and questioned whether they could satisfactorily fulfill their duties to the full-day class if interrupted to provide translation services in the other classroom. ACF also pointed out that Ms. Santos had

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL    Document 20-5    Filed 03/03/2008    Page 51 of 56

acknowledged that she had lunch and tooth brushing duties to fulfill in the mid-day period and questioned how she could also interact with parents. Finally, ACF pointed out certain inconsistencies in Mr. Rizek's testimony.

While ACF's concern about the aides' abilities to perform their primary duties if also engaged in providing translation for the part-day classes is legitimate, we do not consider it a basis for finding First State deficient in meeting the requirement of section 1304.52(g)(2). The witnesses testified that they did not feel the aides' ability to perform their duties was compromised by the arrangement. Moreover, while one could read section 1304.52(g)(2) as meaning that at least one staff person assigned to the classroom must be bilingual, this is not explicit in the regulation or in ACF Guidance. As First State pointed out, the regulation refers to "classroom staff member . . . interacting regularly with the children." The evidence supports a finding that the aides were interacting regularly with the children. Thus, we conclude that First State showed that it was substantially performing this requirement.

We note, however, that ACF also found, under organizational structure, that the few Spanish-speaking staff spent so much of their time translating that they were not able to fulfill their other duties. First State presented no evidence that the bilingual Family Resource Coordinator was able to fulfill her other duties, in spite of the need to translate often. Moreover, while we find that First State presented sufficient evidence to rebut the finding that the bilingual aides were not able to fulfill their assigned duties, the arrangement appeared to have been done on an ad hoc basis and to have worked only because of the quality and dedication of the staff. While Mr. Rizek's testimony was somewhat inconsistent on his hours, this appears to be true because his hours later changed, and we do not discount his testimony on this basis. Instead, we credit the testimony that the aides sometimes put in extra time, in order to meet children's or parents' needs. The fact that these particular staff members were able to make the arrangement (while less than ideal) nonetheless function satisfactorily does not fully undercut the inference regarding organization structure, however. First State presented no evidence that shows that, when the bilingual teacher for the part-day classes resigned, First State made any conscious management decision that it could meet the requirements by relying on the aides from the other classroom, and the Family Resource Coordinator, rather than hiring another teacher. Nor did First State present any evidence that the position descriptions for the aides contemplated that they would serve both classrooms. As indicated above, while Mr. Hill said that First State advertised in a Spanish language newspaper when the bilingual teacher resigned a month into the school year (presumably October 2001), First State presented no documentary evidence of this. Moreover, the QIP said that First State would not only advertise in the local Spanish newspaper, but also through the Sussex Guide, on the Internet, and through local Hispanic organizations. ACF Ex. 10. The only evidence about any advertisement for Spanish-speaking staff was for a newspaper advertisement. Thus, while First State rebutted some of ACF's findings in this area, and we do not rely on section 1304.52(g)(2) as an independent basis for termination, our findings in this area support our overall conclusion above regarding First State's organizational structure.

Conclusion

For the reasons stated above, we uphold ACF's determination to terminate funding for First State's Head Start program.

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL    Document 20-5    Filed 03/03/2008    Page 52 of 56

| JUDGE | ...TO TOP |
| --- | --- |

Donald F. Garrett

Marc R. Hillson

Judith A. Ballard
Presiding Board Member

| FOOTNOTES | ...TO TOP |
| --- | --- |

1. Before us, ACF pressed its bases for termination under subsection (4) of section 1303.14(b) and never fully explained its reliance on subsections (7) and (9). Thus, even though the evidence might support termination on other grounds, we rely here only on subsection (4).

2. First State's exhibits included a proposed QIP submitted on May 24, 2001, and a revised QIP submitted on June 6. Mr. Curatola's declaration states that First State submitted the unapprovable QIP on May 2; apparently this statement was meant to refer to the proposed QIP submitted on May 24, 2001.

3. First State's arguments, particularly with respect to approval of personnel policies, suggest that actions taken in May 2002 after the 2002 Review should be considered timely. The record indicates, however, that First State received the report of the 2001 Review on April 24, 2001. First State Ex. 6 (FAX marks at top). Moreover, First State acquiesced in ACF performing the follow-up review in April 2002.

4. With its post-hearing reply brief, First State submitted two proposed exhibits, which we admit,

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL    Document 20-5    Filed 03/03/2008    Page 53 of 56

since they address issues not clearly raised previously. First State Exs. 75, 76.

5. ACF also relied on language in this Board's decision in Utica Head Start Children and Families, Inc., DAB No. 1749 (2000), referring to whether a grantee had "fully corrected" or "fully and adequately corrected" a deficiency. In that case, however, the Board was not addressing the issue raised here, nor was it addressing any non-compliance that fit the definition of "deficiency" under section 1304.3(a)(6)(C) on the basis of failure to substantially perform.

6. This position was referred to as both the Head Start Director and the Head Start Administrator.

7. In questioning at the hearing, First State also tried to suggest that ACF had a general bias against community action agencies, such as First State. First State did not elicit any testimony to support this implication, however.

8. ACF said, and Mr. Curatola's testimony indicates, that ACF retracted this finding because ACF's 2001 Review report identified it as a non-compliance rather than a deficiency, meaning that First State should have been afforded an opportunity to correct it before it would be considered a deficiency. Tr. at 312-14; ACF Ex. 3. In light of reports of staff members involved in the application process during two interviews in 2002 and First State's recruitment procedure checklist showing that social security numbers were required during enrollment, ACF had a basis for its finding on this issue, notwithstanding statements from First State management during the exit interview that First State's policy was not to require social security numbers. Tr. at 315-19, 693-95. First State alleged that one of its Family Resource Coordinators denied to her supervisor that she had told the ACF reviewer about having rejected a child for lack of a social security number, but First State did not present testimony from the Family Resource Coordinator involved or from any others involved in the group interview. Tr. 694-95, 700.

9. ACF has published the Program Performance Standards from 45 C.F.R. Parts 1301 through 1311 in a document that includes ACF's rationale and guidance for each provision, as well as sources of related information. We refer to this document as the Guidance. It is available on the Internet at http://www2.acf.dhhs.gov/programs/hsb/pdf/1304_ALL.pdf and http://www.acf.dhhs.gov/programs/hsb/performance/index.htm.

10. ACF subsequently withdrew its finding regarding one of these children. ACF Post-Hearing Br. at 9.

11. The self-assessment report stated that First State was using the HSFIS to maintain files on children. First State Ex. 11, at 156. First State's progress report submitted April 9, 2002 indicated that First State's efforts to implement the HSFIS, although delayed beyond the dates specified in the QIP, had been completed as of the end of March 2002. ACF Ex. 7, at 27. These reports conflict with Mr. Hill's testimony at the hearing, and are unsupported.

12. The Health Coordinator claimed only to have sent letters for hearing and vision screenings. Mentzer Decl. at ●● 6, 8. While a Head Start grandparent testified that she had received a letter regarding her granddaughter's dental screening, she did not say when this occurred, and she had other grandchildren who attended Head Start in other than the 2001-2002 year. Baker Decl. at ●● 1-2. Another parent remembered letters only for visual and hearing screening. Ayers Decl. at ● 2. One reviewer did note such a letter in the file for needed dental follow-up for one child (initials J. W.). Tr. at 652 (Wirth), referring to ACF Ex. 11, at 12. Her notes for the other children she reviewed who needed dental follow-up do not record any such letter, though, and her notes instead indicate that some of the children did not even get the initial dental screening. ACF Ex. 11, at 12-16.

13. The Family Resource Coordinator's notes indicate that she informed the "HEAD START nurse" about the asthma attack, and later about the child using an inhaler. Id. First State submitted no

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL     Document 20-5     Filed 03/03/2008     Page 54 of 56

evidence, however, that the Health Coordinator recorded this information in the file, developed any follow-up plan, or made any contact with the parent.

14. Brenda Ayers testified that, when her child was absent with a broken arm during the 2001-2002 school year, "her teacher called to check on her and then called to make sure she kept her appointment." Ayers Decl. at • 4.

15. As part of its argument that ACF had failed to provide notice of and opportunity to correct deficiency findings, First State argued that ACF improperly changed this deficiency finding from having no contract for a mental health professional to having a contract that was inadequate. We reject this argument. It is perfectly proper for ACF to comment on whether evidence put forward by a grantee to dispute deficiency findings is the type of evidence required to show that a deficiency was corrected.

16. First State alleged that Drs. Rosas and Lesko testified that the CCP was designed for Head Start programs and was relied upon to meet the mental health requirements under the Head Start regulations. First State Post-Hearing Br. at 16, citing Tr. at 640, 644. The cited transcript pages, however, are testimony by Jim Lesko, and Dr. Rosas's testimony was that it was not his office's intention to serve as a mental health consultant or to provide a regular schedule of on-site mental health consultation by a mental health professional. Tr. at 451-52.

17. First State argued that ACF Guidance supported First State's view that, merely by entering into contracts with CCP and other organizations, it met the requirement for "securing the services of a mental health professional on a schedule of sufficient frequency . . . ." We disagree. The Guidance contemplates services of a mental health professional on a schedule "frequent enough to allow the mental health professional to become familiar with the needs of children requiring assistance, to provide information and consultation, and to help locate any needed treatment or services in a timely fashion." Guidance at 121; First State Ex. 50, at 573. Unless the contract specifies a schedule (which the CCP contract did not), a grantee would have to take other steps to secure the services on a schedule meeting the standard in the Guidance. While the Guidance provides some flexibility for a judgment on what is frequent enough, it does not contemplate no schedule at all.

18. Ms. Sowers seemed to imply that Program Development Specialists could request ICPS "classroom consultations" as well as PBS consultations, but her testimony on this was unclear and conflicts with the wording of the contract. In any event, she did not in fact claim to have requested such consultations for any classroom.

19. We note that First State did not claim that the Policy Council ever approved the CCP contract. If First State was viewing the CCP as its mental health consultant, rather than merely a means of obtaining training, then such approval should have been sought and obtained.

20. First State provided some testimony that it had always had a contract with the CCP in effect, but the only other contract with the CCP that it submitted was signed in August 2000 and provided for training from September 2000 through May 2001. First State Ex. 44.

21. The organizational chart shows four head teachers and 15 other teachers, as well as 15 aides. First State Ex. 64.

22. While CCP records identified Ms. Stalvey as a teacher, documentation from the review identifies her as an aide to teacher Leonia Robinson and also indicates that Wanda Webb may have been on maternity leave for part of the year. ACF Ex. 21. ACF notes also indicate that Heather Morrow, one of the teachers who received the PBS training, resigned in March 2002. Id.

23. The QIP said that First State would register its teachers for PBS training by October 2001, and this would be evidenced by registration forms. The registration forms First State provided are

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL    Document 20-5    Filed 03/03/2008    Page 55 of 56

undated, and First State provided no evidence about when the registration occurred. First State Ex. 14. ACF presented evidence that ICPS and PBS training both were provided by the CCP in Sussex County in classes starting in October. ACF Ex. 15. First State did not explain why its teachers were not enrolled in these classes, but we note that the contract with the CCP was not signed until November 2001.

24. Although this note does not appear on one of the copies of this document in the record, we accept Ms. Sowers' explanation about why.

25. Reviewer Jim Lesko testified that if a Head Start agency suspected that a child had a disability and could not obtain services from the LEA, the Head Start agency had an obligation to follow through with an evaluation of the child and, if services were needed, to pay for such services itself. ACF did not provide requested support for this testimony, but, in any event, the documentation undercuts First State's assertions that it had an effective referral system.

26. Trish Sowers testified that she recalled few instances over the years of a child needing referral for therapy from the CCP program. It appears from her later clarification, however, that she meant she only recalled a few times she needed to rely on the Director of the CCP as a resource for obtaining referral to a mental health provider for treatment, after an intervention by CCP, or based on a problem other than behavioral. Tr. at 770-771. One of the roles of the mental health professional, however, is to evaluate whether such a referral is needed. If the mental health professional is not observing the children, or at least regularly being informed of staff and parental concerns, it may be that the need for referral to a provider is simply not being recognized.

27. The Guidance indicates that policy groups are Policy Councils at the grantee agency level, and Policy Committees at the delegate agency level. Guidance at 159.

28. The 2001 Report consolidated ACF's findings regarding program governance that are currently on appeal with several findings under provisions of 42 C.F.R. • 1304.50 that were deemed corrected in the 2002 Review and are not at issue here.

29. The QIP cited sections 1304.50(d)(1)(i)-(iii), which were not at issue in the 2002 Review or in this appeal. However, the corrective steps outlined do relate to the outstanding program governance deficiencies. The QIP described the deficiency as "[t]he grantee does not have a system in place that ensures the governing bodies, the Board of Directors and the Policy Council, participate in key decision making and oversight of the program." The "Expected Outcome" was "Grantee will devise and implement a system that ensures that the Board of Directors and Policy Council participate in key decision-making and oversight of the program." First State Ex. 10, at 120.

30. First State also argued that there was no mention of personnel policies in the 2001 Report, and that it thus had not been given sufficient notice and opportunity to correct the deficiency. However, the 2001 Report did mention personnel policies, stating that the Policy Council had not worked in partnership with key management staff and the governing body to develop, review and approve (or disapprove), among other things, "program personnel policies." ACF Ex. 3, at 11.

31. This number includes Pearl Maull, who signed in the space for "Community Representatives" (and not in the "FSCAA Board Members" space) for 3 of those meetings, but who is listed as a Board member from Sussex County on First State letterhead, and who signed in the space for Board member (and in the space for Community Representatives) at the July 31, 2001 meeting. First State Exs. 17, at 192; 23, at 225; 62; 36, at 324; at 842, 852; ACF Ex. 7, at 1.

32. The minutes of seven parent meetings that First State provided include a space to be checked "yes" or "no" as to whether a Policy Council report was given; on none of the minutes is "yes" checked; on two of the minutes "no" is checked, on three neither space is checked, including one

2003.05.01 DAB1877 First State Community Action Agency, Inc.

Case 1:07-cv-01835-RCL    Document 20-5    Filed 03/03/2008    Page 56 of 56

where spaces immediately above indicating whether center and social services reports were made are checked, and one where "yes" was checked for both center and social services reports, a line was drawn through both the Policy Council "yes" and "no" spaces. First State Ex. 57, at 712, 732, 736, 745, 754, 763, 764.

33. The record indicates that a decision was made by the new Head Start Director not to implement the curriculum with child outcomes that had been approved by the Policy Council and was also included in the goals allegedly developed as part of the Self-Assessment process. Curatola Decl. at • 44. The Policy Council minutes do not show any approval of this change.

34. Under the organizational structure regulation, the 2001 and 2002 Review Reports included findings related to the lack of mental health services and bilingual classroom staff that we address in other sections of this decision.

35. The record indicates that the Child Development Administrator both acted as the Head Start Director and had broader responsibilities for other child-related programs First State ran.

36. In support of this position, Jim Lesko testified that the Delaware Office of Childcare Licensing uses whole building size in the working square footage while Head Start looks at a direct space that the child would directly work within (such as a classroom space). Tr. at 631.

37. It appears that Delaware would allow sleeping space to be included, whereas the federal Guidance calls for excluding areas where there are cribs. There was no allegation in this case, however, that cribs were present in the space.

CASE | DECISION | ANALYSIS | JUDGE | FOOTNOTES

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

CAMDEN COUNTY COUNCIL                        )
  ON ECONOMIC OPPORTUNITY,                   )
538 Broadway                                 )
Camden, NJ 08103                             )
                                             )
        Plaintiff,                        )
                                             )
     v.                                    )        Civil Action No.: 1:07-cv-01835-RCL
                                             )
UNITED STATES DEPARTMENT OF                  )
  HEALTH AND HUMAN SERVICES,                 )
200 Independence Avenue, S.W.                )
Washington, D.C. 20201,                      )
                                             )
     and                                  )
                                             )
MICHAEL LEAVITT, Secretary,                  )
  U.S. Department of Health and              )
  Human Services,                            )
200 Independence Avenue, S.W.                )
Washington, D.C. 20201,                      )
                                             )
        Defendants.                       )
_____)

## PROPOSED ORDER

Upon consideration of the parties' cross-motions for summary judgment and supporting

memoranda, Defendants' motion for summary judgment is hereby DENIED and Plaintiff's

cross-motion for summary judgment is hereby GRANTED.  Defendant's termination of

Plaintiff's federal financial assistance under the Head Start Act (42 U.S.C. §§ 9831-9852), and

September 25, 2007 decision of the Departmental Appeals Board of the U.S. Department of

Health and Human Services upholding that termination are hereby reversed.

SO ORDERED this ___ day of _____, 2008


By:    _____
       United States District Judge